## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| BOBBY ROE and DONALD M. CHRISTENSON, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................1

II.  JURISDICTION AND VENUE ...................................................7

III. PARTIES ....................................................................................8

    A.   Plaintiffs ...........................................................................8

    B.   Defendant ..........................................................................9

IV.  FACTUAL ALLEGATIONS ....................................................10

    A.   Chain-Driven Water Pumps ............................................10

    B.   The Water Pump Defect ..................................................14

    C.   Defendant Touted Reliability, Quality and Safety in Its Marketing and Advertising ............................................20

    D.   Defendant's Knowledge of the Defect and Associated Safety Risk ....................................................................23

V.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL. ....................................................................34

VI.  CLASS ACTION ALLEGATIONS ..........................................35

VII. CLAIMS FOR RELIEF ............................................................40

VIII. PRAYER FOR RELIEF ............................................................69

IX.  DEMAND FOR JURY TRIAL .................................................70

The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel:[1]

## I.   INTRODUCTION

1.     Ford Motor Company ("Ford" or "Defendant") informs consumers that its vehicles are "Built Ford Tough," and touts the quality, reliability and safety of its vehicles.  Ford's customers rely on these representations when they decide to lease or purchase vehicles sold under the Ford, Lincoln and Mercury brand names.

2.     Yet, for more than a decade Ford has failed to inform its customers that its vehicles incorporating the Ford Cyclone engine, branded as the *Duratec* engine (the "Cyclone Engine"), contain a defect in design, manufacturing, materials and/or workmanship that causes the water pump to suddenly and prematurely fail—before the end of the useful life of the engine—and can lead to catastrophic engine failure (the "Water Pump Defect").

3.     Beginning in 2007 and continuing through the present, Ford has equipped millions of vehicles sold under the Ford, Lincoln and Mercury brand names with the Cyclone Engine (the "Class Vehicles").  Unbeknownst to purchasers

---

[1]     Counsel's investigation includes an analysis of publicly available information, including consumer complaints to the National Highway Traffic Safety Administration ("NHTSA") and additional analysis.  Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

and lessees of the Class Vehicles at the time of purchase or lease, the Class Vehicles contain the Water Pump Defect.

4.     Plaintiffs Bobby Roe and Donald M. Christenson ("Plaintiffs") bring this class action against Ford, individually and on behalf of all persons or entities in the United States who purchased, leased or own a Class Vehicle, asserting claims for fraudulent concealment, negligent misrepresentation, breach of express and implied warranties, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, unjust enrichment and violations of the Arkansas and Washington consumer fraud statutes on behalf of the Sub-Classes (defined below).

5.     The Cyclone Engine contains an internal chain-driven water pump, which means the timing chain is connected to the water pump and provides the power the water pump needs to circulate coolant through the engine when the engine is running.

6.     The chain-driven water pump in the Class Vehicles is located inside the Cyclone Engine, behind numerous engine components, including the timing chain cover.  As a result of the Water Pump Defect, coolant leaks from the water pump directly into engine parts or the oil pan, destroying essential engine components or mixing with the engine's oil.  In many cases, this mixture of engine oil and coolant is carried throughout the engine leading to destruction of the engine.  Indeed,

catastrophic engine failure with little to no warning has been reported in the Class Vehicles.

7. An internal chain-driven water pump, such as that contained in the Class Vehicles, should last for the useful life of the engine, which in modern vehicles is well over 150,000 miles. Moreover, Ford omitted the water pump from the maintenance schedules for the Class Vehicles, which indicate Ford parts that need to be maintained, repaired or replaced within the first 150,000 miles. Plaintiffs and members of the Classes relied on Ford's representation that the water pump in the Class Vehicles does not require maintenance, repair or replacement before the vehicles are driven 150,000 miles.

8. Based on pre-production testing, design failure mode analysis, warranty claims and consumer complaints to dealers and NHTSA, *inter alia*, Defendant was aware of the Water Pump Defect in the Class Vehicles and fraudulently concealed the defect from Plaintiffs and members of the Classes. Despite the numerous complaints to NHTSA and Ford dealerships, *inter alia*, Ford knowingly, actively and affirmatively omitted and/or concealed the existence of the Water Pump Defect to increase profits by selling additional Class Vehicles and unlawfully transferring the cost of repair or replacement of the water pump and damaged engine parts to Plaintiffs and members of the Classes.

9.    Knowledge and information regarding the Water Pump Defect and the associated safety risk was in the exclusive and superior possession of Defendant and its dealers, and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence.  Notwithstanding this knowledge, Ford continued selling defective vehicles, has failed to disclose the existence of the Water Pump Defect to Plaintiffs and members of the Classes, has not issued a recall and has not remedied the issue and/or compensated Class Vehicle purchasers, owners or lessees for this material defect.

10.    Moreover, no reasonable consumer expects to purchase or lease a vehicle that contains a concealed Water Pump Defect that causes the water pump and/or engine to fail with no advance warning.  This is especially true here given that the water pumps are absent from Ford's maintenance schedules.  The Water Pump Defect is material to Plaintiffs and members of the Classes because when they purchased or leased their Class Vehicles, they reasonably expected that the Class Vehicles would be free from defects and would not contain the Water Pump Defect and corresponding safety risk.  Had Defendant disclosed the Water Pump Defect, Plaintiffs and members of the Classes would not have purchased or leased the Class Vehicles, or would have paid less for their Class Vehicles.

11.    Indeed, the Water Pump Defect presents a significant safety risk for Plaintiffs and members of the Classes because when the water pump suddenly and

unexpectedly fails and causes catastrophic engine failure, Class Vehicles lose engine power, including the ability to accelerate, maintain speed, adequately control the steering wheel and/or fully engage the brakes.  Thus, drivers and occupants of the Class Vehicles are at risk for rear-end collisions and other accidents as a result of Defendant's failure to disclose the existence of the Water Pump Defect and corresponding safety risk.

12.     This hazardous defect has resulted in numerous complaints to NHTSA. For example, numerous Ford customers have reported sudden engine failure while driving as a result of the Water Pump Defect, leading to dangerous on-road situations that could have resulted in accidents.

13.     Ford has shifted costs associated with the Water Pump Defect to the Classes.  Defendant provides warranty coverage for Class Vehicles under one or more manufacturer's warranties.  For illustrative purposes, Defendant currently offers New Vehicle Limited Warranty coverage for Class Vehicles sold under the Ford brand (and offered the same for Class Vehicles sold under the Mercury brand until the brand was discontinued) for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles.[2]  Notwithstanding

---

[2]     *See* Exhibit A (Ford Cars and Trucks 2018 Model Year Warranty Guide); Exhibit B (Mercury Cars and Trucks 2009 Model Year Warranty Guide).  For the Class Vehicles sold under the Lincoln brand name, Defendant has provided New Vehicle Limited Warranty coverage for the Class Vehicles for 4 years or 50,000

the fact that the water pump should not fail in Class Vehicles for at least 150,000 miles and that Defendant concealed the Water Pump Defect, on information and belief, Ford has refused to repair or replace the water pump (and corresponding damaged engine parts) outside of the time periods covered by the manufacturer's warranties.

14.    Defendant breached its express and implied warranties through which it promised to, *inter alia*, (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the water pump and corresponding damaged engine parts.  Because the Water Pump Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, Defendant is required to repair or replace the water pump and corresponding damaged engine parts resulting from the Water Pump Defect under the terms of the warranties.  Yet, on information and belief, Ford has failed to repair or replace the defective and damaged parts free of charge under its warranties.

15.    Given the latent nature of the Water Pump Defect, Defendant knew or should have known that the majority of water pump failures likely would occur outside of the warranty periods and has wrongfully transferred the costs of repair or

---

miles and extended warranty coverage for Powertrain components for 6 years or 70,000 miles.  *See* Exhibit C (Lincoln 2012 Model Year Warranty Guide).

replacement to Plaintiffs and members of the Classes through Defendant's fraudulent concealment of the defect. These costs are significant and range in the thousands of dollars, and no reasonable consumer expects to incur such costs during the useful life of the engine, especially given Defendant's representations in the maintenance schedules.

16.     As a result of the Water Pump Defect and the placement of the water pump internal to the Cyclone Engine, repair or replacement of the water pump—which retails for under $200—can lead to Plaintiffs and Class members being forced to pay over $1500 for replacement of the water pump or as much as $8500 to replace a destroyed engine.

17.     Thus, as a direct result of Defendant's unlawful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to, *inter alia*, actual damages, including damages for diagnosis, repair and/or replacement of the water pump, damaged engine parts or the entire engine, damages for the diminished value of their vehicles, compensatory, statutory and punitive damages, attorneys' fees, costs, restitution and/or injunctive and declaratory relief.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100

members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendant and greater than two-thirds of the members of the Classes reside in states other than the state in which Defendant is a citizen.  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson-Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

19.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant maintains operational facilities in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, because Defendant conducts a substantial amount of business in this District and because Defendant is headquartered in this District.  Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.

## III.   PARTIES

### A.     Plaintiffs

20.     Plaintiff Bobby Roe is a citizen of the State of Arkansas.  In April 2018, Plaintiff Roe purchased a 2011 Ford Edge in Sherwood, Arkansas for personal, family or household purposes.  On or about July 19, 2018, Mr. Roe's vehicle suffered immediate catastrophic engine failure while he was driving on a highway due to the

Water Pump Defect in his Class Vehicle, without any prior warning that there was a problem with the vehicle's engine.  The engine failure was diagnosed as the result of a failed water pump and occurred at or around 95,000 miles.  As a result of the Water Pump Defect, Plaintiff Roe was forced to pay at least $1200 to replace his failed engine with a used engine.

21.     Plaintiff Donald M. Christenson is a citizen of the State of Washington. In 2012, Plaintiff Christenson purchased a 2011 Ford Edge in Spokane, Washington for personal, family or household purposes.   At or around 63,500 miles, Mr. Christenson's vehicle suffered immediate catastrophic engine failure due to the Water Pump Defect in his Class Vehicle, without any prior warning that there was a problem with the vehicle's engine.  As a result of the Water Pump Defect, Plaintiff Christenson was forced to pay nearly $7600 to have his engine replaced with a new engine.

### B.     Defendant

22.     Defendant Ford Motor Company is a Delaware corporation, with its corporate headquarters located in Dearborn, Michigan.

23.     Ford designs, engineers, manufactures, markets and/or sells vehicles throughout the United States, through its network of authorized motor vehicle dealers.   Ford engages in interstate commerce by selling vehicles through its

authorized dealers located in every state of the United States, including within this District.

24.    At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased and warranted the Class Vehicles, containing the defect described herein, throughout the United States.  Defendant developed and disseminated the owner's manuals and warranty booklets, maintenance schedules, advertisements and other promotional materials relating to the Class Vehicles.

25.    On information and belief, at all times relevant to this action, Defendant made decisions related to advertising, marketing, maintenance schedules, sales, warranties and recalls of the Class Vehicles at its Dearborn, Michigan headquarters, which is located within this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Chain-Driven Water Pumps

26.    Chain-driven water pumps are relatively new to the automobile industry.  Historically, water pumps were located external to the engine block and driven by an accessory belt drive system.  When such external water pumps fail, notice is provided to the driver of the vehicle in the form of coolant leaking onto the ground, steam coming from the engine, or dashboard warning lights indicating that the vehicle is overheating.

27.    More recently, automakers have attempted to remove items, including the water pump, from the accessory drive belt in order to improve engine efficiency.

28.    A chain-driven water pump is located within the engine block behind the timing chain cover and relies on the timing chain to deliver its power, as shown in the image below (the water pump is labeled "13"):



29.    An engine's timing chain is driven by the crankshaft and turns the camshaft, keeping it in sync with the crankshaft.  The timing chain is constantly lubricated by oil, to ensure that it operates smoothly and without friction.  On certain vehicles, including the Class Vehicles, the timing chain is connected to the water

pump and provides the power the water pump needs to circulate coolant through the engine when the engine is running.

30.     A water pump can circulate up to 7,500 gallons of coolant per hour, which is required to prevent the engine from overheating.  A typical water pump is made up of numerous components, including, *inter alia*, a shaft, bearing assembly, seal, gasket, housing that encases the water pump and a weep hole designed to let a small amount of leaked coolant escape rather than being forced into the water pump bearing assembly.  Failure of one or more of the above components, *inter alia*, may lead to water pump failure, which can cause the engine to overheat or coolant to leak into engine parts or oil, causing catastrophic engine failure.

31.     Beginning in 2007, with the Cyclone Engine, Ford began using an internal chain-driven water pump, which it incorporated into the Class Vehicles.  The Cyclone Engine, shown below, uses a double overhead camshaft ("DOHC") configuration with two camshafts connected to the crankshaft by a timing chain to ensure that the operating cycle is timed correctly.  The chain-driven water pump is circled in the photo below:



32.     The engine cooling system in the Cyclone Engine, including the water pump, is intended to be a closed system, so that the coolant does not leak into engine parts or mix with the engine's oil and circulate throughout the engine.

33.     However, when the water pump fails in the Class Vehicles, coolant is able to escape from the closed system and leak into other engine parts, including, *inter alia*, the timing chain, crankcase and/or oil pan, where it mixes with the engine's oil.  If coolant mixes with engine oil, that mixture is then carried throughout the other parts of the engine, where it causes friction and leads to catastrophic engine failure.

13

**B.     The Water Pump Defect**

34.     Defendant is a manufacturer of vehicles sold under the Ford, Lincoln and Mercury brand names throughout the United States. Defendant designed, manufactured, imported, distributed, marketed and/or sold the Class Vehicles in the United States.  Defendant also provides service and maintenance for the Class Vehicles through its extensive network of authorized dealers and service providers nationwide.

35.     Each of the Class Vehicles is equipped with the Cyclone Engine, which was introduced by Ford in 2007, and incorporated into millions of Class Vehicles. Plaintiffs and members of the Classes purchased, leased and/or own Class Vehicles that contain the Water Pump Defect, which causes premature failure of the water pump and the need to repair or replace the water pump at a cost of over $1500.  The Water Pump Defect can also lead to catastrophic engine failure, requiring thousands of dollars to repair or replace the entire engine.

36.     The Cyclone Engine, and the Class Vehicles which are equipped with the engine, contain the Water Pump Defect, which is the result of defects in design, manufacturing, materials and/or workmanship.  By designing, manufacturing, assembling, inspecting, distributing, selling and leasing the Class Vehicles with the Water Pump Defect, Ford rendered the Class Vehicles defective and unsafe for their intended use and purpose.

14

37.    The engine cooling system in the Class Vehicles is designed, engineered and/or manufactured in a manner that causes coolant from a failed or failing water pump to leak into engine parts, including, *inter alia*, the timing chain, crankcase and/or oil pan.  The Water Pump Defect can also allow coolant to mix with the engine oil and instantaneously spread throughout the entire engine.  This causes immediate catastrophic engine failure, without the operator of the vehicle having any notice that the water pump failed and that the vehicle should no longer be driven and needs to be serviced.

38.    As shown below, this mixture of oil and coolant resulting from the Water Pump Defect has been described as a "chocolate milk" substance, which is devastating to an engine:



39.     Once this substance is spread throughout an engine, the engine will cease, and replacement of the entire engine is required.  This often occurs while the vehicle is being driven, with no warning to drivers of the Class Vehicles and poses a safety risk.

40.     Ford provides no warning to Plaintiffs and members of the Classes regarding the Water Pump Defect and associated safety risk.  Rather, Ford publishes owner's manuals and maintenance schedules that do not disclose that the water pump should be repaired or replaced during the first 150,000 miles of the Class Vehicles'

lives.[3]  Ford's maintenance schedules inform customers of the parts that are required to be maintained or replaced at certain intervals, up to 150,000 miles, and wholly omit the water pump.  As such, Ford represents that the water pump is expected to last for the useful life of the engine, or at least 150,000 miles, without the need for maintenance, repair or replacement.  As a result, Plaintiffs and members of the

---

[3]      *See, e.g.*, Exhibit D (2007 Model Year Scheduled Maintenance Guide); Exhibit E (2008 Model Year Scheduled Maintenance Guide); Exhibit F (2009 Model Year Scheduled Maintenance Guide); Exhibit G (2010 Model Year Scheduled Maintenance Guide); Exhibit H (2011 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2011/Ford/Explorer/31 (a screenshot of this interactive website showing the suggested maintenance at 150,000 miles has been provided); Exhibit I (2012 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2012/Ford/Explorer/31 (same); Exhibit J (2013 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2013/Ford/Explorer/31 (same); Exhibit K (2014 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2014/Ford/Explorer/31 (same); Exhibit L (2015 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2015/Ford/Explorer/31 (same); Exhibit M (2016 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2016/Ford/Explorer/31 (same); Exhibit N (2017 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2017/Ford/Explorer/31 (same); Exhibit O (2018 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2018/Ford/Explorer/31 (same).

Classes rely on Ford's representations that the water pumps in the Class Vehicles do not need to be repaired or replaced before the Class Vehicles reach 150,000 miles.

41.      Replacement water pumps for the Cyclone Engine, one of which is shown below as 8501, retail for less than $200:[4]



42.      However, the location of the water pump in Class Vehicles makes it both time-consuming and extremely expensive to replace the water pump. Numerous engine components, including, *inter alia*, the timing chain, guides and cover, have to be removed in order to access the water pump. Given the internal

---

[4]      *See* Exhibit P (Pump Assy – Water), available at: https://parts.ford.com/shop/en/us/pump-assy-water-6347575-1 (last accessed August 14, 2018).

placement of the water pump, replacing the water pump in the Cyclone Engine requires between 12-14 hours of work at an expense of over $1500.

43.     While exorbitant, this expense pales in comparison to the expense of replacing the entire engine as a result of the Water Pump Defect, as depicted in the image below, which can cost as much as $8500 for a new engine.



44.     As alleged herein, Plaintiffs and members of the Classes unknowingly purchased or leased vehicles that contain the Water Pump Defect and suffered actual damages and diminished market value related to their purchase or lease of the Class Vehicles as a direct result of Defendant's omissions regarding the standard, quality or grade of the Class Vehicles and/or the existence of the Water Pump Defect and

its associated safety risk. The fact that the Class Vehicles contain the Water Pump Defect is material to Plaintiffs and members of the Classes because it leads to exorbitant repair or replacement costs, diminishes the value of the Class Vehicles and exposes drivers and passengers of the Class Vehicles to a safety risk. Plaintiffs and members of the Classes experienced the Water Pump Defect within the warranty periods.

45. As a result of Defendant's fraudulent concealment and material omissions, including its failure to disclose the presence of the Water Pump Defect in the Class Vehicles, Defendant has caused Plaintiffs and members of the Classes to suffer actual damages, including, but not limited to, out-of-pocket expenses and the diminished value of their vehicles.

**C.    Defendant Touted Reliability, Quality and Safety in Its Marketing and Advertising**

46. Defendant purports to build reliable, high quality and safe vehicles. Defendant's customers are well aware of Ford's slogan it uses to describe its vehicles—"Built Ford Tough":



47.     Specifically, Ford represents to consumers that "[i]mproving quality is a daily priority at Ford" and that "[f]rom design and manufacture to sales and service, Ford always aims to increase customer satisfaction."[5]   Defendant further informs consumers that it has "a longstanding commitment to developing and implementing innovations that make our vehicles safer for our customers and their families."[6]

48.     Similarly, Defendant has stated that "[s]afety continues to be one of the highest priorities in the design of our vehicles, and quality is a critical aspect of customer safety – and therefore of our responsibilities and success as a company" and that the Company "continue[s] to produce high-quality, smart, clean and safe vehicles."[7]

49.     Likewise, Defendant has stated that "[q]uality is at the heart of everything we do, and it drives ongoing improvements across all functions while delivering high-quality vehicles that our customers want and value."[8]

50.     In advertising for Class Vehicles on Ford's website during the times in which the vehicles were sold, Defendant repeatedly touted the safety of the Class

---

[5]     Exhibit   Q   (Our   Company,   Ford),   available   at: https://corporate.ford.com/company.html (last accessed August 14, 2018).

[6]     *Id.*

[7]     Exhibit   R   (2017-18   Sustainability   Report),   available   at: https://corporate.ford.com/content/dam/corporate/en/company/2017-18-Sustainability-Report/sr17.pdf (last accessed August 14, 2018).

[8]     *Id.*

Vehicles, claiming for example, *inter alia*, that the 2010 Ford Edge was a "Top Safety Pick," the 2010 Ford Explorer offered "Five Star Safety" and the 2012 Ford Flex included "advanced safety features":







51.    Defendant makes such claims while knowing that it is selling and has sold hundreds millions of Class Vehicles equipped with the Water Pump Defect and corresponding safety risk.

**D.    Defendant's Knowledge of the Defect and Associated Safety Risk**

52.    Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the defect in the Class Vehicles even though Defendant knew or should have known of the Water Pump Defect in Class Vehicles.

53.    Knowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford and its dealers, and that information

23

was not provided to Plaintiffs and members of the Classes.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Water Pump Defect in the Class Vehicles and fraudulently concealed the defect and safety risk from Plaintiffs and members of the Classes.

54.     Defendant knew, or should have known, that the Water Pump Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within the applicable warranty periods.

55.     Notwithstanding Defendant's exclusive and superior knowledge of the Water Pump Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles containing the defect.  Defendant intentionally concealed that the Water Pump Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

56.     Consumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA reporting the Water Pump Defect, describing the need to pay exorbitant amounts to repair or replace the water pump and damaged engine parts and detailing their experiences of catastrophic engine failure, which put the safety of drivers and their passengers at risk.

57.     Federal law requires Ford to monitor defects which can cause a safety issue and report them within five (5) days.  Ford regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the defect through these complaints, *inter alia*.

58.     Below is a small sample of consumer complaints made to NHTSA regarding the Water Pump Defect in Class Vehicles:

- **March 12, 2015 – 2008 Ford Edge**
  NHTSA ID Number: 10693918
  Incident Date March 5, 2015
  Consumer Location NORTHVILLE, MI
  Vehicle Identification Number 2FMDK38C98B****
  **Summary of Complaint:**
  THE WATER PUMP IS LOCATED INSIDE THE ENGINE AND WHEN A SIMPLE $160 PART FAILED, IT CIRCULATED ANTI-FREEZE THROUGH THE ENGINE NECESSITATING A COMPLETE ENGINE REPLACEMENT.

  THIS HAPPENED WITHIN THE SPAN OF 5 MINUTES WITH THE FIRST SYMPTOM THE HEAT WENT OFF INSIDE THE CABIN. NO ENGINE LIGHTS CAME ON, THE HEAT CAME BACK ON AND WENT OFF AGAIN, STILL NO INDICATION OF ENGINE OR TROUBLE LIGHTS GOING ON. THEN MAJOR ENGINE FAILURE, INSTANTLY THE OIL LIGHT WENT ON AND

WITHIN SECONDS THE MOTOR OVERHEATED. THERE WAS A TERRIBLE NOISE AS I FOUND MY WAY TO A SAFE SPOT TO STOP THE CAR.

THIS IS THE MOST BASIC KIND OF IRRESPONSIBILITY IN CREATING AN EXPENSIVE PRODUCT LIKE A CAR. AMERICAN COMPANIES OWE IT TO THE PUBLIC NOT TO FOIST A HUGE DESIGN DEFECT ON AN UNSUSPECTING PUBLIC AND SHOULD WILLINGLY PAY 100% OF ANY AND ALL CLAIMS FOR THIS ISSUE. *TR

- **October 6, 2015 – 2010 Ford Fusion**
  NHTSA ID Number: 10780007
  Incident Date September 12, 2015
  Consumer Location DELMAR, NY
  Vehicle Identification Number 3FAHP0DC7AR****
  **Summary of Complaint:**
  WHILE DRIVING I NOTICED THE TEMP GAUGE WAS ON HIGH. NO WARNING LIGHTS PRECEDING THIS AND NOW LOW COOLANT ALARM. TURNED A CORNER TO PULL OFF AND BEFORE I COULD, CHECK ENGINE LIGHT CAME ON AND ENGINE SHUDDERED TO A STOP CAUSING ME TO LOOSE STEERING AND BRAKES. WITH NO WARNING ENABLING ME TO EITHER CHECK THE CAR OUT, OR SAFELY GET OFF THE ROAD. THE WATER PUMP WHICH IS INSIDE THE ENGINE FAILED. IT HAS CONTAMINATED THE OIL NOW REQUIRING AN ENTIRE NEW ENGINE. ON SEARCHING GOOGLE FOR THE FORD 3.5L V6 ENGINE THIS APPEARS TO BE A HUGE PROBLEM WITH THESE ENGINES AND ITS DESIGN. I CANT IMAGINE WHAT WOULD HAPPEN SHOULD IT FAIL WITHOUT WARNING AT HIGHWAY SPEEDS.

- **December 18, 2015 – 2010 Ford Flex**
  NHTSA ID Number: 10811218
  Incident Date December 15, 2015
  Consumer Location LAKE ELSINORE, CA
  Vehicle Identification Number 2FMHK6CC9AB****
  **Summary of Complaint:**
  WHILE WAITING AT A LIGHT IN MY 2010 FORD FLEX THE ENGINE WAS IDLING ROUGH, AFTER THE SIGNAL TURNED

GREEN THE POWER SEEMED LOW AND SLUGGISH AS I ACCELERATED. WHEN I WAS AT ABOUT 45 MPH THE ENGINE POWER RETURNED AND SEEMED MORE NORMAL, SUDDENLY WITHOUT NOTICE THE ENGINE TURNED OFF AND ALL DASH LIGHTS ILLUMINATED. I WAS ABLE TO PULL INTO A DRIVE WAY BUT WAS VERY HARD AS THERE WAS NO POWER STEERING. I WAS ABLE TO COAST TO A STOP SAFELY. ONCE STOPPED THERE WAS A VERY STRONG SMELL OF COOLANT. I OPENED THE HOOD AND FOUND A LARGE AMOUNT OF COOLANT ON RIGHT SIDE OF ENGINE. MY CAR WAS TOWED TO MY HOME TO FIGURE OUT WHAT THE ISSUE COULD BE. ON FURTHER INSPECTION IT IS SUSPECTED THAT THE WATER PUMP FAILED WHICH IS INTERNAL TO THE TIMING CHAIN COVER AND THEREFORE DUMPED A LARGE AMOUNT OF COOLANT INTO THE CRANKCASE WHICH THEN CONTAMINATED THE ENGINE OIL AND OVER FILLED THE OIL PAN. I WAS FORTUNATE THAT THIS OCCURRED ON A CITY STREET AND NOT ON THE FREEWAY AS THIS COULD HAVE CAUSED A MAJOR ACCIDENT. ON FURTHER RESEARCH I HAVE FOUND THIS HAS OCCURRED MANY TIMES. THE ENGINE IN QUESTION IS THE CYCLONE ENGINE AND IS FORDS LATEST V6 FAMILY OF GASOLINE ENGINES INTRODUCED IN 2006, AND IS KNOWN AS THE DURATEC 35 WHICH DISPLACES 3.5 L, THE DURATEC 37 WHICH DISPLACES 3.7L AND THE ECOBOOST 35 WHICH IS A TWIN TURBO CHARGED VARIANT OF THE DURATEC 35, THESE ENGINES ARE INSTALLED IN THE FOLLOWING VEHICLES, 2007–PRESENT FORD EDGE, 2010–2012 FORD FUSION SPORT, 2011–PRESENT FORD MUSTANG, 2009–PRESENT FORD FLEX, 2010–PRESENT FORD TAURUS SHO, 2013–PRESENT POLICE INTERCEPTOR SEDAN, 2011–PRESENT FORD EXPLORER, 2013–PRESENT FORD POLICE INTERCEPTOR UTILITY, 2011–PRESENT FORD F-150, 2015–PRESENT FORD EXPEDITION/EXPEDITION EL, 2014–PRESENT FORD TRANSIT, 2015–PRESENT LINCOLN NAVIGATOR/NAVIGATOR L, 2010–PRESENT LINCOLN MKS, 2010–PRESENT LINCOLN MKT, 2007–PRESENT LINCOLN MKX, 2007–PRESENT MAZDA CX-9(MZI).

- **February 16, 2016 – 2011 Ford Edge**
  NHTSA ID Number: 10836546
  Incident Date February 5, 2016
  Consumer Location EUREKA, MO
  Vehicle Identification Number 2FMDK3GC0BB****
  **Summary of Complaint:**
  DRIVING TO WORK ABOUT TEN MILES OF HIGHWAY, MY CAR STARTED RUNNING ROUGH AND SHAKING. I WAS ABLE TO COAST INTO A PARKING LOT THEN MY HEATER STOPPED WORKING A WARNING LIGHT CAME ON "ENGINE COOLANT TEMP" THEN IT DIED COMPLETELY IN A MATTER OF SECONDS, I SAW SOME SMOKE UNDER THE HOOD SO I CALLED FOR HELP. THERE WAS NO OTHER WARNING WHATSOEVER! THE MECHANIC TOLD US THAT THE WATER PUMP HAD GONE OUT AND CAUSED THE ENGINE TO OVER HEAT. IT SHOT COOLANT INTO THE ENGINE AND IT WAS TOTALED. AGAIN THERE WAS ABSOLUTELY NO WARNING AT ALL. NO SENSORS NO ANYTHING. I MAINTAIN MY VEHICLE WITH REGULAR OIL CHANGES ETC. AND IF THERE HAD BEEN ANY WARNING LIGHT I WOULD HAVE TAKEN IT TO MY MECHANIC IMMEDIATELY.

- **July 19, 2016 – 2011 Ford Explorer**
  NHTSA ID Number: 10886023
  Incident Date July 13, 2016
  Consumer Location RESTON, VA
  Vehicle Identification Number 1FMHK8F86BG****
  **Summary of Complaint:**
  LONG STORY SHORT, I PULLED OUT OF MY NEIGHBORHOOD GOT ABOUT A QUARTER OF A MILE DOWN THE ROAD. HEARD THE DRIVE BELT SQUEAL FOR ABOUT 15 SECONDS, FOLLOWED BY CHECK ENGINE LIGHT, AND EXTREME ENGINE KNOCK. THE VEHICLE WAS SHUT OFF IMMEDIATELY. THE CODES READ, CRANKSHAFT/CAMSHAFT CORRELATION BANK A SENSOR 1, THE SECOND CODE WAS ENGINE KNOCK. VEHICLE TOWED TO THE DEALER WERE THEY HAD 2 OF THEIR TOP TECHNICIANS LOOK AT THE VEHICLE AND THE BOTH REPORTED THE WATER PUMP HAD FAILED AND FILLED THE ENGINE UP WITH COOLANT WHICH CAUSE THE ENGINE

28

TO EXPIRE. MY WIFE ONLY HAD THE TRUCK FOR 2 YEARS AND SHE'S VERY CAREFUL DRIVER. NO WOARNING SIGNS OF A FAILING WATER PUMP. JUST GOT BACK FROM A 7HR ROAD TRIP A WEEK BEFORE THE WATER PUMP FAILED AND THE ENGINE EXPIRED.

- **September 14, 2016 – 2011 Ford Taurus**
  NHTSA ID Number: 10906283
  Incident Date September 9, 2016
  Consumer Location BELLEVUE, KY
  Vehicle Identification Number 1FAHP2EW5BG****
  **Summary of Complaint:**
  CATASTROPHIC WATER PUMP FAILURE LEAKED A LOT OF COOLANT IN OIL - DRIVER WAS DRIVING THE CAR ON HIGHWAY WHEN ALL OF SUDDEN THE MOTOR JUST DIED (STALLED), FORCING THE DRIVER TO HARD STEER TO THE SIDE OF HIGHWAY. THE GAUGE AT THE TIME JUST SUDDENLY JUMPED TO H - IN A SPAN OF FEW SECONDS AND ALL DASH LIGHTS ILLUMINATED. VERY LITTLE STEAM WAS COMING OUT - VERY LITTLE FLUID WAS LEAKING. NOTICED SMELL OF COOLANT RIGHT AWAY. LOOKED/DOUBLE CHECKED UNDER THE CAR - LITTLE LEAK AGAIN. IMMEDIATELY THOUGHT MAYBE WATER PUMP OR AT LEAST RADIATOR HOSE LEAK, CHECKED THE COOLANT - IT WAS EMPTY. HAD IT TOWED TO PAUL MILLER FORD IN LEXINGTON. VERY UNFRIENDLY CUSTOMER SERVICE. THEY MENTIONED THAT IT WAS A "CATASTROPHIC ENGINE FAILURE" - COOLANT HAD MIXED IN WITH THE OIL AND WAS PRETTY MUCH SITTING THERE. I WAS VERY FORTUNATE THAT THIS HAS NOT CAUSED A MAJOR ACCIDENT AS I EXPLAINED IT WAS REAL DIFFICULT TO DRIVE THE CAR AFTER IT STALLED. WE FOLLOWED MAINTENANCE SCHEDULE - WE ARE VERY ANAL ABOUT THAT. MY HUSBAND HAS A FORD EXPLORER HIMSELF. I AM JUST AT DISBELIEF THAT WE HAD A ENGINE FAILURE AT 108,000 MILES. I AM NOT SURE IF THIS IS COMMON AMONG THE 3.5L V6 DOHC 24V ENGINE. IT WAS MY UNDERSTANDING THAT FORD HAD DESIGNED THE WATER PUMP TO BE INTERGRAL PART OF THE ENGINE (PRETTY MUCH INSIDE THE ENGINE NOW BEHIND THE TIMING

29

CHAIN COVER, WHERE YOU HAVE TO REMOVE SEVERAL PARTS TO GET TO IT. MOST PEOPLE KNOW WATER PUMP FAILED BUT TO BE A PART OF INTERNAL ENGINE AND TO HAVE IT POUR COOLANT INTO ENGINE, MIXING UP WITH OIL AND SIT IN THE OIL PAN???? HUH? COSTED US SEVERAL GRAND TO GET THE ENGINE REPLACED.

- **November 2, 2016 – 2011 Ford Explorer**
  NHTSA ID Number: 10923775
  Incident Date October 28, 2016
  Consumer Location BASSETT, VA
  Vehicle Identification Number 1FMHK8085BG****
  **Summary of Complaint:**
  HAVE EXTENSIVE ENGINE DAMAGE DUE TO WATER PUMP FAILURE WITH NO WARNING! I WAS DRIVING MY VEHICLE DOWN A MAIN HIGHWAY AND ALL OF A SUDDEN THE "ENGINE COOLANT OVERTEMP" CAME ON THEN "LOW OIL PRESSURE" AND MY VEHICLE SHUT DOWN! I COULDN'T DRIVE THE VEHICLE. LUCKILY I DRIFTED TO SIDE OF THE ROAD SO THAT MY CAR COULD BE TOWED WITHOUT HAVING AN ACCIDENT! SHOP DETERMINED WATER PUMP FAILURE AND WATER LEAKED INTO MY ENGINE POOR ENGINE DESIGN ON FORDS PART) AND DESTROYED THE ENGINE WITH NO WARNING! NO ENGINE LIGHT CAME ON OR ANYTHING. PLEASE INVESTIGATE THIS. THERE ARE NUMEROUS COMPLAINTS ABOUT THIS SAME SITUATION. I CALLED FORD TO COMPLAIN BUT ALL THEY DID WAS TAKE DOWN MY COMPLIANT. THIS IS A SAFETY ISSUE BECAUSE I WAS DRIVING IN TRAFFIC AND THIS COULD HAVE CAUSED AN ACCIDENT. THE WHOLE CAR JUST SHUT DOWN! *TR

- **December 28, 2016 – 2010 Ford Fusion**
  NHTSA ID Number: 10938393
  Incident Date December 26, 2016
  Consumer Location RENTON, WA
  Vehicle Identification Number 3FAHP0DC8AR****
  **Summary of Complaint:**
  WITHOUT WARNING, DRIVING HIGHWAY SPEEDS WE LOST POWER. GOT THE CAR STARTED AGAIN AND REALIZED THERE WAS NO HEAT, THEN NOTICED THE TEMPERATURE

GAUGE WAS ON HOT. THE BATTERY LIGHT, CHECK ENGINE LIGHT AND WRENCH LIGHT TURNED ON. WE EVENTUALLY HAD TO BE TOWED AT A COST OF $460. THE MASTER MECHANIC IDENTIFIED THE WATER PUMP CRACKED, THEN RESEALED ITSELF AND COOLANT MIXED WITH THE OIL WHICH KILLED THE ENGINE. HE SAID THERE WOULD HAVE NOT BEEN ANY WARNING AND THIS ISSUE HAS BEEN SEEN BEFORE AND IS CATASTROPHIC. WE NOW HAVE TO REPLACE THE ENGINE AT A COST OF $8000. THERE ARE FORUMS ONLINE WITH OTHER FUSION OWNERS EXPERIENCING THE SAME ISSUE BUT NO RECOGNITION OR RECALL FROM FORD. I HAVE HAD ISSUES WITH THIS CAR SINCE THE DAY I BOUGHT IT. I HAD TO HAVE MY ELECTRONIC THROTTLE BODY REPLACED TWICE, ALSO NOT A RECALL BY FORD BUT A CUSTOMER SATISFACTION PROGRAM. I GUESS THEY ARE OK WITH HAVING CARS LITERALLY TURNING OFF AT HIGHWAY SPEEDS BEFORE THEY FIX THE ISSUES. *TR

- **April 7, 2017 – 2010 Ford Flex**
  NHTSA ID Number: 10971174
  Incident Date February 25, 2017
  Consumer Location ALFRED STATION, NY
  Vehicle Identification Number 2FMHK6DC4AB****
  **Summary of Complaint:**
  VEHICLE WAS TURNING OFF OF A STATE HIGHWAY INTO A SCHOOL ENTRANCE. WITHOUT WARNING (NO WARNING LIGHTS ON DASH) ENGINE STOPPED RUNNING. DUE TO ENGINE SHUT DOWN ALL AUXILIARY SYSTEMS LOST POWER. VEHICLE WAS MAKING A LEFT TURN INTO A SCHOOL ENTRANCE WHEN ENGINE TURNED OFF. IN THE MIDDLE OF THE TURN THE LOSS OF POWER STEERING AND POWER BRAKES MADE NEGOTIATING THE TURN UNSAFE. THE OPERATOR WAS UNABLE TO KEEP THE VEHICLE ON THE PAVED ENTRANCE AND ENDED UP OFF THE SHOULD AND INTO THE GRASS. FORTUNATELY THERE WERE NO PEDESTRIANS OR OBSTACLES. FAILURE COULD CAUSE A SAFETY ISSUE AT HIGHWAY SPEED DUE TO POTENTIAL FOR REAR ENDING DUE TO LOSS OF POWER.

31

THIS ENGINE FAILURE IS DUE TO FORD 3.5 DURATEC INTERNAL WATER PUMP DESIGN. WHEN THE WATER PUMP SEALS FAIL, ALL COOLANT IS CONTAINED IN THE MOTOR AND COLLECTED IN THE OIL PAN. BY COLLECTING THE COOLANT IN THE OIL PAN IT CAUSED A P0016 CODE AND THE ENGINE TO SHUT OFF. THEIR WAS NO WARNING OF THIS. THE CAR WAS DRIVEN 3.5HRS THE PREVIOUS DAY WITH NO ISSUES OR WARNING LIGHTS.

FORD IS UNWILLING TO RECOGNIZE THE PROBLEM. I FILED CLAIMS WITH FORD CUSTOMER SERVICE #11792792 AND CAS-11876774 ON THIS ISSUE. REPAIR BILL WAS $4100 TO REPLACE THE MOTOR WITH A SIMILAR USED MOTOR. THE VEHICLE REPAIR WAS JUST COMPLETED YESTERDAY AND I STILL FEEL UNSAFE AND UNCOMFORTABLE KNOWING THE SAME POTENTIAL FOR ENGINE FAILURE EXISTS. IT IS BOTH A SAFETY CONCERN AND AN FINANCIAL CONCERN.

THEIR ARE MANY DOCUMENTED CASES OF THIS HAPPENING ON FORDFLEX.NET (15 CASES) ALSO ON FORDTAURUS.NET. PLEASE GOOGLE DURATEC 3.5 WATER PUMP FAILURE. THESE FORUMS DOCUMENT OTHER NHTSA CLAIMS FILED FOR EXACT REASONS.

- **February 14, 2018 – 2010 Ford Taurus**
  NHTSA ID Number: 11072959
  Incident Date February 11, 2018
  Consumer Location IRMO, SC
  Vehicle Identification Number 1FAHP2HW7AG****
  **Summary of Complaint:**
  ON SUNDAY, 2/11/2018, I WAS DRIVING EAST I-26 IN COLUMBIA, SC HEADING TO WORSHIP SERVICES AND WITHOUT WARNING, MY CAR SUDDENLY SHUTDOWN CAUSING ME TO LOSE MY STEERING ABILITY. I MANAGED TO GUIDE THE CAR OUT OF THE 60 MPH TRAFFIC AND CAME TO A STOP. AFTER I STOPPED, I SAW A PUFF OF WHAT APPEARED TO BE STEAM OR SMOKE COMING FROM THE RIGHT FRONT PASSENGER SIDE. AS I OPENED THE HOOD, I COULD NOT SEE ANY LEAKS OR OTHER EVIDENCE OF A

BROKEN HOSE OR ANYTHING THAT PRODUCED THE SMOKE.

I CHECKED MY FLUID LEVELS AND DISCOVERED THAT MY RADIATOR RESEVOIR WAS LOW ON FLUID. I THEN PULLED THE ENGINE OIL DIPSTICK AND DISCOVERED A CHOCOLATE MILKY SUBSTANCE ON THE DIPSTICK. I SUSPECTED THAT THE OIL AND COOLANT HAD MIXED CAUSING MY ENGINE TO FAIL. I CALLED A WRECKER SERVICE AND HAD THE CAR TOWED TO CLASSIC FORD OF COLUMBIA. ON MONDAY, 2/12/2018, I RECEIVED A CALL FROM DEAN RAY, SERVICE PROFESSIONAL FROM CLASSIC FORD. MR. RAY TOLD ME THAT HE THOUGHT THAT THE INTERNAL WATER PUMP FAILED CAUSING THE COOLANT AND OIL TO MIX AND POSSIBLE RUINED THE ENGINE AND I NEEDED TO REPLACE THE ENGINE. AFTER RECEIVING THIS INFORMATION, I CONDUCTED RESEARCH AND DISCOVERED THAT FORD WAS AWARE OF THE DESIGN FLAW WITH THE FAILURE OF THE INTERNAL WATER PUMP.

WHEN FAILURE OF THE WATER PUMP OCCURS, THERE IS NO WARNING GIVEN TO THE DRIVER THE ENGINE SHUTS DOWN SUDDENLY. THIS INTERNAL WATER PUMP WAS PLACED IN THE 3.5 DURATEC ENGINES IN THE TAURUS, EDGE, FLEX, FUSION, AND POSSIBLY OTHER FORD CARS. THIS FAILURE ALMOST CAUSED ME TO HAVE A MAJOR ACCIDENT ON A MAJOR INTERSTATE HIGHWAY. I THINK FORD SHOULD RECALL THESE ENGINES. MANY AUTO EXPERTS HAVE DISCOVERED THIS ISSUE WITH THE ENGINE. LOSS OF LIFE IS POSSIBLY WITH THIS DANGEROUS ENGINE MALFUNCTION AND AN ESTIMATED $7,300.00 ENGINE REPLACEMENT BILL. PLEASE TAKE ACTION ASAP TO AVOID DEATH AND INJURY TO FORD OWNERS. A RECALL COULD SAVE LIVES.

- **June 19, 2018 – 2011 Ford Edge**
  NHTSA ID Number: 11102616
  Incident Date June 17, 2018
  Consumer Location TIVERTON, RI
  Vehicle Identification Number 2FMDK3KC0BB****

33

**Summary of Complaint:**
WATER PUMP EXPLODED AND DESTROYED THE ENGINE
WITH NO WARNING.

THE CAR STOPPED WORKING AT 65 MILES AN HOUR ON THE
HIGHWAY, LOST POWER, STEERING AND BRAKES.

THE CAR WAS FULLY SERVICED AND PASSED INSPECTION
ONLY 10 DAY BEFORE THE INCIDENT.

THERE WAS NO WARNING BY INSTRUMENTS ON THE
DASHBOARD.

ONLY A LOSS OF POWER.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

59.   Any applicable statute of limitations has been tolled by Defendant's
knowing and active concealment of the Water Pump Defect and the
misrepresentations and omissions alleged herein.  Through no fault or lack of
diligence, Plaintiffs and members of the Classes were deceived regarding the Class
Vehicles and could not reasonably discover the Water Pump Defect or Defendant's
deception with respect to the defect.

60.   Plaintiffs and members of the Classes did not discover and did not know
of any facts that would have caused a reasonable person to suspect that Defendant
was concealing a defect and/or that the Class Vehicles contained a Water Pump
Defect and corresponding safety risk.  As alleged herein, the existence of the Water
Pump Defect was material to Plaintiffs and members of the Classes at all relevant
times.  Within the time period of any applicable statutes of limitations, Plaintiffs and

34

members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Water Pump Defect or that Defendant was concealing the defect.

61.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the Class Vehicles and to disclose the Water Pump Defect and corresponding safety risk.

62.     Defendant knowingly, actively and affirmatively concealed the facts alleged herein.   Plaintiffs and members of the Classes reasonably relied on Defendant's knowing, active, and affirmative concealment.

63.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or (b)(3) on behalf of the following Class and Sub-Classes:

**Nationwide Class**: All persons or entities in the United States who purchased, leased or own a Class Vehicle (the "Nationwide Class" or "Class");

**Arkansas Sub-Class**: All persons or entities who purchased or leased a Class Vehicle in the State of Arkansas and all persons or entities in the State of Arkansas who purchased, leased or own a Class Vehicle (the "Arkansas Sub-Class"); and

**Washington Sub-Class**: All persons or entities who purchased or leased a Class Vehicle in the State of Washington and all persons or entities in the

State of Washington who purchased, leased or own a Class Vehicle (the "Washington Sub-Class").

65.    Excluded from the Class and Sub-Classes are Defendant and its parents, subsidiaries and corporate affiliates.  Plaintiffs reserve the right to revise the definition of the Class and Sub-Classes based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate.  The Class and Sub-Classes are collectively referred to herein as the "Classes."

66.    The Classes are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are at least thousands of proposed members of the Classes throughout the United States.

67.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes.  The common and predominating questions of law and fact include, but are not limited to:

- Whether the Class Vehicles contain the Water Pump Defect;

- Whether the Water Pump Defect is a design defect and/or a defect in material, manufacturing and/or workmanship;

- Whether the Water Pump Defect in the Class Vehicles presents a safety risk;

- Whether Defendant knew or should have known about the Water Pump Defect;

36

- Whether Defendant knew or should have known that the Water Pump Defect in Class Vehicles presents a safety risk;

- Whether Defendant had a duty to disclose the Water Pump Defect;

- Whether Defendant breached its duty to disclose the Water Pump Defect;

- Whether Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the standard, quality or grade of the Class Vehicles and/or the Water Pump Defect;

- Whether Defendant negligently omitted material facts concerning the standard, quality or grade of the Class Vehicles and/or the Water Pump Defect;

- Whether Defendant made material omissions concerning the standard, quality or grade of the Class Vehicles and/or the Water Pump Defect;

- Whether members of the Classes would pay less for a Class Vehicle if Defendant, at the time of purchase or lease, disclosed the Water Pump Defect;

- Whether members of the Classes would have purchased or leased a Class Vehicle if Defendant, at the time of purchase or lease, disclosed the Water Pump Defect;

- Whether Defendant actively concealed material facts from Plaintiffs and members of the Classes in order to, *inter alia*, sell more Class Vehicles and/or transfer repair or replacement costs to Plaintiffs and members of the Classes;

- Whether Defendant breached its express and/or implied warranties to Plaintiffs and members of the Classes;

- Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*;

- Whether Defendant violated the Arkansas Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101, *et seq.*;

37

- Whether Defendant violated the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq.*;

- Whether Defendant was unjustly enriched by its conduct; and

- Whether damages, restitution, equitable, injunctive, compulsory or other relief is warranted.

68.     Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent.  As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same illegal actions and conduct by Defendant.

69.     Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or in conflict with the interests of the other members of the Classes.

70.     Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes.  Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

71.     Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

72.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

73.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

74.    The Classes may also be certified under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

75.    The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical.  The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

76.    The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers and/or on the internet.

## VII.  CLAIMS FOR RELIEF

### COUNT I
### Fraudulent Concealment
### (On behalf of the Nationwide Class or, alternatively,
### on behalf of the Arkansas and Washington Sub-Classes)

77.     Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

78.     Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Arkansas and Washington Sub-Classes.

79.     Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Class Vehicles contain a Water Pump Defect and corresponding safety risk, with the intent that Plaintiffs and members of the Classes rely on Defendant's omissions.   As a direct result of Defendant's fraudulent conduct, Plaintiffs and members of the Classes have suffered actual damages.

80.     Defendant knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Water Pump Defect, concealed the defect and never intended to repair or replace the Water Pump Defect during the warranty periods. To date, Defendant has not provided Plaintiffs or members of the Classes with a repair or remedy for the Water Pump Defect.

81.     Defendant owed a duty to disclose the Water Pump Defect and its corresponding safety risk to Plaintiffs and members of the Classes because Defendant possessed superior and exclusive knowledge regarding the defect.  Rather than disclose the defect, Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Water Pump Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

82.     The Water Pump Defect is material to Plaintiffs and members of the Classes because Plaintiffs and members of the Classes had a reasonable expectation that the vehicles would not contain a defect, such as the Water Pump Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk.  No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials or workmanship, such as the Water Pump Defect, that can lead to thousands of dollars in repair or replacement costs, and can cause catastrophic engine failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road.

83.     Plaintiffs and members of the Classes would not have purchased or leased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the

Water Pump Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

84.     Defendant knew its concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendant knew its concealment and suppression of the Water Pump Defect would sell more Class Vehicles and would discourage Plaintiffs and members of the Classes from seeking replacement or repair of the Water Pump Defect during the applicable warranty periods.  Further, Defendant intended to induce Plaintiffs and members of the Classes into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Water Pump Defect in order to decrease costs and increase profits.

85.     Defendant acted with malice, oppression and fraud.

86.     Plaintiffs and members of the Classes reasonably relied upon Defendant's knowing concealment and omissions.  As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Water Pump Defect and associated safety risk, Plaintiffs and members of the Classes have suffered actual damages in an amount to be determined at trial.

## COUNT II
### Negligent Misrepresentation
### (On behalf of the Nationwide Class or, alternatively,
### on behalf of the Washington Sub-Class)

87.     Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

88.     Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Washington Sub-Class.

89.     Defendant owed a duty to disclose the Water Pump Defect and its corresponding safety risk to Plaintiffs and members of the Classes because Defendant possessed superior and exclusive knowledge regarding the defect and the associated risks.

90.     Defendant negligently omitted material facts including the standard, quality or grade of the Class Vehicles and/or presence of the Water Pump Defect in the Class Vehicles.  As a direct result of Defendant's negligent conduct, members of the Classes have suffered actual damages.

91.     The Water Pump Defect is material to Plaintiffs and members of the Classes because Plaintiffs and members of the Classes had a reasonable expectation that the vehicles would not contain a defect, such as the Water Pump Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk.  No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials or workmanship, such as the Water Pump Defect,

that can lead to thousands of dollars in repair or replacement costs, and can cause catastrophic engine failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road.

92.    Plaintiffs and members of the Classes would not have purchased the Class Vehicles but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and/or existence of the Water Pump Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiffs and members of the Classes justifiably relied upon Defendant's negligent omissions of material facts.

93.    As a direct and proximate result of Defendant's negligent omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the presence of the Water Pump Defect and corresponding safety risk, Plaintiffs and members of the Classes have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

**COUNT III**
**Breach of Express Warranty**
**(On behalf of the Nationwide Class or, alternatively,**
on behalf of the Arkansas and Washington **Sub-Class**es)

94.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

95.    Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Arkansas and Washington Sub-Classes.

96.    Defendant marketed the Class Vehicles as safe, built to last and reliable vehicles.  Such representations formed the basis of the bargain in Plaintiffs' and members of the Classes' decisions to purchase or lease the Class Vehicles.

97.    Defendant is and was at all relevant times a merchant and seller of motor vehicles (i.e., the Class Vehicles) within the meaning of the Uniform Commercial Code.

98.    With respect to leases, Defendant is and was at all relevant times a lessor of motor vehicles (i.e., the Class Vehicles) within the meaning of the Uniform Commercial Code.

99.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

100.    In connection with the purchase or lease of each of the Class Vehicles, Defendant provides warranty coverage for the Class Vehicles under one or more manufacturer's warranties.  For illustrative purposes, Defendant currently offers New Vehicle Limited Warranty coverage for Class Vehicles sold under the Ford brand (and offered for Class Vehicles sold under the Mercury brand until the brand was discontinued) for 3 years or 36,000 miles and extended warranty coverage for

Powertrain components for 5 years or 60,000 miles.[9]  Under the warranties provided to Plaintiffs and members of the Classes, Defendant promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Water Pump Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time.  As alleged herein, Defendant breached these warranties.

101.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Classes purchased or leased their Class Vehicles. Given the latent nature of the Water Pump Defect, Defendant knew or should have known that the majority of the water pump failures (and corresponding engine damage) occur outside of the warranty periods.

102.   Plaintiffs and members of the Classes experienced the existence of the Water Pump Defect within the warranty periods but had no knowledge of the existence of the defect and associated safety risk, which were known and concealed by Defendant.   Despite the existence of the warranties, Defendant failed to adequately inform Plaintiffs and members of the Classes that the Class Vehicles

---

[9]   *See* Exhibit A (Ford Cars and Trucks 2018 Model Year Warranty Guide); Exhibit B (Mercury Cars and Trucks 2009 Model Year Warranty Guide).  For the Class Vehicles sold under the Lincoln brand name, Defendant has provided New Vehicle Limited Warranty coverage for the Class Vehicles for 4 years or 50,000 miles and extended warranty coverage for Powertrain components for 6 years or 70,000 miles.  *See* Exhibit C (Lincoln 2012 Model Year Warranty Guide).

contained the Water Pump Defect and failed to provide a suitable repair or replacement of the Water Pump Defect free of charge within a reasonable time.

103.   Defendant breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

104.   On information and belief, Defendant has not suitably repaired or replaced the Water Pump Defect free of charge for Plaintiffs and members of the Classes despite the existence of the defect in the Class Vehicles at the time of sale or lease.

105.   Defendant further breached its express warranties by selling Class Vehicles that were defective with respect to engine materials, workmanship, design and manufacture, and were accompanied by an owner's manual and/or maintenance schedule that incorporated no inspection and service intervals for the water pump for the first 150,000 miles although Defendant knew of the Water Pump Defect and that the water pump required maintenance and replacement.

106.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, design and/or manufacturing defects which cause engine failure and/or failure to perform as warranted.

107.   Defendant was provided notice of the Water Pump Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing.  Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant has known of and concealed the Water Pump Defect and has failed to provide a suitable repair or replacement of the Water Pump Defect free of charge within a reasonable time.

108.   Any attempt by Defendant to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.  Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect.  The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  Among other things, Plaintiffs and the members of the Classes did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Classes, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Water Pump Defect posed a safety risk.

109.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

48

insufficient to make Plaintiffs and members of the Classes whole because, on information and belief, Defendant has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

110.   Defendant knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs and members of the Classes were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

111.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Classes purchased or leased their Class Vehicles.

112.   Plaintiffs and the members of the Classes experienced the existence of the Water Pump Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by Defendant.  Despite the existence of the warranties, Defendant failed to inform Plaintiffs and members of the Classes that the Class Vehicles contained the Water Pump Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the water pump and damaged engine parts to Plaintiffs and members of the Classes.

113.   Because of the Water Pump Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

114.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the Classes have been damaged in an amount to be determined at trial.

115.   Finally, because of Defendant's breach of express warranty as set forth herein, Plaintiffs and members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT IV
### Breach of Implied Warranty of Merchantability
### (On behalf of the Nationwide Class or, alternatively,
on behalf of the Arkansas and Washington **Sub-Class**es)

116.   Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

117.   Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Arkansas and Washington Sub-Classes.

118.   Plaintiffs and members of the Classes purchased or leased the Class Vehicles from Defendant by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.   At all relevant times, Defendant was the

manufacturer, distributor, warrantor and/or seller of Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

119.  Defendant is and was at all relevant times a merchant and seller of motor vehicles (i.e., the Class Vehicles) within the meaning of the Uniform Commercial Code.

120.  With respect to leases, Defendant is and was at all relevant times a lessor of motor vehicles (i.e., the Class Vehicles) within the meaning of the Uniform Commercial Code.

121.  The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

122.  Defendant impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

123.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Water Pump Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendant breached its implied warranty of merchantability.

124.   Under normal circumstances, a properly designed and manufactured chain-driven internal water pump, such as the water pump in the Cyclone Engine, should last for the life of the engine or at least 150,000 miles without the need for repair or replacement. Through its maintenance schedules, Defendant further represented that the water pump would not need repair or replacement before 150,000 miles and/or fraudulently concealed the need for repair or replacement of the water pump before 150,000 miles by omitting the water pump from the maintenance schedules.   Defendant cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

125.   Defendant was provided notice of the Water Pump Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing.  Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Water Pump Defect and, on information and belief, has refused to repair or replace the Water Pump Defect free of charge within a reasonable time.

126.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

127.    Any attempt by Defendant to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes. Among other things, Plaintiffs and members of the Classes did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Classes, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Water Pump Defect posed a safety risk.

128.    Plaintiffs and members of the Classes have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

129.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, fraudulent concealment and the terms of the express warranty.

## COUNT V
## Violation of the Magnuson-Moss Warranty Act ("MMWA"),
## 15 U.S.C. § 2301, *et seq.*
## (On behalf of the Nationwide Class or, alternatively,
on behalf of the Arkansas and Washington **Sub-Class**es)

130.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

131.    Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Arkansas and Washington Sub-Classes.

132.    Plaintiffs satisfy the MMWA jurisdictional requirement because Plaintiffs allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

133.    Plaintiffs and members of the Classes are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

134.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

135.    The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

136.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

137.   Defendant provided Plaintiffs and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6).   For illustrative purposes, Defendant currently offers New Vehicle Limited Warranty coverage for Class Vehicles sold under the Ford brand (and offered for Class Vehicles sold under the Mercury brand until the brand was discontinued) for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles.[10]   Under warranties provided to members of the Classes, Defendant promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Water Pump Defect, at no cost to owners and lessees of the Class Vehicles.   As alleged herein, Defendant breached these warranties.

138.   Plaintiffs and members of the Classes experienced the Water Pump Defect within the warranty periods but Defendant failed to inform Plaintiffs and members of the Classes of the existence of the Water Pump Defect and associated safety risk, and failed to provide a suitable remedy or repair of the Water Pump Defect free of charge within a reasonable time.

-----

[10]   *See* Exhibit A (Ford Cars and Trucks 2018 Model Year Warranty Guide); Exhibit B (Mercury Cars and Trucks 2009 Model Year Warranty Guide).   For the Class Vehicles sold under the Lincoln brand name, Defendant has provided New Vehicle Limited Warranty coverage for the Class Vehicles for 4 years or 50,000 miles and extended warranty coverage for Powertrain components for 6 years or 70,000 miles.   *See* Exhibit C (Lincoln 2012 Model Year Warranty Guide).

139.    Any attempt by Defendant to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendant's warranty periods are also unconscionable and inadequate to protect Plaintiffs and members of the Classes. Among other things, Plaintiffs and members of the Classes did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Classes, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that they posed a safety risk.

140.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

141.    Defendant breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality or grade of the Class Vehicles and/or the presence of the Water Pump Defect and corresponding safety risk. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing and/or workmanship that fails to operate as represented by Defendant and presents a safety risk.

142.   Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendant knew, or was reckless in not knowing, of the material omissions concerning the standard, quality or grade of the Class Vehicles and the presence of the Water Pump Defect and corresponding safety risk, but failed to repair or replace the Water Pump Defect and/or disclose the defect.   Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

143.   Plaintiffs and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiffs and members of the Classes have not re-accepted their Class Vehicles by retaining them.

144.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

145.   Plaintiffs, individually and on behalf of members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT VI
## Unjust Enrichment
## (On behalf of the Nationwide Class or, alternatively,
on behalf of the Arkansas and Washington **Sub-Class**es)

146.   Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

147.   Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the Arkansas and Washington Sub-Classes.

148.   Plaintiffs and members of the Classes conferred a benefit on Defendant by leasing or purchasing the Class Vehicles. Defendant was and should have been reasonably expected to provide Class Vehicles free from the Water Pump Defect and associated safety risks.

149.   Defendant unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its omissions and concealment of the Water Pump Defect in the Class Vehicles.

150.   As a proximate result of Defendant's false representations, omissions and concealment of the Water Pump Defect in the Class Vehicles, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly

enriched at the expense of Plaintiffs and members of the Classes.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiffs and members of the Classes.

151.   Plaintiffs and members of the Classes are entitled to restitution of the amount of Defendant's ill-gotten gains, benefits and profits, including interest, resulting from its unlawful, unjust and inequitable conduct.

152.   Plaintiffs and members of the Classes seek an order requiring Defendant to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT VII
### Violation of the Arkansas Deceptive Trade Practice Act ("ADTPA"), Ark. Code Ann. § 4-88-101, *et seq.* (On behalf of the Arkansas Sub-Class)

153.   Plaintiff Roe incorporates and re-alleges each preceding paragraph as though fully set forth herein.

154.   Plaintiff Roe brings this count on behalf of himself and the members of the Arkansas Sub-Class.

155.   Defendant, Plaintiff Roe, and members of the Arkansas Sub-Class are "[p]erson[s]" within the meaning of the ADTPA.  *See* Ark. Code Ann. § 4-88-102(5).

156.   The Class Vehicles are "[g]oods" within the meaning of the ADTPA. *See* Ark. Code. Ann. § 4-88-102(4).

157.   The ADTPA prohibits "[d]eceptive and unconscionable trade practices," including, *inter alia*, engaging in any "unconscionable, false, or deceptive act or practice in business, commerce, or trade."  Ark. Code Ann. § 4-88-107(a)(10).

158.   The ADTPA also prohibits the following in connection with the sale or advertisement of any goods: "(1)[t]he act, use, or employment by any person of any deception, fraud, or false pretense; or (2) [t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  Ark. Code Ann. § 4-88-108.

159.   In violation of the ADTPA, Defendant employed deceptive and/or unconscionable acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Class Vehicles.  Defendant knowingly concealed, suppressed and/or omitted material facts regarding the Water Pump Defect and corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Roe and members of the Arkansas Sub-Class.

160.   Defendant intentionally and knowingly misrepresented and omitted facts regarding the Water Pump Defect with the intent to mislead Plaintiff Roe and members of the Arkansas Sub-Class.  Defendant knew, or should have known, that

the Water Pump Defect was a latent defect and that the Water Pump Defect was likely to fail outside of the periods of the manufacturer's warranties. Defendant also knew, or should have known, that the Water Pump Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendant knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers and other motorists at risk for injury.

161. Defendant owed a duty to disclose the Water Pump Defect and its corresponding safety risk to Plaintiff Roe and members of the Arkansas Sub-Class because it possessed superior and exclusive knowledge regarding the defect and the risks associated with the Water Pump Defect's failure. Rather than disclose the defect, Defendant engaged in deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Water Pump Defect, damaged engine parts and/or the entire engine to Plaintiff Roe and members of the Arkansas Sub-Class.

162. Defendant's unconscionable or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Water Pump Defect were intended to mislead consumers and misled Plaintiff Roe and members of the Arkansas Sub-Class.

61

163.   At all relevant times, Defendant's unconscionable or deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Water Pump Defect and its corresponding safety risk were material to Plaintiff Roe and members of the Arkansas Sub-Class.   When Plaintiff Roe and members of the Arkansas Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would not contain the Water Pump Defect and would not pose an unavoidable safety risk.   Had Defendant disclosed that the Water Pump Defect existed in the Class Vehicle and/or presented an unavoidable safety risk, Plaintiff Roe and members of the Arkansas Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.   Further had Defendant disclosed that the Water Pump Defect existed in the Class Vehicles and/or presented an unavoidable safety risk, Plaintiff Roe and members of the Arkansas Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in Defendant's warranties.

164.   Defendant had a continuous duty to Plaintiff Roe and members of the Arkansas Sub-Class to refrain from unfair and deceptive practices under the ADTPA and to disclose the Water Pump Defect.   Defendant's unconscionable or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Water Pump Defect and its corresponding safety risk are substantially injurious to consumers.   As a result of Defendant's knowing, intentional concealment and/or

62

omission of the Water Pump Defect and corresponding safety risk in violation of the ADTPA, Plaintiff Roe and members of the Arkansas Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the water pump and/or actual damages in the amount of the cost to replace the Water Pump Defect, essential engine parts or the entire engine, and damages to be determined at trial.   Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices in the course of their business.

165.   Defendant's unlawful acts and practices occurred in the conduct of business, commerce or trade in commerce.

166.   Defendant has knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.   Further, Defendant unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

167.   Defendant's unlawful acts and practices affect the public interest and present a continuing safety risk to Plaintiff Roe and members of the Arkansas Sub-Class, as well as the public.

168.   As a direct and proximate result of Defendant's violations of the ADTPA, Plaintiff Roe and members of the Arkansas Sub-Class have suffered actual financial loss, actual damages and/or injury-in-fact.

169.   Plaintiff Roe and members of the Arkansas Sub-Class seek actual damages against Defendant in an amount to be determined at trial and punitive damages because Defendant acted wantonly or with such conscious indifference to the consequences that malice may be inferred.

170.   Plaintiff Roe and members of the Arkansas Sub-Class also seek an order enjoining Defendant's unfair, unlawful and/or deceptive practices, awarding costs and attorneys' fees and any other just and proper relief available under the ADTPA.

## COUNT VIII
### Violation of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010, *et seq.* (On behalf of the Washington Sub-Class)

171.   Plaintiff Christenson incorporates and re-alleges each preceding paragraph as though fully set forth herein.

172.   Plaintiff Christenson brings this count on behalf of himself and the members of the Washington Sub-Class.

173.   Plaintiff Christenson and members of the Washington Sub-Class are persons within the context of the WCPA, *see* Wash. Rev. Code § 19.86.010(1), who purchased and/or leased class vehicles for personal, family, or household use.

174.   Defendant is a person within the context of the WCPA.  *See* Wash. Rev. Code § 19.86.010(1).

175.   The sale of Class Vehicles in Washington constitutes trade and commerce of consumer goods affecting the people of the State of Washington within the context of the WCPA.  *See* Wash. Rev. Code § 19.86.010(2).

176.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by representing that Class Vehicles have characteristics, uses, benefits and/or qualities that they do not possess.  This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

177.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by representing that Class Vehicles are of a particular standard, quality or grade, when they are not.  This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

178.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by failing to state a material fact that deceives or tends to deceive.  This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

179.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by advertising Class Vehicles without intent to sell or lease as advertised.  This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

180.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by selling Class Vehicles knowing that a service, replacement or repair was needed. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

181.   Defendant violated Wash. Rev. Code §§ 19.86.020 and 19.86.093 by deception, fraud, false pretense, false promise, misrepresentation, knowing concealment, suppression and/or omission of material facts concerning Class Vehicles with the intent to deceive Plaintiff Christenson and members of the Washington Sub-Class.  This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

182.   Defendant committed unfair and deceptive acts in the course of trade and commerce within the context of the WCPA as described in this Complaint in violation of Wash. Rev. Code §§ 19.86.020 and 19.86.093.

183.   Defendant committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false

promise, misrepresentation and the knowing concealment, suppression and omission of materials facts concerning the Class Vehicles' Water Pump Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles.

184.   Defendant fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Christenson and members of the Washington Sub-Class that the water pump in the Class Vehicles would not require maintenance, repair or replacement for the first 150,000 miles and fraudulently omitted the water pump from its maintenance schedules.

185.   Defendant fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Christenson and members of the Washington Sub-Class the characteristics of Class Vehicle engines with respect to materials, manufacture, durability, design, longevity, maintenance and operating costs.

186.   Defendant intended that Plaintiff Christenson and members of the Washington Sub-Class would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations and material omissions concerning the quality of Class Vehicle engines with respect to materials, workmanship, design, manufacture and information in the owner's manuals.

187.   Information regarding the Water Pump Defect as described in this Complaint is material to consumers in that the defect results in exorbitant repair or replacement costs, can cause catastrophic engine failure and poses a safety risk.

188.   If Defendant had not concealed the defect from Plaintiff Christenson and members of the Washington Sub-Class within the express warranty period, the Water Pump Defect would have been repaired without cost to purchasers as promised under the original warranty.

189.   Defendant violated the WCPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle engines were defectively designed and/or manufactured and were accompanied by incorrect maintenance recommendations and maintenance intervals.

190.   Defendant violated the WCPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle engines contained defects and would require replacement of expensive internal engine components.

191.   As a proximate and direct result of Defendant's unfair and deceptive trade practices, Plaintiff Christenson and members of the Washington Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.

192.   Plaintiff Christenson and members of the Washington Sub-Class experienced premature failure of the water pump and/or engine failure, diminution of Class Vehicle resale value, increased repair and maintenance costs and other substantial monetary damages and inconvenience.

193.   The conduct of Defendant offends public policy as established by statutes and common law, is immoral, unethical, oppressive and/or unscrupulous and caused unavoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

194.   Plaintiff Christenson and members of the Washington Sub-Class demand judgment against Defendant for restitution, disgorgement, statutory and actual monetary damages, including multiple damages, interest, costs, and attorneys' fees and injunctive relief, including a declaratory judgment and an appropriate court order prohibiting Defendant from further deceptive acts and practices as described in the Complaint.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiffs and the Classes, and award the following relief:

- An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the

representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

- An order awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, fraudulent, harmful and unfair business conduct and practices alleged herein;

- Appropriate injunctive and equitable relief;

- A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

- An order awarding costs, restitution, disgorgement, punitive damages, statutory damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss, diminished value and out-of-pocket costs in an amount to be determined at trial;

- An order awarding any applicable statutory and civil penalties;

- An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

- An award of costs, expenses, and attorneys' fees as permitted by law; and

- Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED: August 14, 2018

*/s/ E. Powell Miller*_____
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.:  (248) 841-2200
Fax:  (248) 652-2852
epm@miller.law
ssa@millerlawpc.com
dal@millerlawpc.com

Joseph H. Meltzer
Peter A. Muhic
Ethan J. Barlieb
Natalie Lesser
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.:  (610) 667-7706
Fax:  (610) 667-7056
jmeltzer@ktmc.com
pmuhic@ktmc.com
ebarlieb@ktmc.com
nlesser@ktmc.com

***Attorneys for Plaintiffs and the Proposed
Classes***

John C. Goodson
Matt Keil
**KEIL & GOODSON PA**
406 Walnut Street

Texarkana, Arkansas 71854
Tel.: (870) 772-4113
Fax: (870) 773-2967
jgoodson@kglawfirm.com
mkeil@kglawfirm.com

Robert H. Edwards
**THE EDWARDS FIRM, P.L.L.C.**
711 West Third Street
Little Rock, AR 72201
Tel.: (501) 372-1329

***Additional Counsel for Plaintiffs and the
Proposed Classes***