UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY ROE, *et al.*,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.

Case No. 2:18-cv-12528-LJM-APP
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

## OPINION AND ORDER
## GRANTING IN PART DEFENDANT'S MOTION TO DISMISS [20]

The 12 plaintiffs in this case are owners of vehicles made by Ford Motor Company and think that their vehicles were not "Built Ford Tough." In particular, after their vehicles had logged many miles—54,000 on the low end, 117,000 on the high end—the water pump broke. In Plaintiffs' view, their water pumps should have lasted the useful life of their vehicle's engine, which, say Plaintiffs, is at least 150,000 miles. Because their water pumps fell well short of that mark, Plaintiffs think it was defective. Worse, say Plaintiffs, Ford knew that the water pump was defective but failed to disclose that fact, or, still worse, hid it. So Plaintiffs, haling from 11 states, sued Ford alleging 55 violations of law. And Plaintiffs say they are not alone: they seek to represent classes of owners of Ford vehicles that had or might have a water-pump failure like theirs.

Ford asks the Court to dismiss the entire (amended) complaint on a host of grounds. For the reasons that follow, the Court will dismiss all but two counts.

Car engines burn fuel. And burning fuel produces a lot of heat. And too much heat for too long can damage engine parts.

Enter the water pump. The water pump circulates coolant throughout the engine block to keep engine parts from getting too hot. Historically, water pumps were located outside the engine block and coolant would simply leak onto the ground under the car when the pump failed. (ECF No. 14, PageID.592.)

Beginning in 2007 and continuing to this day, Ford Motor Company's "Cyclone" engine has powered its Edge, Fusion, Taurus, and Explorer lines of vehicles. One innovation of the Cyclone engine was to place the water pump inside the engine block. One benefit of this design was that the timing chain could spin the water pump; there was no longer a need for a separate accessory belt for the water pump. (ECF No. 14, PageID.592–93.)

According to Plaintiffs, this efficiency gain came at a cost. Because the water pump was now located inside the engine block, if it broke, the coolant would no longer leak onto the ground below. Instead, the coolant would mix with engine oil. (ECF No. 14, PageID.596.) And this "chocolate milk" substance would then end up in places where only oil should go. (ECF No. 14, PageID.596.) The result, in at least some cases, was that the engine would seize up while the vehicle was in operation. (ECF No. 14, PageID.597.) And if the vehicle was in operation on the highway, a dangerous situation might arise. (*See* ECF No. 14, PageID.611 ("I was driving my [Ford Explorer] down a main highway and all of a sudden the 'engine coolant overtemp' came on then 'low oil pressure' and my vehicle shut down! . . . Luckily I drifted to [the] side of the road[.]").) And should the driver avoid an accident, she would still be stuck with a large repair bill:

$1,500 to replace just the water pump, but up to $9,000 if the coolant-oil mixture damaged the engine. (ECF No. 14, PageID.584.)

The Plaintiffs in this case are owners of Ford vehicles with Cyclone engines. And Plaintiffs each say that their water pumps failed. (Fortunately, none were injured.) Among the 12 plaintiffs, Daryl Mori had his water pump fail with the least mileage on his Ford, 54,000 miles. (ECF No. 14, PageID.586.) At the other end of the spectrum sits Christopher Stack's Ford: it went 117,000 miles before water-pump failure. (ECF No. 14, PageID.589.)

But whether 54,000 or 117,000 miles or somewhere in between, each plaintiff says his or her water pump should have lasted a good while longer. Plaintiffs collectively allege that "[i]n modern vehicles, the useful life of the engine is well over 150,000 miles." (ECF No. 14, PageID.577.) Given that the water pump's internal location makes it hard to service, and that Ford's maintenance schedules do not include the water pump for service, Plaintiffs say that Ford led them to believe that the water pump would last as long as their engines. And because their pumps did not last at least 150,000 miles, and because the costs to repair their pumps was significant ($7,600 in one case), Plaintiffs filed this lawsuit on behalf of themselves and other owners of Fords with Cyclone engines.

Plaintiffs' amended complaint has a total of 55 counts under 11 states' laws. Oversimplifying somewhat, Plaintiffs' claims fall into three categories. They have tort claims premised on Ford's alleged misrepresentations (both affirmative and omissions). Plaintiffs also bring breach-of-warranty claims. And Plaintiffs have claims under state consumer protection acts.

Ford has moved to dismiss all 55 counts pursuant to Federal Rule of Civil Procedure 12(b)(6).

**II.**

Ford's motion under Rule 12(b)(6) tests the adequacy of the allegations of the amended complaint. For each count, Plaintiffs' amended complaint must contain enough factual content for this Court to reasonably infer that Ford is liable for that cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The shorthand for this standard is "plausibility." *See id.* And what is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Id.* at 679.

**III.**

The analysis is broken into three parts. Part III.A. assesses the plausibility of Plaintiffs' tort claims. Part III.B. does the same for Plaintiffs' claims under various states' consumer protection acts. In Part III.C., the Court examines Plaintiffs' breach-of-warranty claims.

**A.**

Plaintiffs' tort claims come in several varieties: fraudulent concealment, fraud by omission, and negligent misrepresentation. And they arise under a variety of states' laws (California, Illinois, Maryland, New Jersey, Ohio, Pennsylvania, Tennessee, and Washington). But Plaintiffs' tort claims have something in common: they are all based on allegedly misleading disclosures or allegedly misleading non-disclosure.

**1.**

The Court begins with Plaintiffs' tort claims based on Ford's disclosures.

Plaintiffs' misleading-disclosure theory appears to be based on the principle *expressio unius est exclusio alterius* or, roughly translated, "the explicit mention of one thing implies the exclusion of another." Plaintiffs point out that the maintenance schedules for their Ford vehicles listed many parts that needed to be serviced or replaced. For example, the maintenance schedules

indicated that the transmission-fluid filter needed to be replaced at 60,000 miles (trucks) or 150,000 miles (cars). (ECF No. 14, PageID.1130, 1135, 1138, 1151.) And Ford's maintenance schedules said to replace spark plugs at 90,000 miles. (ECF No. 14, PageID.1133, 1146.) And at 150,000 miles, said the schedules, "accessory drive belt(s)" needed to be replaced (if they had not been already). (ECF No. 14, PageID.1138, 1151.) In Plaintiffs' view then, Ford identified "numerous engine components" that needed to be "maintained or replaced at certain intervals, up to 150,000 miles." (ECF No. 14, PageID.598–99.) Yet, Plaintiffs point out, Ford's maintenance schedules "wholly omit[ted] the water pump." (ECF No. 14, PageID.598; ECF No. 22, PageID.1591.) Plaintiffs thus maintain that "Ford represent[ed] in the maintenance schedules that no maintenance or service is needed for the Water Pump through 150,000 miles." (ECF No. 22, PageID.1591; *see also* ECF No. 14, PageID.577, 598; ECF No. 22, PageID.1596.)

The Court does not find Plaintiffs' misrepresentation theory persuasive.

As an initial matter, accepting Plaintiffs' theory would mean that, via the maintenance schedules, Ford represented that hundreds of engine parts would last 150,000 miles. Take, for example, the 2011 Ford Edge, the vehicle owned by three plaintiffs. (ECF No. 14, PageID.585, 589, 590.) Examining just a few components of that vehicle's engine reveals that there are 7 parts associated with the tensioner; 15 associated with the radiator;18 associated with the timing gear; and 21 associated with the cylinder head.[1] In other words, it appears that the engine of a 2011 Ford Edge is made up of well over 100 parts. Yet, under Plaintiffs' theory, if any of these 100-plus parts were not on the maintenance schedule, Ford represented that the part would last 150,000 miles. It

---

[1]This information can be found at https://parts.ford.com and searching by the appropriate make and model. The direct links to the four components are as follows: https://ford.to/2SoNBq5 (tensioner); https://ford.to/2YX8ACU (radiator); https://ford.to/2JLXri1 (camshaft sprocket); https://ford.to/2SlufSR (cylinder head gasket).

seems unlikely that a car manufacturer would make that strong of a representation about so many parts.

Adding to the implausibility that, via the maintenance schedule, Ford represented that the water pump would last 150,000 miles is the purpose of the schedule. Plaintiffs' maintenance schedules state, "Routine maintenance is the best way to help ensure you get the performance, dependability, long life and resale value you expect from your vehicle. *This is exactly why we've put together the Scheduled Maintenance Guide*." (*See e.g.*, ECF No. 14, PageID.1115 (emphasis added).) The maintenance schedules further state, "Failure to perform scheduled maintenance specified in this guide will invalidate warranty coverage on parts affected by the lack of maintenance." (*See e.g.*, ECF No. 14, PageID.1115.) So the stated purpose of the maintenance schedule was to set out those parts that, if serviced or replaced according to schedule, would keep the vehicle in good working order and would keep the warranty intact. The stated purpose was not to delineate every single part that might need repair or replacement before 150,000 miles.

Finally, to the extent that the maintenance schedule somehow suggested that the water pump would last 150,000 miles, the express warranty that came with Plaintiffs' vehicles suggested just the opposite. Ford's express warranty told Plaintiffs that their powertrain, which includes the water pump, was "covered for five years or 60,000 miles, whichever occurs first." (ECF No. 20, PageID.1434.) But Ford was not willing to go further, say 10 years or 100,000 miles. The express warranty thus implied that after the lesser of 5 years and 60,000 miles, all bets were off on the water pump; it might last quite a while longer, it might not.

Taking together (1) that it is unlikely that a car manufacturer would represent, under penalty of suit, that each of a hundred-plus unidentified engine parts would last 150,000 miles, (2) that the purpose of the maintenance schedule was not to delineate every part that might need

replacement before 150,000 miles, and (3) that Ford's powertrain warranty went no further than 5 years or 60,000 miles, Plaintiffs' theory that Ford, via the maintenance schedule, represented that the water pump would last the useful life of the engine is not plausible.

Plaintiffs cite a few cases suggesting, if not holding, that car manufacturers, via their maintenance schedules, do represent that parts not scheduled for maintenance will last the useful life of the engine or vehicle.

Not only are Plaintiffs' cases not binding on this Court, the plaintiffs in those cases made allegations not present in this one. In *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765 (JLL), 2017 WL 1902160 (D.N.J. May 8, 2017), the complaint alleged, "Timing chains usually last considerably longer than timing belts. For example, Defendants' maintenance schedules require replacement of timing belts after a certain number of miles but do not require maintenance or replacement of the chain-driven Timing Chain System." Plaintiffs have not likewise alleged that Ford's maintenance schedules for vehicles with water pumps outside the engine block list the water pump on the schedule (whereas the maintenance schedules for vehicles with Cyclone engines omit the water pump). *In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, No. 8:07CV298, 2008 WL 4866604 (D. Neb. Nov. 7, 2008), is likewise distinguishable. There, in addition to omitting the timing chain from the maintenance schedule, Saturn's promotional materials (albeit not for the plaintiffs' vehicles) touted the durability of steel timing chains over other manufacturers' rubber timing belts. *Id.* at *7. And in *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558, 567 (D.N.J. 2012), the plaintiffs "alleged that the Nissan factory maintenance schedules did not even require having the transmission fluids flushed or changed during the life of the vehicle, unless it was used for towing or driving through rough or muddy roads." The "unless"

clause makes Nissan's representation different that Ford's; Ford did not imply that in harsh driving conditions the pump would need to be replaced but in normal driving conditions it would not.

Shifting gears, Plaintiffs also allege that Ford made misleading disclosures when it advertised its vehicles. For instance, Plaintiffs point to Ford's slogan, "Built Ford Tough." (ECF No. 14, PageID.601.) (Notably, when most of the plaintiffs bought their car, Ford's slogan was "Go Further.") They also cull statements from Ford's website such as, "[s]afety continues to be one of the highest priorities in the design of our vehicles," "[Ford has] a longstanding commitment to developing and implementing innovations that make our vehicles safer," and that Ford vehicles were "Top Safety Pick[s]." (ECF No. 14, PageID.602–603.)

It is not plausible that these and like promotional statements were false or misleading statements about the lifespan of the water pump. As an initial matter, courts and consumers alike expect manufacturers to use a bit of hyperbole when promoting their goods. *See Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 750 (E.D. Mich. 2017) ("[T]o the extent Beck is claiming that he relied on any [of] FCA's representations regarding their vehicles' general safety, quality, reliability, or performance, those assertions undoubtedly constitute non-actionable puffery."). Second, the statements Plaintiffs identify are very general. In some instances, Ford is touting the safety or durability of its entire fleet of vehicles. And even when Ford references a single model, the statements refer to the vehicle as whole (e.g., "Top Safety Pick"). A Ford Fusion may well be safe even if 1 out of 100,000 has a water pump failure before 150,000 miles.

In short, to the extent that Plaintiffs' tort claims are premised on affirmative representations by Ford, they are implausible.

## **2.**

Having addressed Plaintiffs' allegations that Ford made misleading disclosures about the life of the water pump, the Court turns to Plaintiffs' tort claims based on omission.

Although Plaintiffs bring their omission-based tort claims under the common law of eight states, these claims, at least in the manner that Plaintiffs have pursued them, have something in common: they all require Plaintiffs to show that Ford knew or should have known of the water-pump defect.

Start with fraud-by-omission. For six states (California, Maryland New Jersey, Ohio, Tennessee, and Washington), Plaintiffs concede that fraud-by-omission requires them to show that Ford knew or should have known of the water-pump defect. (ECF No. 22, PageID.1583.)

As for the other two states (Illinois and Pennsylvania), Plaintiffs concede that fraud-by-omission requires them to show that Ford had a legal duty to disclose the water-pump defect. (ECF No. 22, PageID.1583.) Yet each of the three ways that Plaintiffs seek to establish a duty to disclose requires a showing that Ford knew or should have known of the water-pump defect. Plaintiffs say that a defendant has a duty to disclose a defect when it poses a safety hazard. But (under California law at least) "for [a defendant] to have a duty to disclose under [the safety-hazard] theory, [the defendant] must . . . have knowledge of the defect." *Beck*, 273 F. Supp. 3d at 754 n.10. Indeed, each of the cases Plaintiffs cite in support of a duty to disclose safety hazards found that defendant had knowledge of the defect or that the law required defendant to have knowledge of the defect (or both).[2] Plaintiffs also say that Ford had a duty to disclose because it made statements that

---

[2] In chronological order:

*Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007) ("[P]laintiffs' material allegations suffice to state a claim that GM had exclusive knowledge of the alleged defect in their speedometers[.]").

required additional disclosure to avoid being misleading. (ECF No. 14, PageID.1591.) But the general rule is that a duty to disclose clarifying information arises only if the defendant is aware of the clarifying information. *See* Restatement (Second) of Torts § 551 (1977). And Plaintiffs' third duty-to-disclose theory is based on Ford's "superior and exclusive knowledge of a defect." (ECF No. 22, PageID.1587.) In short then, all of Plaintiffs' fraud-by-omission claims require Plaintiffs to adequately plead that Ford knew or should have known of the water-pump defect.

Plaintiffs' negligent-misrepresentation claims based on omission (*see* ECF No. 22, PageID.1595; *see also* ECF No. 14, PageID.643, 675, 721, 764, 834 (asserting that Ford "negligently omitted material facts")), also require a showing that Ford had a duty to disclose, *see* Restatement (Second) of Torts § 551(2) (1977) (listing situations where a duty to disclose arises,

---

*In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, No. 8:07CV298, 2008 WL 4866604, at *20 (D. Neb. Nov. 7, 2008) ("Menzer has adequately pled facts . . . that Defendants knew of the defect at the time they sold her the car.").

*Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 940 (M.D. Tenn. 2010) ("[A] seller must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous.").

*Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 537 (D. Md. 2011) ("[The Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.*] states that a manufacturer of a motor vehicle has a duty to notify the NHTSA and vehicle owners *when it learns [that] the vehicle or equipment contains a defect* and decides in good faith that the defect is related to motor vehicle safety." (emphasis added)).

*McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1369 (N.D. Ga. 2013) (providing that under Texas law a duty to disclose arises if the speaker made a misrepresentation "that he knew was false when he made it or that he made recklessly as a positive assertion without any knowledge of its truth").

*In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014) (providing that a duty to disclose arises "when there is a *known* defect in a consumer product and there are safety concerns associated with the product's use" (emphasis added)).

*In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) (finding, where plaintiffs alleged the defect created safety concerns and manufacturer knew of both the defect and the safety concerns, that manufacturer plausibly had a duty to disclose under Georgia, Illinois, Ohio, South Carolina, and Texas law).

including "matters *known* to [one party to a transaction] that he *knows* to be necessary to prevent his partial or ambiguous statement of the facts from being misleading" (emphases added)).

As for Plaintiffs' fraudulent-concealment claims, those too require a showing that Ford knew or should have known of the water-pump defect. After all, how could Ford have intended to conceal something that it did not know would be material to car buyers? *See* Restatement (Second) of Torts § 550 (1977) (providing that fraudulent concealment requires an intentional act by the defendant that prevents the plaintiff from acquiring material information).

Thus, despite originating from eight states, all of Plaintiffs' tort claims premised on omission require Plaintiffs to adequately plead that Ford knew or should have known of the water pump defect. Have Plaintiffs done so?

Although quite a few paragraphs of Plaintiffs' amended complaint address Ford's knowledge (e.g., paragraphs 10, 11, 65, 67, 68, 72, 73), those paragraphs largely echo the allegations in paragraph 66. In relevant part, paragraph 66 of the amended complaint states as follows:

> Knowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford, its partner Mazda, and their dealers, and that information was not provided to Plaintiffs and members of the Classes.
>
> Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to [Ford's] and Mazda's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA and testing performed in response to consumer complaints, inter alia, [Ford] was aware (or should have been aware) of the Water Pump Defect in the Class Vehicles[.]

(ECF No. 14, PageID.606 (paragraphing altered).)

This paragraph can be analyzed in three pieces.

Start with the first sentence: "[k]nowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford." That is a legal conclusion. And this Court need not accept legal conclusions as fact when assessing plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

Next consider Plaintiffs' allegations about testing ("pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, . . . testing performed in response to consumer complaints"). The amended complaint does not say what the testing revealed. Even assuming this refers to water pump testing, Plaintiffs would like the Court to infer that the water-pump testing revealed some type of defect. But absent at least a hint as to the test results, it is no more likely that the testing revealed a flawed water pump than a flawless water pump. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

So that leaves Plaintiffs' allegations that Ford owners reported issues about water-pump failures and sought water-pump repairs (i.e., "early consumer complaints made to [Ford's] and Mazda's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA").

These allegations also do not make it reasonable to infer that Ford knew or should have known of the water-pump defect.

To see why, it helps to start with a bit of readily-available knowledge and a bit of common sense. *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). The readily-available knowledge: Ford sells over two million vehicles in North America each year and over five million a year worldwide. *See* Ford Annual Reports (2011 to 2018), https://ford.to/2YXMuA7 (last visited July 17, 2019). So, on any given day, there are millions of Fords (if not tens of millions of Fords) on the road. And, applying common sense, that means that on any given day, there are dozens (if not hundreds) of complaints about Ford vehicles made to a Ford dealer, to NHTSA, on an internet forum, or even to Ford directly. And given the millions of Ford vehicles in operation, there must be dozens (if not hundreds) of repairs of Ford vehicles at Ford dealerships on any given day. So for consumer complaints and repair logs to give fair notice to Ford that one particular part is consistently having problems, it must be that the number of complaints about and repairs of that specific part stood out. Or, put slightly differently, complaints about and repairs of the water pump must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day.

Yet Plaintiffs' amended complaint does not include factual allegations that make it reasonable to infer that complaints about and repairs of the water pumps were anything more than a blip on Ford's complaints-and-repairs radar. Plaintiffs have reproduced only 14 complaints to NHTSA about the water pumps. (ECF No. 14, PageID.607–616.) And these 14 span a three-year period. True, Plaintiffs say the 14 NHTSA complaints are but a "small sample." (ECF No. 14, PageID.607.) But do Plaintiffs mean there are 50 more? 500 more? Their amended complaint does not say. Nor does it say whether the volume was large enough for NHTSA to advise Ford about them. Plaintiffs also give no sense of the number of complaints about the water pump to dealers, the number of online complaints, or the number of repairs of the water pump. Given that there are

dozens (if not hundreds) of complaints about or repairs of Ford vehicles each day, Plaintiffs must give the Court some sense of the fraction of those that are about the water pump. Otherwise, it is entirely likely that complaints about and repairs of the water pump were awash in a sea of complaints and repairs.

Plaintiffs' allegations of consumer complaints and vehicle repairs do not make it reasonable to infer Ford's knowledge for a second, related reason. Even assuming Ford was aware of every consumer complaint about, and repair of, a Cyclone-engine water pump, it does not necessarily follow that Ford knew that the pump was *defective*. According to the amended complaint, Ford has deployed the Cyclone engine since 2007 and that engine can be found in "millions" of Ford vehicles. (ECF No. 14, PageID.578.) Yet Plaintiffs have only expressly identified 26 water-pump failures (the 14 NHTSA complaints and their own 12). Twenty-six out of "millions" is a very low failure rate—approximately 1 in 100,000. And it is entirely possible that a manufacturer has no duty to disclose the fact that, in 1 out of 100,000 vehicles, an engine part will fail before 150,000 miles. Yet Plaintiffs' amended complaint gives little indication of the water pump's failure rate or how that rate compares to the failure rate of a part that the law would deem "defective." *See Maloney v. Microsoft Corp.*, No. CIV. 09-2047, 2012 WL 715856, at *7 (D.N.J. Mar. 5, 2012) ("The number of reported cases in which an LCD screen cracked (i.e., 1.3% of all 30gb-model Zunes sold) is too small for this Court to afford an inference of a design defect based upon Plaintiff's proffered evidence"); *Snodgrass v. Ford Motor Co.*, No. CV 96-1814(JBS), 2001 WL 37118915, at *13 (D.N.J. Aug. 31, 2001) (finding that approximately 4 ignition failures per 1,000,000 vehicles was not evidence permitting a lay person (without aid of an expert) to conclude that Ford knew ignitions were defective). So even assuming Ford knew of all water-

pump complaints and repairs, more information is necessary to infer that Ford knew that the water pump was defective.

Citing several cases, Plaintiffs attempt to show that other courts would find their allegations sufficient to establish Ford's knowledge of the water-pump defect. (ECF No. 22, PageID.1585–1586.) But the allegations of knowledge in the cases Plaintiffs cite are quite different than those in this case. *Cf. Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) (complaint alleged that Ford issued multiple technical service bulletins about the same defect (albeit in models different than the plaintiffs')); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1000 (E.D. Mich. 2017) ("The plaintiffs also point to a combined total of 686 reports of rollaway incidents, . . . where the vast majority of those reports . . . were received by the defendant[.]"); *Stockinger v. Toyota Motor Sales USA, Inc.*, No. 17-cv-00035 (C.D. Cal. July 7, 2017), ECF No. 50 at 4 (complaint alleged that Toyota issued a technical safety bulletin disclosing defect in some Toyota vehicles and issued a recall for some Toyota vehicles); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765, 2017 WL 1902160, at *4 (D.N.J. May 8, 2017) (complaint alleged that Volkswagen issued several technical service bulletins about the defect); *Victorino v. FCA US LLC*, No. 16CV1617-GPC(JLB), 2016 WL 6441518, at *2 (S.D. Cal. Nov. 1, 2016) (complaint alleged that Fiat-Chrysler had issued technical service bulletins about the defect in the same transmission in the plaintiffs' vehicles); *Sater v. Chrysler Grp. LLC*, No. EDCV 14-00700-VAP, 2015 WL 736273, at *2 (C.D. Cal. Feb. 20, 2015) (complaint alleged that Chrysler had fielded "hundreds" of complaints about the defect and had issued seven recalls related to the defect).

Having thoroughly analyzed the allegations in paragraph 66 of the amended complaint, and having reviewed the very-similar allegations elsewhere in the amended complaint, the Court finds

that the factual content is not sufficient to reasonably infer that Ford knew or should have known that water pumps in Cyclone engines were defective. As knowledge underlies Plaintiffs' tort claims based on omission, those claims are implausible.

* * *

In sum, whether based on affirmative representation or omission, Plaintiffs' factual allegations do not make it plausible that Ford fraudulently concealed, fraudulently omitted, or negligently misrepresented a water-pump defect. Plaintiffs' tort claims will be dismissed.

**B.**

The Court thus turns to Plaintiffs' claim that Ford violated the consumer-protection laws of 10 states (Arkansas, California, Illinois, Maryland, New Jersey, North Carolina, Pennsylvania, Tennessee, Texas, and Washington).

In addressing these claims, the Court takes the expressway. That is because the parties have essentially treated Plaintiffs' consumer-protection claims like their tort claims. Ford seeks dismissal of both the tort claims and consumer-protection claims on the same (or very similar) grounds. (*See* ECF No. 20, PageID.1307 (stating that "Plaintiffs' claims of . . . consumer protection . . . sound in fraud"); ECF No. 20, PageID.1313 n.8; ECF No. 27, PageID.1633.) And in responding to Ford's motion to dismiss, Plaintiffs make clear that their consumer-protection claims are based on the same statements and omissions underlying their tort claims. (*See* ECF No. 22, PageID.1596). Because the parties have treated the consumer-protection claims like the tort claims, and because the Court has already found the tort claims implausible, the Court will also dismiss Plaintiffs' consumer-protection claims. *Cf. Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) ("Appellants' [second amended complaint] asserts claims under a number of state consumer fraud statutes, each of which requires either an affirmative misrepresentation or an

omission of material fact."); *see Alban v. BMW of N. Am., LLC*, No. CIV 09-5398, 2010 WL 3636253, at *10 (D.N.J. Sept. 8, 2010) ("[T]he [New Jersey Consumer Fraud Act] does not require manufacturers to disclose things they do not know.").

The Court will, however, dismiss Plaintiffs' consumer-protection-act claims without prejudice. If Plaintiffs believe that liability exists under certain consumer protection acts even when the manufacture does not know, and does not have reason to know, of a defect, then Plaintiffs may file an amended complaint asserting claims under those states' laws. The procedure for amendment is detailed at the end of this opinion.

### C.

The Court turns to Plaintiffs' warranty claims. The Court first assesses the plausibility of Plaintiffs' express-warranty claims. The Court then examines Plaintiffs' implied-warranty claims. Lastly, the Court takes up Plaintiffs' warranty claims under the Magnuson-Moss Warranty Act and the Song-Beverly Consumer Warranty Act.

### 1.

Ford says that Plaintiffs' express-warranty claims are implausible for several reasons. (ECF No. 20, PageID.1292–1300.) The Court agrees with at least one: Ford did not breach the express warranty because no plaintiff brought his or her vehicle in for repair within both the time limit and the mileage limit set by the express warranty.

Explaining this conclusion requires setting out the express warranty at issue in some detail. The warranty guides that came with Plaintiffs' vehicles state,

Under your New Vehicle Limited Warranty *if*:

- *your Ford vehicle* is properly operated and maintained, and

- *was taken to a Ford dealership for a warranted repair during the warranty period*,

> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

(*See e.g.*, ECF No. 14, PageID.875 (Ford 2018 Model Year), PageID.916–917 (Mercury 2009 Model Year), PageID.957 (Lincoln 2012 Model Year); ECF No. 20, PageID.1348–1349 (Ford 2011 Model Year), PageID.1388–1389 (Ford 2008 Model Year) (emphases added).) Regarding the phrases "during the warranty period" and "during the applicable coverage period," the warranty guides state that "[p]owertrain components"—which includes the water pump—were "covered for five years or 60,000 miles, whichever occurs first." (*See e.g.*, ECF No. 20, PageID.1350.) For those plaintiffs who bought their Ford new, the five-year clock started when he or she took delivery (*see e.g.*, ECF No. 20, PageID.1342); for those plaintiffs who bought a used Ford, they received "any remaining warranty coverage" (*see e.g.*, ECF No. 20, PageID.1341). Thus, under the express warranties at issue in this case, Ford agreed to repair or replace the water pump if (1) the pump failed "during normal use" and the vehicle was less than five years old and had no more than 60,000 miles, (2) the vehicle's owner had "properly operated and maintained" his or her vehicle, and (3) the owner took his or her vehicle "to a Ford dealership for a warranted repair" within both the vehicle's first five years and first 60,000 miles.

The third precondition is the key one here. With two exceptions, the amended complaint states that each plaintiff sought a water-pump repair after his or her vehicle logged 60,000 miles. (ECF No. 14, PageID.585–590.) As for the two exceptions, those plaintiffs' vehicles were over five years old when they sought repair. (ECF No. 14, PageID.585–586 (Mori), PageID.587–588 (Lowery).) (Plaintiffs actually do not plead when Lowery's car was first sold; but Lowery has a 2008 Ford, he sought repair in 2015, and common-sense dictates that the car did not sit new on a dealer lot for over two years.) As it is not plausible that any plaintiff brought his or her vehicle to

a Ford dealer for a water-pump repair within the lesser of five years and 60,000 miles, Ford's express-warranty obligation to repair or replace the water pump was never triggered. So even if, as Plaintiffs' plead, Ford did not repair their vehicles cost-free, Ford did not breach the express warranty by failing to do so. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3d Cir. 1995) ("[T]he general rule, from which we see no reason to deviate, is that an express warranty does not cover repairs made after the applicable time has elapsed." (internal quotation marks and alterations omitted)); *Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019) ("Plaintiffs have failed to adequately plead a breach [of the express warranty] because they have not pleaded that the named Plaintiffs presented their vehicles to a Ford dealership before the earlier of three years or 36,000 miles occurred.").

Plaintiffs do not directly contest Ford's claim that they presented their vehicles for repair outside the time-and-mileage limits set by the express warranty. Instead they try two back roads. They argue that the durational limits are unconscionable. They also argue that the express warranty failed its essential purpose.

Take unconscionability first. One reason Plaintiffs say that Ford's durational limits are unconscionable is that when they bought their vehicles, Ford knew something material to the bargain that they did not. (ECF No. 22, PageID.1572.) In particular, Plaintiffs say that Ford knew the water pump in their vehicles would fail before 150,000 miles yet did not disclose that fact before the bargain was struck. (*See id.*) But this Court has already found that Plaintiffs have not pled factual content permitting the reasonable inference that Ford knew or should have known that the water pump was defective. It follows that Plaintiffs have not pled the type of information asymmetry necessary to establish unconscionability. That alone makes Plaintiffs' amended complaint different from the complaints in most of the cases they cite. *Cf. Carlson v. Gen. Motors*

*Corp.*, 883 F.2d 287, 296 (4th Cir. 1989) ("When a manufacturer is aware that its product is inherently defective, but the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power." (internal quotation marks omitted)); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 816, 822 (S.D. Ohio 2012) (finding it plausible that duration limitations on express warranty were unconscionable but also finding it plausible that manufacturer "had knowledge of the alleged coolant tube defect at all times relevant"); *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 618, 622–23 (M.D.N.C. 2006) (following *Carlson*'s unconscionability analysis where complaint alleged "over 20,000 warranty claims relating to premature ball joint failure," "over 850 reports of ball joint failure" to NHTSA, and "various reports in the press concerning failure of the Durango's ball joints").

Plaintiffs also say that the limitations on the express warranty are unconscionable because "they had no meaningful choice in the warranty negotiation and that there existed a gross disparity in bargaining power." (ECF No. 22, PageID.1571.) It probably is true that Plaintiffs had no ability to haggle with their Ford dealer for a warranty tailored to their specific needs. But Plaintiffs still had meaningful choices: General Motors, Toyota, and Kia to name a few. Indeed, around the time when Plaintiffs bought their Fords, they could have opted for Kia's 10-year, 100,000-mile powertrain warranty. *See* Kia Motors, 2011 Warranty and Consumer Information Manual, https://bit.ly/2XDXbeR (last visited July 17, 2019); *JBlanco Enterprises Soprema Roofing & Waterproofing, Inc. Barlovento, LLC v. Great Am. Ins. Grp.*, No. 1:13-CV-2831, 2016 WL 6600423, at *8 (N.D. Ohio Nov. 8, 2016) ("If [JBlanco's president] considered the warranty disclaimer unsatisfactory, JBlanco was free to secure roofing materials from other manufacturers with potentially more favorable warranty terms."). In short, Plaintiffs have not adequately pled that Ford's five-year, 60,000-mile express warranty was unconscionable. *See Perez v. Volkswagen*

*Grp. of Am., Inc.*, No. 2:12-CV-02289, 2013 WL 1661434, at *5 (W.D. Ark. Apr. 17, 2013) ("[T]here is nothing facially unconscionable about a five-year/60,000 mile warranty in the auto industry.").

Plaintiffs also argue that the express warranty failed its essential purpose. Under the Uniform Commercial Code, if "circumstances cause an exclusive or limited remedy to fail of its essential purpose," the buyer can resort to other remedies, including those set out in the UCC. *See* UCC § 2-719. Plaintiffs offer two theories for how the express warranty failed its essential purpose. Before examining those, some factual and legal background is useful.

Factually, Ford did not promise that Plaintiffs' powertrains were defect-free; Ford merely promised that (if certain conditions were met) it would "repair, replace, or adjust" powertrain parts, including the water pump, free of charge. (*See e.g.*, ECF No. 20, PageID.1349.) In other words, the express warranty was a repair-or-replace warranty. *See Darne v. Ford Motor Co.*, No. 13 CV 03594, 2017 WL 3836586, at *6 (N.D. Ill. Sept. 1, 2017) ("[Ford] did not promise a defect-free engine; it promised to repair the problems those defects caused during a limited period." (emphasis added)); *Cosman v. Ford Motor Co.*, 257, 674 N.E.2d 61, 66 (Ill. Ct. App. 1996) (same).

Legally, repair-or-replace warranties usually fail their essential purpose when, after several tries, the manufacturer is not able to bring the product up to snuff. *See Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 594 (D.N.J. 2016) ("[C]ourts have held that a remedy fails of its essential purpose if, 'after numerous attempts to repair,' the product does not operate free of defects."); *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1319 n.11 (S.D. Fla. 2009) ("The 'essential purposes' exception typically has been limited to circumstances involving repeated (unsuccessful) efforts to repair a product that completely fails in its intended use."). That makes sense: if the manufacturer cannot repair the good, a repair warranty fails to ensure that the buyer

gets the benefit of her bargain (a defect-free good). *See BAE Sys. Info. & Elecs. Sys. Integration,*
*Inc. v. SpaceKey Components, Inc.*, 752 F.3d 72, 76 (1st Cir. 2014) ("[T]he essential purpose of a
repair or replacement remedy is to put conforming goods in the hands of the buyer.")

With that background, the Court turns to Plaintiffs' two theories. The first is that Ford
"consistently refused to repair the defective water pump." (ECF No. 22, PageID.1572.) Plaintiffs
also argue that their express warranties failed their essential purpose "because replacing a defective
water pump with another defective water pump is not a sufficient remedy." (ECF No. 22,
PageID.1573.)

As to Plaintiffs' first theory, the amended complaint lacks factual content supporting Ford's
"consistent[] refus[al] to repair the defective water pump." To the contrary, the amended complaint
reveals that no plaintiff brought his or her vehicle in for repair within the time-and-mileage
limitations of the express warranty. And if Plaintiffs never brought their vehicles in for repair
during the express-warranty period, Ford's failure to repair the water pump does not show that the
warranty failed its essential purpose. To the contrary: the express warranty had already fulfilled its
essential purpose by the time Plaintiffs sought repairs (i.e., the warranty had already ensured that
car owners would not have to pay for powertrain repairs during the warranty period). *See Wozniak*
*v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019) ("For
a repair-or-replace remedy to fail its essential purpose . . . the consumer must give the
manufacturer an opportunity to repair or replace the alleged defect during the warranty period.").

Plaintiffs' factual allegations also fall short of establishing their second theory. To start,
Plaintiffs have not pled that the only way Ford could have repaired their vehicles (had they brought
them in during the warranty period) was by using an identically-defective water pump. And even
assuming that all Ford would have done was swap in an identical pump, Plaintiffs have not

adequately pled how this would have failed to give them the benefit of their bargain. Notably, of the 12 plaintiffs, the earliest water pump failure was at 54,000 miles and the median water pump failure was at 77,500 miles. So even if Ford simply swapped in an identically-defective water pump, it appears that Plaintiffs' vehicles would have run, in the usual case, another 77,500 miles. And that means that with one water-pump repair, Plaintiffs vehicles would run, in the typical case, about 145,000 miles. The Court is thus not persuaded by Plaintiffs' equally-defective-repair theory. *See Weidman, v. Ford Motor Co.*, No. 18-CV-12719, 2019 WL 3003693, at *2 (E.D. Mich. July 10, 2019) ("Plaintiff has provided no authority from [Alabama or Texas] demonstrating that replacing an allegedly defective part with the same part amounts to a breach of an express warranty."); *but see Benkle v. Ford Motor Co.*, No. SACV161569DOCJCGX, 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017) (finding plausible the plaintiffs' assertion that "the replacement ETBs are substantially certain to fail again").

* * *

In sum, Plaintiffs did not present their Ford vehicles for a water-pump repair within the durational limits of the express warranties that came with their vehicles, Plaintiffs have not adequately pled that those limits are unconscionable, and Plaintiffs have not adequately pled that their express warranties failed their essential purpose. Plaintiffs' express-warranty claims will be dismissed.

**2.**

Plaintiffs also assert that Ford breached the implied warranty of merchantability, i.e., that their vehicles were not fit for their ordinary purpose.

Ford disagrees; it points out that the ordinary purpose of a vehicle is to "provid[e] transportation." (*See* ECF No. 20, PageID.1300 (quoting *Sheris v. Nissan N. Am. Inc.*, No. CIV.

07-2516, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008).) And, says Ford, each plaintiff's vehicle not only did just that, it did so for several years and tens-of-thousands of miles. (ECF No. 27, PageID.1632 n.15; ECF No. 20, PageID.1301.) Thus, in Ford's view, Plaintiffs' vehicles were merchantable.

Perhaps discovery on consumer expectations and industry standards will prove Ford correct; but at the pleading stage, it is plausible that Plaintiffs' vehicles were not merchantable. Sure, cars are supposed to get people from A to B; but they, like other durable goods, are expected to work for a good while. *See Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 948 (C.D. Cal. 2012) ("A vehicle that operates for some time after purchase may still be deemed unfit for ordinary purposes if its components are so defective that the vehicle becomes inoperable within an unacceptably short period of time." (internal quotation marks omitted)). And in recent years, vehicles are built to last 150,000 miles or more. *See* Dexter Ford, *As Cars Are Kept Longer, 200,000 Is New 100,000*, N.Y. Times (Mar. 16, 2012), https://nyti.ms/2YTbwk7; Ken Budd, *How Today's Cars Are Built to Last*, AARP (Nov. 1, 2018), https://bit.ly/2XSCNlc. So when a car buyer drops $30,000 or so on a 2011 Ford Edge, it might be reasonable for her to expect it to run 75,000 miles (to pick a number) without needing a critical engine part repaired. *Cf. Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996) ("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable."). Yet some of the plaintiffs have alleged that their vehicles needed an expensive engine repair well before 75,000 miles. (*See e.g.*, ECF No. 14, PageID.586 ($4,500 water-pump repair at 54,000 miles); ECF No. 14, PageID.590 ($7,600 water-pump repair at 63,500 miles).)

The Court thus declines Ford's invitation to declare Plaintiffs' vehicles merchantable at the pleading stage.

Ford also argues that, except for Rebekah Backhaus, Plaintiffs brought their breach-of-implied-warranty claims to court too late. (*See* ECF No. 20, PageID.1304, 1328.)

The Court agrees with Ford's statute-of-limitations argument. Under the Uniform Commercial Code, a buyer only has four years to sue a seller for breaching a sale-of-goods contract. *See* UCC § 2-275. And, says the UCC, for a breach-of-warranty claim, the four-year timer starts to run at "tender of delivery." *See id.* And once started, the four-year timer runs even if the buyer does not know of the breach of warranty. *See* UCC § 2-275; 4B Anderson U.C.C. § 2-725:101 (3d. ed.) ("A defective tender of goods starts the running of the statute of limitations, without regard to whether the nonconformity is known or unknown."). Here, tender of delivery was when Ford sold Plaintiffs' vehicles to one of its dealers or, at latest, when Plaintiffs' vehicles were purchased from the dealer. *See Schmidt v. Ford Motor Co.*, 198 F. Supp. 3d 511, 526 (E.D. Pa. 2016); *Cianfrani v. Kalmar–Ac Handling Sys., Inc.*, No. 93-5640, 1995 WL 563289, at *8 (D.N.J. Sept. 11, 1995). And, according to the amended complaint, each plaintiff (except Backhaus) has sued more than four years after their vehicle was first purchased. (Some plaintiffs do not allege when their vehicle was first purchased but, based on the alleged model year, the only reasonable inference is that their vehicles were first purchased more than four years before the complaint or amended complaint. (ECF No. 20, PageID.1331–1332, 1334 (summarizing model year and date of purchase).) Accordingly, except for Backhaus, Plaintiffs' claims that Ford breached the implied warranty of merchantability are barred by the statute of limitations.

This determination admittedly creates some tension with the notion that a vehicle is not merchantable if it fails to run say, 75,000 miles without a major engine repair. After all, most

vehicles will not reach 75,000 miles within their first four years. *See* U.S. Dep't of Transportation, Federal Highway Admin., https://bit.ly/2e2G0JN (last updated Mar. 29, 2018). Or, if merchantability is viewed in terms of years instead of mileage, it might well be the case that a vehicle's engine, if it is fit for its ordinary purpose, should run for more than four years without major repair. In either case, a new-car buyer will not know if her vehicle is merchantable before the four-year clock runs out.

While this tension is reason to tap the brakes on applying the statute-of-limitations, it does not require a full stop. For one, the drafters of the UCC may have contemplated this tension. They recognized that a four-year limitations period, coupled with the fact that the clock would run even if the buyer was unaware of the breach of warranty, could be harsh on buyers. But the drafters wanted to give sellers certainty. *See Dart Indus., Inc. v. Adell Plastics, Inc.*, 517 F. Supp. 9, 11 (S.D. Ind. 1980) ("A seller's interest in having some clearly defined limit on the period of its potential liability apparently outweighed a buyer's interest in an extended warranty unless such an extended warranty was part of a specific bargain."); *Persichini v. Brad Ragan, Inc.*, 735 P.2d 168, 176 (Colo. 1987) ("The intended effect of section 4–2–725 . . . is to provide sellers with a definite and uniform starting and termination date for possible warranty liability on a contract of sale[,] . . . even though such rule might be somewhat disadvantageous to the buyer because of the buyer's lack of awareness of a breach.").

And even if the tension between durable goods and UCC § 2-725 was not contemplated by the drafters, it is not the office of federal courts to rewrite state statutes. *See e.g.*, *Lamie v. U.S. Treasury*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)).

In response to Ford's statute-of-limitations argument, Plaintiffs assert that the four-year clock should have tolled because Ford fraudulently concealed the water-pump defect. (ECF No. 22, PageID.1578–1579.) But for Ford to have fraudulently concealed the water-pump defect, it would have to at least have known that the water pumps in Cyclone engines were defective. *See e.g.*, *AT & T Corp. v. Rylander*, 2 S.W.3d 546, 557 (Tex. App. Ct. 1999) ("The elements of fraudulent concealment are: (1) actual knowledge by a defendant that a wrong has occurred, and (2) a fixed purpose to conceal the facts necessary for the plaintiff to know it has a cause of action."). The Court has already found that Plaintiffs have not adequately pled that Ford had such knowledge. It follows that Plaintiffs have not adequately pled equitable tolling.

That leaves one loose end (Backhaus' implied-warranty claim) and one wrinkle to iron out (Mori's implied-warranty claim). As noted, Ford has not argued that Backhaus' implied-warranty claims are barred by the statute of limitations. So the Court must tie up her claim another way. As for Mori, he is from California and that state's Song-Bervely Consumer Warranty Act introduces a wrinkle into the statute-of-limitations analysis.

Some law is necessary to appreciate that wrinkle. Under the Uniform Commercial Code, the implied warranty of merchantability focuses on the moment the seller tenders goods to the buyer—are the goods merchantable at that moment? As such, the UCC does not speak of a durational period for an implied warranty of merchantability. California's Song-Bervely Consumer Warranty Act changes things somewhat. In particular, the Act provides that implied warranties of merchantability last up to one year after tender (the specific duration depends on the existence and duration of the express warranty). *See* Cal. Civ. Code § 1791.1. This means that, for example, a good sold in California could be merchantable at tender but breach the implied warranty of merchantability by becoming unfit for its ordinary purpose six months later. And California

courts have held, *see Mexia v. Rinker Boat Co.*, 95 Cal. Rptr. 3d 285, 293–95 (Cal. Ct. App. 2009), and the Ninth Circuit believes the California Supreme Court would hold, *see Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222–23 (9th Cir. 2015), that if the buyer discovers the breach of the implied warranty of merchantability after the implied-warranty period set by the Song-Beverly Act, the buyer may still sue for a breach that occurred during the implied-warranty period.

Perhaps an example helps. Suppose that the duration of the implied warranty of merchantability as set by the Song-Beverly Act is one year; suppose the good becomes unmerchantable at six months; further suppose that, despite reasonable efforts, the buyer discovers this fact two years after tender; the fact that the discovery is after the one-year implied-warranty period does not preclude suit. *Cf. Mexia*, 95 Cal. Rptr. 3d at 293–94 (analogous facts).

With that background, here is the wrinkle: some courts have read *Mexia* to hold that the discovery rule not only applies to the implied-warranty period set by the Song-Beverly Act but also to the UCC's four-year statute of limitations on breach-of-implied-warranty claims. If those courts are right, then Mori's implied-warranty claim would be timely.

The wrinkle can be ironed out by noting that the broad reading of *Mexia* stems from *Ehrlich v. BMW of North America, LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010), and that the *Ehrlich* court apparently conflated the durational period of an implied warranty of merchantability and the statute of limitations. *See Block v. Jaguar Land Rover N. Am., LLC*, No. CV 15-5957 (SRC), 2017 WL 902860, at *5-6 (D.N.J. Mar. 7, 2017) ("The court in *Ehrlich* did not provide a persuasive explanation of the basis for its surprising decision."). Indeed, the court in *Mexia* stated, "the duration provision is not a statute of limitations." 95 Cal. Rptr. 3d at 294; *see also Ferris v. Ford Motor Co.*, No. 18-CV-03216-JSW, 2019 WL 1100376, at *3 (N.D. Cal. Mar. 8, 2019) ("*Mexia* affects neither the length of the statute of limitations for a breach of implied warranty nor the point

at which a breach of warranty occurs."). Accordingly, the Court does not find that the Song-Beverly Act or *Mexia*'s interpretation of the Act alters the conclusion that Mori's implied-warranty claim was brought to court too late.

Remaining then, is Backhaus' implied-warranty claim. As an initial matter, the two grounds for dismissal so far discussed—merchantability and statute of limitations—do not render her claim implausible. Backhaus bought a new Ford Explorer in October 2015 and became a plaintiff in this case in December 2018. (ECF No. 14, PageID.589.) So she brought her implied-warranty claim with plenty of time left on the four-year clock. As for merchantability, it is true that Backhaus' Ford went 73,000 miles before needing a $2,500 water-pump repair; but it was also true that her Ford was only three years old at that time. (ECF No. 14, PageID.589.) So it is plausible (just barely) that her Ford was not merchantable. As to Backhaus then, the Court will examine Ford's other grounds for dismissing Backhaus' implied-warranty claim. (*See* ECF No. 20, PageID.1328.)

Ford argues that Backhaus' implied-warranty claim fails because she did not give timely notice of the failure. (ECF No. 20, PageID.1305, 1328.) Backhaus is from Pennsylvania. And it is true that Pennsylvania's version of UCC § 2-607 required Backhaus to notify Ford of a breach of implied warranty "within a reasonable time after [s]he discover[ed] or should have discovered any breach." 13 Pa. Cons. Stat. § 2607. But Backhaus' water pump failed in October 2018 and Plaintiffs sent Ford a letter on November 30, 2018 about the water-pump defect. (ECF No. 14, PageID.796; *see also* ECF No. 22, PageID.1582.) That seems like "a reasonable time after" Backhaus should have discovered the breach. True, the November 30 letter only predated her lawsuit by six days (*see* ECF No. 14 (adding Backhaus as a plaintiff)) and the notice requirement is supposed to give Ford a fair chance to resolve the issue without litigation, *see Am. Fed'n of State*

*Cty. & Mun. Employees v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 08-CV-5904, 2010 WL 891150, at *6 (E.D. Pa. Mar. 11, 2010), but perhaps six days was enough for Ford to decide whether it would make Backhaus whole for the water-pump failure. So the Court narrowly finds it plausible that Backhaus complied with the notice requirements of UCC § 2-607.

Ford also argues that Backhaus' implied-warranty claim fails because the implied warranty of merchantability expired before her vehicle's water pump broke. (*See* ECF No. 20, PageID.1303.) The warranty guides that came with Plaintiffs' vehicles state, "[The] implied warrant[y] [of merchantability is] limited, to the extent allowed by law, *to the time period covered by the written warranties*, or to the applicable time period provided by state law, whichever period is shorter." (ECF No. 20, PageID.1346 (emphasis added).) Because Backhaus' water pump did not fail until her vehicle hit 73,000 miles, i.e., beyond the durational limits of the express warranty, Ford concludes that there was no breach of the implied warranty of merchantability.

This argument may well have merit. *See e.g.*, *White v. Volkswagen Grp. of Am., Inc.*, No. 2:11-CV-02243, 2013 WL 685298, at *5 (W.D. Ark. Feb. 25, 2013). But for now, the Court demurs. It does so for two related reasons. First, and primarily, with only Backhaus' implied-warranty claim (and pendent Magnuson–Moss claim) remaining in the case, it is quite possible that the parties can resolve her claims. Second, the notion that the implied warranty of merchantability is limited to the lesser of five years or 60,000 miles is in tension with the plausible notion that a modern, merchantable engine should last up to say, 75,000 miles without major repair. Presently, the parties have not adequately briefed how the law resolves that tension. And given that a compromise resolution is possible, the Court declines to wade into that legal issue without additional briefing.

In short, except for Backhaus, Plaintiffs' implied-warranty claims will be dismissed as time barred.

**3.**

Both sides agree that Plaintiffs' Magnuson-Moss Warranty Act claims rise and fall with Plaintiffs' express- and implied-warranty claims. (ECF No. 20, PageID.1306; ECF No. 22, PageID.1579.) And there is case law that agrees with the parties' agreement. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015); *Temple v. Fleetwood Enterprises, Inc.,* 133 F. App'x 254, 268 (6th Cir. 2005). The Court thus finds that Backhaus' MMWA claim, to the extent it is premised on her implied-warranty claim, will survive and that all other MMWA claims will be dismissed.

**4.**

Ford has addressed Mori's claim under the Song-Beverly Consumer Warranty Act as though it were no different than his express- and implied-warranty claims. For their part, Plaintiffs say that Mori's claim under the Act survives because they "adequately plead express/implied warranty claims." (ECF No. 22, PageID.1579.) Because Ford has treated Mori's claim under the Song-Beverly Act like his express- or implied-warranty claims, and because Plaintiffs offer no separate grounds for Mori's Song-Beverly Act to survive, the Court will dismiss Mori's claim under the Act for the reasons provided.

\* \* \*

In sum, Plaintiffs' express-warranty claims will be dismissed because Plaintiffs did not present their vehicles for repair within the express-warranty period; except for Backhaus, Plaintiffs' implied-warranty claims will be dismissed because they brought those claims to court

too late; and Plaintiffs' claims under MMWA and Song-Beverly Act will be dismissed for the same reasons that Plaintiffs' implied- and express-warranty claims will be dismissed.

## IV.

For the reasons given, Ford's motion to dismiss is GRANTED IN PART. Plaintiffs' claims of negligent misrepresentation, fraud by omission, and fraudulent concealment are DISMISSED WITH PREJUDICE. Except for Backhaus' claim that Ford breached the implied warranty of merchantability and, because of that, breached the Magnuson–Moss Warranty Act, Plaintiffs' claims that Ford breached an express warranty, breached an implied warranty, violated the Magnuson–Moss Warranty Act, and violated the Song-Beverly Consumer Warranty Act are DISMISSED WITH PREJUDICE.

Plaintiffs' claims that Ford breached the consumer protection laws of 10 states are DISMISSED WITHOUT PREJUDICE. If Plaintiffs intend to file a second amended complaint reasserting a violation of a particular state's consumer protection law, Plaintiffs must first identify at least one case holding (or at least strongly suggesting) that liability under that state's law does not require a showing that Ford knew or should have known of the defect. Plaintiffs should have one such case for each state's consumer-protection law they intend to pursue. This list of cases should then be sent to Ford. Ford will then have the opportunity to either agree that a state's consumer-protection law does not require Plaintiffs to show knowledge or to cite a case to the contrary. The parties are then to meet and confer in an attempt to narrow the disputed states. After the meet and confer, Plaintiffs may file an amended complaint. With the amended complaint, a table of cases by state should be included. One column should be Plaintiffs' cases regarding knowledge, the other Ford's. The amended complaint, if any, must be filed by September 6, 2019. If a second amended complaint is filed, Ford may respond accordingly.

The parties are also to meet and confer in an attempt to resolve Backhaus' two surviving claims.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: August 6, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, August 6, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

s/William Barkholz
Case Manager