UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY ROE, *et al.*,

    Plaintiffs,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No. 2:18-cv-12528
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

**OPINION AND ORDER DENYING IN PART PLAINTIFF'S MOTION FOR RECONSIDERATION [34] AND HOLDING THE REMAINDER OF THE MOTION IN ABEYANCE PENDING SUPPLEMENTAL BRIEFING**

    Plaintiffs own vehicles made by Ford Motor Company and assert that the water pumps in their vehicles' engines broke prematurely. In Plaintiffs' view, "Ford represents that the water pump is expected to last for the useful life of the engine, or at least 150,000 miles, without the need for maintenance, repair or replacement." (ECF No. 14, PageID.598.) Because their vehicles' water pumps broke well before 150,000 miles, Plaintiffs sued Ford (on their own behalf and on behalf of other Ford vehicle owners). Plaintiffs brought 55 claims under 11 states' laws. Oversimplifying slightly, Plaintiffs brought tort claims, consumer-protection act claims, and breach-of-warranty claims.

    Except for two claims of one plaintiff (who has since settled with Ford), the Court dismissed all 55 claims. *See generally Roe v. Ford Motor Co.*, No. 18-12528, 2019 WL 3564589 (E.D. Mich. Aug. 6, 2019). In large part, this dismissal was based on a single determination: Plaintiffs' amended complaint did not plead facts from which it could be reasonably inferred that "Ford knew or should have known that water pumps in Cyclone engines were defective." *Id.* at *8. Moreover, given that Plaintiffs had already amended once, that Plaintiffs were aware that Ford had

challenged the sufficiency of their allegations of knowledge (*see* ECF No. 20, PageID.1318–1320; ECF No. 27, PageID.1636), and that if Plaintiffs had any additional allegations pertaining to Ford's knowledge at their disposal, they surely would have included them in their amended complaint (or moved to amend), the Court elected to dismiss Plaintiffs' claims with prejudice. (Although the consumer-protection act claims were dismissed without prejudice, the Court set out a specific procedure for saving those claims and it appears that Plaintiffs have not taken advantage of that procedure. *See Roe*, 2019 WL 3564589, at *17.)

Plaintiffs now ask this Court to reconsider its decision. (ECF No. 34.) "Specifically, Plaintiffs request that the Court reconsider its finding that Plaintiffs have not sufficiently alleged that [Ford] . . . knew or should have known that the water pump installed in Plaintiffs' vehicles was defective." (ECF No. 34, PageID.1697.)

As will be explained, the Court finds that Plaintiffs have not shown that this Court clearly erred in deciding to dismiss the claims of the amended complaint. But—maybe—dismissal should not have been with prejudice and Plaintiffs should be allowed to file a second amended complaint.

I.

Before turning to Plaintiffs' assertions of error, a few words on the legal standard.

The primary purpose of a motion for reconsideration of a final judgment, *see* Fed. R. Civ. P. 59(e), is to allow a district court to correct its own mistakes before the Court of Appeals corrects them, *see Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) ("The purpose of Rule 59(e) is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." (internal quotation marks omitted)).

This District's corresponding local rule is broader in the sense that it permits reconsideration of interlocutory orders too. *See* E.D. Mich. LR 7.1(h). But the local rule's purpose

is similar to that of Rule 59: when a district court corrects its own interlocutory mistake, it prevents litigation from heading down the wrong path to judgment (only to have to completely backtrack upon reversal on appeal) and saves the time and money of an appeal after judgment is entered. And when a court corrects its own mistakes, it makes known that it is striving for the "right" outcome and thus increases public confidence in the court system. *See Nelson v. City of Albuquerque*, 925 F.3d 1187, 1192 (10th Cir. 2019) (Hartz, J., dissenting from denial of en banc review) ("Occasionally, we did miss something, and we correct our opinion. The important thing is to do justice. I am confident that this is also the practice of the district courts.").

Some principles follow from those aims. One is that the district court's mistake must truly matter, i.e., if the mistake is corrected, there will be a different decision. *See* E.D. Mich LR 7.1(h) (providing that, generally, a party seeking reconsideration must "show that correcting the defect will result in a different disposition of the case"). Otherwise, the path to judgment does not change upon correcting the interlocutory order. Another principle is that the mistake must be quite plain— otherwise all a motion for reconsideration does is invite further debate and, rather than saving time and money, it expends time and money. *See id.* (providing that, generally, a party seeking reconsideration must show a "palpable defect"). That the error must be plain also respects finality: a district court puts considerable thought and effort into its initial decision, and so that decision should not be readily changed. Together, these principles mean that a party seeking reconsideration must either point to key facts or binding legal precedent that the district court misapplied or failed to consider and, once properly considered, would readily lead to a different decision. As a third principle, the party seeking reconsideration must usually demonstrate that the district court erred given the record and law that existed when it made its initial decision. After all, it is hardly fair or efficient to force a district court and opposing counsel to analyze claims based on one record only

3

to turn around with an expanded record, and claim error based on that expanded record. This comports with general appellate rules too—parties appealing a district court decision are not usually allowed to expand the record on appeal.

These principles lead to a general rule: a party seeking reconsideration must show that the district court clearly erred, that the court's initial decision will change if the clear error is corrected, and that the error was based on the law and record as it stood when the district court made its initial decision. *See Saltmarshall v. VHS Children's Hosp. of Mich., Inc.*, 402 F. Supp. 3d 389, 393 (E.D. Mich. 2019) ("[T]he moving party must show that the Court made a mistake based on the record before it and rectifying the mistake would change the outcome.").

That general rule permits some limited exceptions. For instance, perhaps binding and outcome-altering precedent comes down days after the district court's decision. Or perhaps the party seeking reconsideration shows that it discovered new, outcome-altering evidence and, despite all reasonable diligence, it was not able to discover that evidence before the court's initial decision. *See Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) ("[C]ourts will find justification for reconsidering interlocutory orders where there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." (citation and internal alterations omitted)). In these and like situations, although the matter was decided correctly on the facts and law as they stood at the time of the initial decision, a district court might still wish to account for the new developments so that the case can ultimately be decided correctly. *See* E.D. Mich. LR 7.1(h)(3) (providing that court retains "discretion" to grant or deny a motion for reconsideration); *Appeal of Sun Pipe Line Co.*, 831 F.2d 22, 25 (1st Cir. 1987) ("[O]nce the ball has ended, the district court has substantial

4

discretion in deciding whether to strike up the band again in order to allow the losing party to argue new material or a new theory.").

## II.

That discussion of the legal standard helps partition Plaintiffs' motion for reconsideration into two. Plaintiffs make several arguments based on the complaint as it stood at the time this Court made its decision to dismiss their claims. Plaintiffs also make several arguments based on information that was not part of their complaint (some of which was obtained after this Court's decision on Ford's motion). The Court starts with Plaintiffs' arguments based on the amended complaint as filed. The Court then turns to Plaintiffs' arguments based on new allegations.

### A.

As a general matter, Plaintiffs assert that their amended complaint pled facts that, if taken as true, "raise a plausible inference that Ford knew that the internal chain-driven water pump installed in Plaintiffs' vehicles was prone to failure before the useful life of the engine and that the internal placement of this defective water pump would lead to complete engine failure and/or costly repairs." (ECF No. 34, PageID.1701.) More specifically, Plaintiffs say that the Court made three errors in concluding that it was not reasonable to infer from their allegations that Ford knew or should have known of the water-pump defect.

#### 1.

First, Plaintiffs argue that the Court erred in casting a factual allegation about Ford's knowledge as a legal conclusion.

In its prior opinion, the Court reasoned,

> Start with the first sentence [of paragraph 66 of the amended complaint]: "[k]nowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford." That is a legal conclusion. And this Court need not accept legal conclusions as fact when assessing plausibility. *See*

5

> *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

*Roe*, 2019 WL 3564589, at *6.

Plaintiffs say this was error. They argue, "It is more than plausible—in fact unquestionably true—that Ford, as the Original Equipment Manufacturer, had greater information about the design, development, testing, installation and use of the internal chain-driven water pump installed in Plaintiffs' vehicles than Plaintiffs or the general public." (ECF No. 34, PageID.1701.) Plaintiffs point out that they pled that when Ford elected to place the water pump inside the engine block, Ford knew (or should have known) that the pump needed to be sealed off from other engine parts (i.e., in a "closed system") to prevent coolant from mixing with oil. (ECF No. 34, PageID.1702.) Plaintiffs also point out that they pled that given the pump's internal location, Ford knew (or should have known) that replacing a broken pump would be "extremely expensive." (*Id.*) Plaintiffs say that it is reasonable to infer from their allegations that Ford knew (or should have known) that the pumps "must last the useful life of the engine to avoid premature engine failure and/or expensive repairs." (*Id.*) Further, say Plaintiffs, given that Ford knew or should have known that the pump's failure would lead to costly repairs and catastrophic engine failure, "Ford would (or should) have in its possession information not available to Plaintiffs examining whether Plaintiffs' water pump design and materials were defective." (*Id.*)

Plaintiffs have not shown that the Court clearly erred in finding that their allegation, "[k]nowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford," was a legal conclusion. Without more, that statement is undoubtedly a legal conclusion. And if this Court understands Plaintiffs' reconsideration argument correctly, the "more" is their allegations that Ford knew that it was placing the pump inside the engine block,

6

that Ford knew that an internal-pump had to be sealed off from the rest of the engine to prevent coolant from mixing with oil, that Ford had exclusive information about the design and manufacture of the internal pump, and that Ford knew that if the pump failed, it would result in costly repairs and perhaps destroy the engine. But it does not follow from this alleged knowledge that Ford had exclusive and superior knowledge of "the Water Pump Defect." It is one thing to know about the pump's design and to know that *if* the pump fails, it will cause lots of damage; but it is another thing to know that the pump *is* defective. In other words, it does not follow from Ford's exclusive and superior knowledge about the water pump that Ford had exclusive and superior knowledge that the pump was defective. It is likely true of every part on a Ford vehicle that Ford has more knowledge than a consumer about the part and the consequences of the part's failure—but the overwhelming majority of such parts are not defective.

So Plaintiffs have not shown that the Court clearly erred in finding that their allegation about "exclusive and superior" knowledge was a legal conclusion. Or, even granting that the Court erred in casting the allegation as a legal conclusion, Plaintiffs have not shown that the allegation materially supports an inference that Ford knew or should have known that the water pump was defective.

**2.**

Plaintiffs next assert the Court erred in finding that the allegations about Ford's testing did little to establish that Ford knew or should have known of a water-pump defect.

In its prior opinion, the Court stated,

> Next consider Plaintiffs' allegations about testing ("pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, . . . testing performed in response to consumer complaints"). The amended complaint does not say what the testing revealed. Even assuming this refers to water pump testing, Plaintiffs would like the Court to infer that the water-pump testing revealed some type of defect. But absent at least a hint as to the test

7

results, it is no more likely that the testing revealed a flawed water pump than a flawless water pump. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

*Roe*, 2019 WL 3564589, at *6.

Plaintiffs assert this reasoning is flawed. For one, Plaintiffs assert that it was "near[ly] impossible" to know what Ford's testing revealed at the pleading stage. (ECF No. 34, PageID.1703.) Citing *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 735 (6th Cir. 2015), Plaintiffs say that "it is unreasonable to place the burden on Plaintiffs to specifically plead facts only accessible [to] the Defendant at the time of filing." (ECF No. 34, PageID.1703.) Plaintiffs point out that their amended complaint pled that their 12 vehicles had broken water pumps, quoted 14 complaints filed with the National Highway Traffic Safety Administration about broken pumps, and pled that those 14 were but a "small sample" of water-pump complaints. (ECF No. 34, PageID.1704.) Plaintiffs point out that they also alleged that there were customer complaints about the pumps and reports of repairs of pumps, and that it stands to reason that those complaints and repairs would have exceeded the number of complaints to NHTSA. (ECF No. 34, PageID.1705.) Given these allegations of numerous water pump failures, Plaintiffs imply that it was reasonable to infer that the Ford's testing revealed a problem with the water pump.

The Court is not persuaded that it clearly erred in reaching the contrary conclusion.

As an initial matter, the Court is not completely confident that *El-Hallani* paints a complete picture of the plausibility standard. *El-Hallani* states that "a plaintiff is not required to set out detailed factual allegations," that "[u]ntil discovery has begun, the plaintiff simply may not have access to all the facts," and that courts "should take into account 'economic[] or logistical[]' circumstances that prevent the plaintiff from obtaining evidence supporting his claim and adjust

8

the plausibility threshold appropriately to account for these difficulties." 623 F. App'x at 735. But the third quote from *El-Hallani* is from a law review article and the article's author seems to be suggesting how the law should be instead of explaining what the law is.[1] And there is some published Sixth Circuit authority that is in tension with *El-Hallani*. *See New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) ("[P]laintiff must allege specific facts of price discrimination even if those facts are only within the head or hands of the defendants.").

But even embracing *El-Hallani*'s lower plausibility standard, Plaintiffs allegations about testing and broken pumps still do not cross *El-Hallani*'s threshold. The normal situation is that when a car manufacturer sells a vehicle, testing of a critical part revealed no significant issues (as opposed to the norm being that the critical part was defective, but the manufacturer nefariously chose to sell millions of vehicles anyway). So Plaintiffs' amended complaint needed to rebut that commonsense notion. Yet Plaintiffs merely alleged that their 12 pumps broke, that the pumps of 14 others broke (according to the quoted NHTSA complaints), that the 14 NHTSA complaints were but a "small sample," and that there were some unspecified number of complaints about and repairs of pumps. From these allegations it is unclear, even to an order of magnitude, how many water pumps in Ford vehicles have failed. Further, Plaintiffs alleged that "millions"—plural—of Fords were sold with an engine and pump like theirs. (ECF No. 14, PageID.578.) (Indeed,

---

[1] "*Twombly* and *Iqbal* have shifted this information-access balance so that it favors those defendants best able to keep their records, conduct, and institutional secrets to themselves. Yet, I would think that judicial 'common sense' suggests that when a plaintiff has no economically or logistically reasonable way of unearthing important information that is in the possession of the defendant, the plausibility barrier needs to be lowered somewhat to allow some contained discovery or to give the plaintiff, whose complaint must comply with and is subject to the sanctions provided by Rule 11, the benefit of the doubt." Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. Rev. 286, 341 (2013).

according to Plaintiffs, Ford had used the Cyclone Engine and the associated internal-water-pump design in several popular vehicles for over ten years. (*See* ECF No. 14, PageID.593.)) With a denominator of "millions," Plaintiffs' amended complaint needed to give a better sense of the numerator to permit the reasonable inference that more than an infinitesimal percentage of Ford vehicles had water pumps that failed before 150,000 miles. In other words, because it was not reasonable to infer that more than a tiny fraction of Ford vehicles experienced water-pump failures, it was not reasonable to infer that Ford's testing revealed a defect. Or think of it this way: if only 1 in 100,000 Cyclone engines experience a water pump failure before 150,000 miles, how many vehicles would Ford have to test before discovering that issue? And how many more would it have to test to decide that the issue was occurring frequently enough that there was a defect?

So it was not clear error to find that "absent at least a hint as to the test results, it is no more likely that the testing revealed a flawed water pump than a flawless water pump," *Roe*, 2019 WL 3564589, at *6, when the Court probably could have more strongly found that "absent at least a hint as to the test results, it is quite unlikely that the testing revealed a flawed water pump."

### 3.

Plaintiffs' third claim of error based on the as-filed complaint is similar to their second. Plaintiffs assert that this Court erred in finding that their allegations of customers complaints about and auto-shop repairs of water pumps did not make it plausible that Ford knew or should have known of the water pump defect.

> To better understand this argument, the Court again recounts what it said previously:
>
> So that leaves Plaintiffs' allegations that Ford owners reported issues about water-pump failures and sought water-pump repairs (i.e., "early consumer complaints made to [Ford's] and Mazda's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA").

These allegations also do not make it reasonable to infer that Ford knew or should have known of the water-pump defect.

To see why, it helps to start with a bit of readily-available knowledge and a bit of common sense. . . . The readily-available knowledge: Ford sells over two million vehicles in North America each year and over five million a year worldwide. . . . So, on any given day, there are millions of Fords (if not tens of millions of Fords) on the road. And, applying common sense, that means that on any given day, there are dozens (if not hundreds) of complaints about Ford vehicles made to a Ford dealer, to NHTSA, on an internet forum, or even to Ford directly. And given the millions of Ford vehicles in operation, there must be dozens (if not hundreds) of repairs of Ford vehicles at Ford dealerships on any given day. So for consumer complaints and repair logs to give fair notice to Ford that one particular part is consistently having problems, it must be that the number of complaints about and repairs of that specific part stood out. Or, put slightly differently, complaints about and repairs of the water pump must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day.

Yet Plaintiffs' amended complaint does not include factual allegations that make it reasonable to infer that complaints about and repairs of the water pumps were anything more than a blip on Ford's complaints-and-repairs radar. Plaintiffs have reproduced only 14 complaints to NHTSA about the water pumps. (ECF No. 14, PageID.607–616.) And these 14 span a three-year period. True, Plaintiffs say the 14 NHTSA complaints are but a "small sample." (ECF No. 14, PageID.607.) But do Plaintiffs mean there are 50 more? 500 more? Their amended complaint does not say. Nor does it say whether the volume was large enough for NHTSA to advise Ford about them. Plaintiffs also give no sense of the number of complaints about the water pump to dealers, the number of online complaints, or the number of repairs of the water pump. Given that there are dozens (if not hundreds) of complaints about or repairs of Ford vehicles each day, Plaintiffs must give the Court some sense of the fraction of those that are about the water pump. Otherwise, it is entirely likely that complaints about and repairs of the water pump were awash in a sea of complaints and repairs.

Plaintiffs' allegations of consumer complaints and vehicle repairs do not make it reasonable to infer Ford's knowledge for a second, related reason. Even assuming Ford was aware of every consumer complaint about, and repair of, a Cyclone-engine water pump, it does not necessarily follow that Ford knew that the pump was *defective*. According to the amended complaint, Ford has deployed the Cyclone engine since 2007 and that engine can be found in "millions" of Ford vehicles. Yet Plaintiffs have only expressly identified 26 water-pump failures (the 14 NHTSA complaints and their own 12). Twenty-six out of "millions" is a very low failure rate—approximately 1 in 100,000. And it is entirely possible that a manufacturer has no duty to disclose the fact that, in 1 out of 100,000 vehicles, an engine part will fail before 150,000 miles. Yet Plaintiffs' amended complaint gives little indication of the water pump's failure rate or how that rate compares to the failure

11

> rate of a part that the law would deem "defective." . . . So even assuming Ford knew
> of all water-pump complaints and repairs, more information is necessary to infer
> that Ford knew that the water pump was defective.

*Roe*, 2019 WL 3564589, at *7–8 (citations omitted).

Plaintiffs say that this reasoning was erroneous. According to them, "Not only have Plaintiffs pled facts sufficient for the Court to infer that the volume of complaints that Ford received would have raised concerns, but the nature of the problem is also significant enough to register on Ford's radar." (ECF No. 34, PageID.1706.) The "volume of complaints" has already been discussed. Regarding the "nature of the problem," Plaintiffs point out that the water pump affected the "basic function" of their vehicles. (*Id.*) Plaintiffs argue that "the high cost" of repairing the water pumps would have caught Ford's eye. (ECF No. 34, PageID.1709.) And Plaintiffs highlight that a vehicle's pump can fail while the vehicle is on the highway, thereby creating a dangerous situation. (ECF No. 34, PageID.1707.) So that too would have garnered Ford's attention. "To believe that water pump failures registered as no more than a 'blip' on Ford's radar," Plaintiff say, "one must infer that Ford is so used to receiving reports about its vehicles being found inoperable that Ford simply stopped paying attention to the 'sea of complaints' it receives each day." (ECF No. 34, PageID.1709.)

The Court is again not convinced that it clearly erred. The Court has already explained that the amended complaint did not give enough information about the volume of failed water pumps relative to the volume of Ford vehicles sold with a Cyclone engine (the numerator/denominator issue). As for the nature of the failure, the Court agrees with Plaintiffs' theory: Ford could have notice based on a very low volume of failures if the failures were high profile. For example, if news outlets across the country replayed the harrowing 911 call about a stuck accelerator leading to the death of the family inside the car, perhaps one incident would be sufficient to catch the car

12

manufacturer's eye. *See* Meagan Parrish, *The 2009 Toyota Accelerator Scandal That Wasn't What It Seemed*, Manufacturing.Net (Aug. 11, 2016), https://bit.ly/2si7nei. The problem is that Plaintiffs' theory does not fit the facts (or allegations). True, repairing the pump is costly; but the same can be said of dozens of critical vehicle parts. And while pump failure when the vehicle is at highway speeds does create a dangerous situation, Plaintiffs have not pled that a single person has been injured by a pump failure. Nor have they pled that pump failures have attracted media or public attention. As such, the allegations of Plaintiffs' complaint did not make it reasonable to infer that the pump failures were the type of high-profile problem that Ford would have noticed even if the number of failures were small.

**B.**

Having addressed Plaintiffs' arguments that this Court erred in dismissing Plaintiffs' claims as filed, the Court turns to Plaintiffs' arguments that this Court erred in dismissing their claims with prejudice. (ECF No. 34, PageID.1710.)

In support of this argument, Plaintiffs use information that was not before the Court when the Court dismissed Plaintiffs' claims. With respect to the 14 NHTSA complaints quoted in the amended complaint and the associated assertion that those were a "small sample" of such complaints, Plaintiffs now tell the Court that "over the last 5 years, NHTSA has received at least 200 complaints about water pump failures." (ECF No. 34, PageID.1705.) Further, Plaintiffs tell the Court for the first time, "in just the eight months since Plaintiffs' filed their Amended Complaint, Plaintiffs' counsel has received nearly 200 complaints from putative class members with water pump failures and catastrophic engine damage." (ECF No. 34, PageID.1705.) Plaintiffs recount what some of the people who contacted their attorneys said. (ECF No. 34, PageID.1707.) As an example, Plaintiffs say that an owner of a 2011 Ford Flex reported that while he, his wife,

and their three children were on the highway, "[t]he car lost power 1/4 of a mile before entering a construction zone where there were no roadway shoulders at all." (ECF No. 34, PageID.1707.) Plaintiffs also say that one person contacted their lawyers and stated that he works two jobs and had to take money from his retirement fund to pay for a replacement engine. (ECF No. 34, PageID.1709.)

In light of this new information, perhaps there are good reasons for allowing Plaintiffs to file a second amended complaint or to "strike up the band again." *See Appeal of Sun Pipe Line Co.*, 831 F.2d at 25; E.D. Mich. LR 7.1(h)(3) (providing that court retains "discretion" to grant or deny a motion for reconsideration).

But there are also probably good reasons not to. The Court has heard Plaintiffs' case for allowing additional amendment, but, given the procedural rules governing motions for reconsideration, *see* E.D. Mich. LR 7.1(h)(2), the Court has not heard from Ford. The Court thinks that hearing from Ford will help. So, as set out in the order below, the Court will order additional briefing.

### III.

For the reasons provided, Plaintiffs have not shown that this Court erred in dismissing the claims of the amended complaint. Thus, to the extent Plaintiffs seek reconsideration of that decision, Plaintiffs' motion for reconsideration is DENIED.

To the extent that Plaintiffs seek reconsideration of this Court's decision to dismiss Plaintiffs' claims *with prejudice*, the Court orders supplemental briefing. *See* E.D. Mich. LR 7.1(h)(2). In particular, the Court would like the parties to address whether it would be reasonable to infer that Ford knew or should have known of the water pump defect presuming that the amended complaint included the information in Tiffany Ehm's declaration (ECF No. 34,

14

PageID.1718). In particular, the Court is interested in the parties' positions on how the information in Ehm's declaration affects this Court's prior analysis of Ford's knowledge, including the Court's reasoning regarding the volume of complaints about and repairs of water pumps in Cyclone engines. The parties may also briefly address other factors bearing on this Court's discretion to allow a second amended complaint, including when the new information came into Plaintiffs' possession. Ford's response brief is due on or before February 3, 2020 and shall not exceed 7 pages. Plaintiffs' reply is due on or before February 10, 2020 and shall not exceed 3 pages.

SO ORDERED.

Dated: January 21, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE