UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY ROE, *et al.*, | |
| Plaintiffs, | Case No. 18-12528 |
| | Honorable Laurie J. Michelson |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## OPINION AND ORDER
## GRANTING IN PART AND DENYING PART MOTION TO DISMISS [45]

This case is about an allegedly defective water pump for car and truck engines. The 11 plaintiffs each bought a vehicle manufactured by Ford Motor Company. Their vehicles were equipped with Cyclone engines. In vehicles with a Cyclone engine, the water pump—a part that helps keep the engine cool—is located inside the engine block. The pump's internal location makes it very expensive to inspect or maintain. And according to Plaintiffs, the pump's location inside the engine block means that if the pump fails, it can cause "catastrophic" engine failure. Thus, Plaintiffs believe that their water pumps should have lasted the useful life of their vehicles' engines, which they say is at least 150,000 miles. But each of their water pumps failed before then. And so Plaintiffs sued Ford, alleging fraud and breach of warranties (among other claims).

Now pending is Ford's third motion to dismiss Plaintiffs' third complaint. As explained in great length below (a consequence of the complaint containing 55 counts

and Ford seeking to dismiss them in multiple ways), the Court will grant in part and deny in part Ford's motion. A table at the end of this opinion summarizes the Court's determinations.

## I.

### A.

Engine parts heat up when a vehicle is in operation. To combat this, a water pump circulates coolant through channels in the engine. (ECF No. 42, PageID.1832.) Engine parts near these channels are thus kept cool.

Historically, water pumps were located outside the engine block and were powered by an accessory belt. (ECF No. 42, PageID.1830–1831.) Because of this external location, if the water pump failed, coolant would simply leak onto the ground below the vehicle. (*Id.* at PageID.1831.) This was potentially beneficial in two ways: it gave notice to the driver of the leak (if the driver happened to observe the coolant on the ground), and the coolant would not contaminate other parts of the engine.

Over a decade ago, Ford and Mazda designed the Cyclone engine. (ECF No. 42, PageID.1818–1819.) In a Cyclone engine, the water pump is located *inside* the engine block. (*Id.* at PageID.1831–1832.) This not only saved space under the hood but also eliminated the need for the pump to be powered by an accessory belt—it is instead powered by the timing chain, which already operated other parts. (*Id.* at PageID.1831–1832.) In Cyclone engines, the coolant system, including the water pump, is a closed system. (*Id.* at PageID.1834.) This closed system ensures that coolant only goes where it is supposed to go. (*See id.*) In 2007, Ford began using the

Cyclone engine in several of its vehicles, including the Edge, Taurus, and Explorer. (*Id.* at PageID.1815.)

Plaintiffs allege that Ford designed or manufactured the internal water pumps in Cyclone engines defectively. The alleged defect is based on a confluence of at least three factors. First, because the pump is inside the engine block, it is extremely costly to inspect and maintain. To access the pump, many other parts need to be removed, requiring around six hours of skilled labor at a total cost of around $1,000. (ECF No. 42, PageID.1817–1818.) Thus, monitoring the water pump's condition is simply not practical. Second, because the water pump is located above the oil pan, if the pump breaks, coolant does not simply leak onto the ground below. (*Id.* at PageID.1834– 1835.) Instead, the coolant mixes with the engine's oil creating a substance that looks like chocolate milk. (*Id.*) This chocolate-milk substance then goes where only oil should go. (*Id.* at PageID.1835.) In turn, this can lead to "sudden, catastrophic engine failure," costing up to $9,000 to repair. (*Id.*) Worse, if the pump fails while the vehicle is in operation, the sudden engine failure might result in a car accident. (*Id.* at PageID.1820.) Third, the water pump does not last the "useful life of the engine," which, allegedly, is "well over 150,000 miles." (*Id.* at PageID.1815.) This is the essence of the defect claim.

The 11 plaintiffs in this case own Edges, Tauruses, and Explorers with Cyclone engines, and each of their water pumps failed. On one end of the mileage spectrum, the water pump in Plaintiff Darryl Mori's vehicle failed after 54,000 miles. (ECF No. 42, PageID.1824.) At the other end of the spectrum, Plaintiff Christopher Stack's

vehicle went 117,000 miles before his water pump failed. (*Id.* at PageID.1828.) But whether 54,000, 117,000 miles, or somewhere in between, none of the 11 plaintiffs' pumps lasted the useful life of the engine, which, they claim, is "well over 150,000 miles." And each plaintiff paid between $1,200 and $7,600 to repair their water pumps and associated engine damage. (*Id.* at PageID.1824, 1829.)

**B.**

In August 2018, Plaintiffs filed this case against Ford, bringing 55 counts under 11 states' laws. Roughly speaking, Plaintiffs brought fraud, breach-of-warranty, and consumer-protection claims—each based on an allegedly defective water pump.

Plaintiffs filed an amended complaint in December 2018.

In February 2019, Ford moved to dismiss Plaintiffs' amended complaint. (ECF No. 20.)

In August 2019, in an extensive opinion, the Court largely granted Ford's motion; it dismissed all but two claims of one plaintiff. (That plaintiff has since settled with Ford.) The Court's decision to dismiss the complaint rested in large part on Plaintiffs' failure to adequately plead that Ford knew or should have known of the water pump defect. *See Roe v. Ford Motor Co. (Roe I)*, No. 18-12528, 2019 WL 3564589, at *8 (E.D. Mich. Aug. 6, 2019). Plaintiffs sought to establish Ford's knowledge of the defect by referencing consumer complaints about the water pump or repairs of the water pump by authorized Ford dealers. But, the Court explained, because there were millions of Ford vehicles on the road, there had to be dozens (if

not hundreds) of complaints about and repairs of Ford vehicles on any given day. *Id.* at *7. "So for consumer complaints and repair logs to give fair notice to Ford that one particular part [was] consistently having problems, it must be that the number of complaints about and repairs of that specific part stood out. Or, put slightly differently, complaints about and repairs of the water pump must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day." *Id.* Because Plaintiffs had not given the Court any sense of how many of the daily complaints about or repairs of Ford vehicles concerned the water pump, it was not plausible that water-pump complaints or repairs had caught Ford's eye, i.e., it was not plausible that Ford knew or should have known about them.

Plaintiffs then sought reconsideration, which the Court addressed in two more opinions. The Court first found that based on the information it had before it—the complaint and the parties' briefs—it committed no error warranting reconsideration. *See Roe v. Ford Motor Co. (Roe II)*, 439 F. Supp. 3d 922, 927–32 (E.D. Mich. 2020). But Plaintiffs' motion for reconsideration also introduced new information: Plaintiffs stated that there were 200 complaints to the National Highway Traffic Safety Administration (NHTSA) about water pump failures and that their attorneys had also received 200 like complaints. (ECF No. 34, PageID.1705.) In light of this new information, the Court thought that perhaps it should give Plaintiffs a chance to further plead Ford's knowledge of the defect. *Roe II*, 439 F. Supp. 3d at 932.

So the Court asked the parties to file additional briefs on whether Plaintiffs should be granted leave to file a third complaint in this case. In its brief, Plaintiffs

informed the Court that another 600 consumers had contacted Plaintiffs' law firm about the water pump in Ford vehicles. *See Roe v. Ford Motor Co. (Roe III)*, No. 18-12528, 2020 WL 1270778, at *2 (E.D. Mich. Mar. 17, 2020). Given that Plaintiffs' firm had received a total of 800 complaints about failed water pumps in Ford vehicles, the Court reasoned in part, "it seems that dismissing this case will not truly resolve anything. Even if dismissal was with prejudice, and even if that precluded the 11 remaining plaintiffs in this case from filing a new suit, it seems like there would be 800 others who are not precluded and would likely want to sue." *Id.* at *4. So the Court permitted Plaintiffs to file a "final" complaint. *Id.*

So where do things stand now? In June 2020, Plaintiffs filed their third complaint. (ECF No. 42) And about two months later, Ford filed another motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 45.)

## II.

In deciding a motion to dismiss under Rule 12(b)(6), the Court asks whether "a complaint . . . contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In turn, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.

In this section, the Court addresses two arguments by Ford that cut across Plaintiffs' claims. Ford argues that all 55 counts should be dismissed because it did

not know and had no reason to know of the water-pump defect. Ford also argues that Plaintiffs' failure to plead a uniform defect warrants dismissal of all counts.

## A.

According to Ford, Plaintiffs' third complaint still fails to adequately plead that it knew or should have known of the defect. If Ford is correct, the logic of *Roe I* would warrant dismissal of all (or almost all) of Plaintiffs' claims.

The primary reason the Court allowed the Plaintiffs to file a third complaint is their discovery of hundreds of additional consumer complaints. Plaintiffs now allege that in the "last five years" (which, apparently, is August 2014 to August 2019, *see Roe III*, 2020 WL 1270778, at *3) the National Highway Traffic Safety Administration received "nearly 200 complaints regarding water pump failures in Ford and Mazda vehicles containing the Cyclone engine." (ECF No. 42, PageID.1858.) And, say Plaintiffs, since they filed this lawsuit in August 2018, their law firm has been contacted by "over 2,400 consumers about water pump problems" in Ford vehicles with Cyclone engines. (ECF No. 42, PageID.1846.) Ford points out that some of the 200 NHTSA complaints were about Mazda vehicles, and so those complaints do nothing to show that Ford knew about a defect in its vehicles. (ECF No. 45, PageID.2493.) Assuming that is correct, Plaintiffs still allege that there have been around 2,500 reports of water pump problems in Ford vehicles with Cyclone engines.

That is a significant number. If at least 2,500 owners or lessors of Ford vehicles have reported a problem about their water pump to either NHTSA or Plaintiffs' law firm, it is a fair inference that Ford authorized dealers have repaired or replaced

thousands of water pumps in the 14 years since the Cyclone engine was introduced. Indeed, the number of water pump repairs likely far exceeds the number of people who took the extra step of lodging a complaint with NHTSA or Plaintiffs' firm. So it is plausible that since the introduction of the Cyclone engine in 2007, Ford authorized dealers have repaired or replaced well over 2,500 water pumps. And it is plausible that Ford would have known about these water-pump repairs either because its authorized dealers reported them to Ford or because it filled orders for replacement pumps. (ECF No. 42, PageID.1860; *see also* ECF No. 42, PageID.1889 (quoting a NHTSA complaint as stating, "Ford cannot keep up with the demand on the water pumps and there is a National back order").) True, not all of these repairs would have been before 150,000 miles—part of Plaintiffs' definition of defective—but based off of the mileage-at-failure for Plaintiffs' vehicles and those in the NHTSA complaints, it is reasonable to infer that the overwhelming majority of pump failures occurred before 150,000 miles. (*See* ECF No. 42, PageID.1860 (suggesting that over 80% of pumps failed before 135,000 miles).)

Several thousand water-pump repairs sounds large enough to have grabbed Ford's attention, but as the Court reasoned in *Roe I*, the denominator is also important. It appears that since 2007, Ford has sold around 4,000,000 vehicles with Cyclone engines. (*See* PageID.1878 (indicating almost 4,000,000 vehicles with Cyclone engines but not including 2010 to 2012 Fusions).) If Ford was only aware of around 2,500 or so water-pump repairs, that would mean it only knew that less than 3 out of 40,000 Ford vehicles with Cyclone engines were having water-pump issues.

That small fraction might not be enough to infer that Ford knew the pump was defective. *See Roe I*, 2019 WL 3564589, at *7 ("[C]omplaints about and repairs of the water pump must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day."). And such a small fraction might not be enough for courts to deem a part defective. *Cf. Roe I*, 2019 WL 3564589, at *7 ("[I]t is entirely possible that a manufacturer has no duty to disclose the fact that, in 1 out of 100,000 vehicles, an engine part will fail before 150,000 miles."). But, as stated, it is plausible that the number of people who had their pumps *repaired* is much more than the number of people who *filed complaints* with NHTSA or Plaintiffs' firm. So it is plausible that Ford knew of many times more than 2,500 repairs. And that plausibly represents a systemic issue that Ford should have recognized as a defect.

In all, Plaintiffs' third complaint plausibly alleges that Ford knew that the water pump in a significant number of Cyclone engines failed before 150,000 miles (and that failure would lead to costly repairs).

Ford resists this conclusion by arguing that timing matters. (*See* ECF No. 45, PageID.2497.) In particular, Ford points out that Plaintiffs have not provided the date of the 2,500 complaints or, if they have, the date of the complaint was after Plaintiffs bought their vehicles. So those complaints, says Ford, cannot establish that it was aware of a water-pump defect or had a duty to disclose the defect before Plaintiffs bought their vehicles.

Although the Court made a similar point about the timing of the complaints in a prior opinion, *see Roe III*, 2020 WL 1270778, at *3, Plaintiffs' current argument is a bit different than the Court anticipated. Plaintiffs are not attempting to show that the complaints its firm received predate their vehicle purchases. Nor are they attempting to show that Ford saw or was aware of these particular complaints. Instead, Plaintiffs suggest that if their firm and NHTSA received a total of 2,500 or so complaints about water pumps in Cyclone engines, it stands to reason that there have been many thousands of water-pump failures in Cyclone engines. (*See* ECF No. 42, PageID.1846 (providing that complaints law firm received show the "magnitude and scope of the problem").) And if there have been many thousands of water-pump failures, there have been many thousands of water-pump repairs. (*See* ECF No. 48, PageID.2725 (arguing that Ford "would have received orders for replacement parts and communications through authorized dealerships concerning these failures").) It is these repairs that the Court now finds to be reasonably inferred from the allegations. And because these repairs would have occurred throughout the 14-year period that the internal pump has been in use, the fact that Plaintiffs cannot establish that the 2,500 complaints predate their vehicle purchases is not fatal to their claims.

Or not fatal to most of their claims, at least. For two of the 11 plaintiffs, it is possible that the thousands-of-repairs inference does not establish Ford's pre-sale knowledge. Based on the specific reports of pump failures recited in the complaint, the water pump rarely fails within the first few years of the vehicle's lifetime. *See Roe III*, 2020 WL 1270778, at *3. And Ford only began using the Cyclone engine in 2007.

So that means it is highly unlikely that there were many water-pump repairs before 2010. Yet two plaintiffs, Darryl Mori and David Krow, bought their vehicles in 2010. So arguably, the thousands-of-repairs inference does not help show that Ford knew of the water pump defect before Mori and Krow purchased their vehicles.

That said, the Court will not now dismiss Mori's and Krow's claims on the basis that Ford did not have pre-sale knowledge of the defect. Aside from the fact that the Court cannot be certain when there were enough water pump repairs for Ford to have recognized a systemic problem (and that the Court must draw reasonable inferences in favor of Plaintiffs), Mori and Krow might also be alleging that Ford should have informed them about the water pump defect even after they bought their cars. For instance, Mori and Krow hint that if they had known of the pump defect within the warranty period, they might have asked a Ford dealer to do something about their water pumps. (*See* ECF No. 42, PageID.1949 (alleging that Ford knew that its suppression of the defect would discourage Mori from seeking replacement during the warranty period); ECF No. 42, PageID.2085 (similar for Krow).) If discovery shows that Ford did not have knowledge of the water-pump defect before Mori's and Krow's purchases, Ford can file the appropriate motion addressing that issue and whether it had a post-purchase duty to disclose (if Plaintiffs are pursuing such a theory).

In sum, the Court finds that Plaintiffs' third complaint contains enough factual matter to reasonably infer that Ford knew of the water-pump defect before Plaintiffs purchased their Ford vehicles.

**B.**

Aside from lack of knowledge, Ford makes a second argument that it believes warrants dismissal of all 55 counts of the complaint: Ford argues that Plaintiffs have not pled a uniform defect. This argument comes in three forms.

In one, Ford says that Plaintiffs' allegations of a defect are conclusory. (ECF No. 49, PageID.2765.) And through the decisional law it cites, Ford suggests that Plaintiffs have merely pled symptoms of a defect, which does not adequately plead a defect. (ECF No. 45, PageID.2494; ECF No. 49, PageID.2765.)

The Court disagrees with Ford that their allegations of a defect are conclusory. Plaintiffs allege that the water pump is located inside the engine block and thus costs $1,000 to even inspect. (ECF No. 42, PageID.1817–1818.) Plaintiffs also point out that because the pump is located above the oil pan, if the pump breaks, coolant can mix with oil and cause severe engine damage (as much as $9,000). (ECF No. 42, PageID.1820–1822.) Because it is not practical (cost-wise) to maintain the water pump, and because the pump's failure can compromise the entire engine, it follows, from Plaintiffs' perspective, that the pump should last as long as the engine lasts, which they say is "well over 150,000 miles." (ECF No. 42, PageID.1815–1816.) But, say Plaintiffs, the water pumps in the Cyclone engine fail "well-before the end of the useful life of the engine." (ECF No. 42, PageID.1816.) Taken together, those allegations adequately plead a defect.

Plaintiffs have also identified some components that might cause the water pumps to fail before the useful life of the engine. Plaintiffs allege that the weep port

where coolant flows is prone to blockage, that the water pump uses a plastic impeller instead of a more durable metal one, and that a rubber part is "perpetually immersed in coolant" which causes it to degrade. (ECF No. 42, PageID.1837–1840.) These allegations of how the water pump might fail stand in contrast to the mere allegations of consequences and effects in Ford's cited cases. *Cf. Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 797 (N.D. Cal. 2019) ("Plaintiff's description of the alleged defect identifies only the consequences of the alleged defect (i.e., cracking, shattering, or detaching), but is notably silent on identifying the defect that causes such consequences."); *McQueen v. BMW of N. Am., LLC*, No. 12-6674, 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013) ("Throughout her Complaint, Plaintiff merely identifies the effects of the alleged defect . . . . There is no identification as to what precisely the defect is . . . .").

In a related argument, Ford asserts that Plaintiffs' "laundry list of possible defects" only goes to show that Plaintiffs cannot plead "the kind [of] uniform defect necessary to unite any putative class." (ECF No. 45, PageID.2488; *see also* ECF No. 49, PageID.2766.)

Perhaps so—but now is not the time to decide the issue. If commonality is lacking, Ford can make that argument at the class-certification stage of this case. *See Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *4 n.2 (E.D. Mich. Mar. 1, 2021).

Ford also asserts that Plaintiffs' defect theory is implausible because under Plaintiffs' theory, a part needs to last forever to avoid the "defective" label. (ECF No. 45, PageID.2489.)

Plaintiffs' theory is not so far reaching. Their theory does not extend to all goods. It does not even extend to all car parts. Plaintiffs instead home in on (1) an internal engine part that is (2) expensive to maintain and (3) can destroy the engine if it fails. Stated differently, if a car part was cheap to replace and did not render the vehicle inoperable when it broke, Plaintiffs would not likely claim that it needed to last 150,000 miles.

In all, Plaintiffs have adequately alleged that the water pump in a Cyclone engine is defective.

## IV.

Having addressed Ford's arguments that Plaintiffs have not adequately pled a defect or knowledge, the Court turns to Ford's efforts to dismiss Plaintiffs' tort claims.

Eight plaintiffs have brought common-law tort claims. (Bobby Roe (Arkansas), Franklin Lowery (North Carolina), and Jeffery Eidson (Texas) have not.) Plaintiffs' tort claims come in three varieties: negligent misrepresentation, fraudulent omission, and fraudulent concealment. In a prior opinion, this Court addressed Plaintiffs' tort claims based on Ford's statements separately from tort claims based on Ford's omissions. The Court will do the same here, starting with Plaintiffs' assertions of affirmative misstatements.

**A.**

Plaintiffs allege that Ford made false or misleading statements in its maintenance schedules and advertising. Plaintiffs allege, "Ford's maintenance schedules inform customers of the parts that are required to be maintained or replaced at certain intervals, up to 150,000 miles, and make no reference to the water pump." (ECF No. 42, PageID.1843.) So, in Plaintiffs' view, "Ford implicitly represents that the water pump is expected to last for the useful life of the engine, or at least 150,000 miles, without the need for maintenance, repair, or replacement." (ECF No. 42, PageID.1843.) Plaintiffs also say some of Ford's promotional statements were misleading, including "Built Ford Tough" and "[i]mproving quality is a daily priority at Ford." (ECF No. 42, PageID.1850.)

Plaintiffs' tort claims, insofar as they are premised on affirmative misrepresentations, will be dismissed. The first go-round, this Court found that Plaintiffs had not plausibly alleged that the maintenance schedules or promotional statements were affirmative misrepresentations about the lifespan of the water pump. *See Roe I*, 2019 WL 3564589, at *2–5. Plaintiffs have not shown that the Court's prior determination was error. Indeed, it is not clear that Plaintiffs continue to base their tort claims on affirmative misrepresentations (as opposed to omissions). (*Compare* ECF No. 14, PageID.597 (second complaint), with ECF No. 42, PageID.1842 (third complaint); *see also* ECF No. 48, PageID.2751–2752 (focusing on omission and partial disclosure).) Accordingly, the Court adheres to its prior decision. *Roe I*, 2019 WL 3564589, at *5.

In addition to dismissing Plaintiffs' tort claims insofar as they are based on affirmative misrepresentations, the entirety of Mori's, William Schuette's, and Donald Christenson's negligent-misrepresentation claims under California, Ohio, and Washington law, respectively, will be dismissed. As Ford points out (ECF No. 45, PageID.2514), a negligent-misrepresentation claim in each of those three states requires an affirmative representation (as opposed to material omission). *Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 596 (2011) (California); *Andersons, Inc. v. Consol*, Inc., 348 F.3d 496, 506 (6th Cir. 2003) (Ohio); *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007) (Washington). Plaintiffs rely on *In re Volkswagen Timing Chain*, but the court in that case made no finding that negligent-misrepresentation claims under California, Ohio, or Washington law can be based solely on omission. *See* No. 16-2765, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) (finding that negligent-misrepresentation claims under New York and Michigan law may be based on omission).

### B.

Plaintiffs also bring negligent-misrepresentation, fraudulent-omission, and fraudulent-concealment claims based on Ford's omissions. Simplifying these claims, Plaintiffs believe that Ford knew (or should have known) of the water pump defect, had a duty to disclose what it knew, and failed to fulfill that duty.

Ford seeks to dismiss Plaintiffs' tort claims based on nondisclosure in four ways. For one, Ford asserts that it did not know of the defect (and thus could not have disclosed it). The Court has already addressed that argument and found Plaintiffs'

allegations of knowledge sufficient at this stage of the case. Ford also argues that Plaintiffs' tort claims based on omission should be dismissed because (1) Plaintiffs allegations do not satisfy Rule 9(b)'s heightened pleading standard, (2) it had no duty to disclose the defect (even if it was aware of it), and (3) the tort claims are barred by the economic-loss doctrine. The Court examines these three grounds for dismissal in turn.

## 1.

The Court is not persuaded that Plaintiffs' complaint lacks the specifics that Rule 9(b) demands. To allege a fraud claim based on omission, Plaintiffs must plead "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [Ford] obtained as a consequence of the alleged fraud." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Plaintiffs have done just that: the "what" is a water pump that is too expensive to inspect or maintain, that destroys the engine if it breaks, and that dies in under 150,000 miles (ECF No. 42, PageID.1816, 1818, 1837–1842); the "who" is Ford; the "content" of the omission is the alleged defect; the "manner" that the omission misled consumers is by taking advantage of their expectations about how long a vehicle should last without costly repair (*id*. at PageID.1818, 1820); and "what Ford obtained" is increased sales of, or decreased warranty claims for vehicles equipped with Cyclone engines (*id*. at 1819). In a recent opinion, this Court said that similar allegations were enough to cross Rule 9(b)'s threshold. *Gregorio v. Ford Motor Co.*, — F.3d —, No. 20-

11310, 2021 WL 778913, at *6 (E.D. Mich. Mar. 1, 2021) (Michelson, J.). The reasoning of *Gregorio* applies just as well here.

**2.**

Ford's next basis for dismissing Plaintiffs' omission-based tort claims is that it had no duty to disclose the water-pump defect.

Courts have found that a few different situations give rise to a duty to disclose a defect. These include when the manufacturer makes a partial disclosure that is misleading absent additional disclosure (a half-truth), when the defect poses a safety risk, and when the manufacturer's knowledge about the defect is superior to the reasonable consumer's knowledge. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at *19–20 (D.N.J. May 8, 2017); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007).

Here, Plaintiffs argue that they have adequately pled that Ford made partial disclosures giving rise to a duty to disclose the water-pump defect. They again point to the maintenance schedules and Ford's advertising. (*See* ECF No. 48, PageID.2752.) They argue that by providing for scheduled maintenance of some parts, but not the water pump, Ford made a partial disclosure requiring disclosure of the water-pump defect. (*See id.*) Similarly, Plaintiffs argue that by touting the reliability and safety of its vehicles in advertisements, Ford made a partial disclosure giving rise to a duty to disclose. (*See id.*)

Some law helps address Plaintiffs' argument about Ford's partial disclosures. In *In re Volkswagen Timing Chain*, Volkswagen had included the timing *belt* in its

maintenance schedules for vehicles with timing belts but did not include the timing *chain* in its maintenance schedules for vehicles with timing chains—despite the fact that the belt and chain served the same function; the court found that the inclusion of the belts in the maintenance schedules was a partial disclosure giving rise to a duty to disclose issues with the timing chain. No. 16-2765, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017). In *In re Whirlpool Corporation Front-Loading Washer*, Whirlpool touted its washing machines as "high efficiency" and told customers that their washers would use less water and energy; the court found it plausible that this was a partial disclosure requiring Whirlpool to disclose that "customers would need to run extra cycles of hot water and other cleaning products to combat mold problems in the machines." No. 1:08-WP-65000, 2010 WL 3655954, at *1–2 (N.D. Ohio Sept. 15, 2010). In *Falk v. General Motors*, GM was faced with questions about allegedly defective speedometers in its vehicles and, in response, advised consumers to buy a service manual or to go get their speedometers "diagnosed"; these statements, because they "convey[ed] no information about the GM trucks or speedometers," were not partial disclosures creating a duty for GM to disclose issues with its speedometers. *See* 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007).

In this Court's view, the allegations of this case are more similar to those in *Falk* than those in *Whirlpool* or *Volkswagen*. True, somewhat like the belt-versus-chain situation in Volkswagen, Ford's visual-inspection charts differed for vehicles with an external versus an internal water pump. But Plaintiffs have not alleged that they ever saw the visual-inspection charts, and it appears that Ford only supplied the

charts to "mechanics and dealerships." (*See* ECF No. 42, PageID.1893.) As for the maintenance schedules that came with Plaintiffs' vehicles, Plaintiffs have not alleged that the schedules for Ford vehicles with external water pumps included service of the pump whereas the schedules for Ford vehicles with internal water pumps excluded service of the pump—the situation in *Volkswagen*. (And even if that were the case, Plaintiffs have not alleged that they were personally aware that the maintenance schedules differed for external- and internal-pump vehicles.) And, unlike *Whirlpool*, Ford did not make representations that its coolant system or internal water pump was, for instance, "long lasting." Touting your vehicles as "Built Ford Tough" does not give rise to a duty to disclose a specific issue with a vehicle. *See e.g.*, *In re Subaru Battery Drain Prod. Liab. Litig.*, No. 1:20-CV-03095, 2021 WL 1207791, at *25 n.21 (D.N.J. Mar. 31, 2021). Accordingly, the Court finds that Plaintiffs have not adequately alleged that via its vehicle-inspection charts, maintenance schedules, and advertising, Ford told a half-truth requiring it to disclose the water-pump defect.

Aside from partial disclosure, Plaintiffs also argue that Ford's superior knowledge of the defect (ECF No. 48, PageID.2731; *e.g.*, ECF No. 42, PageID.1927, 1948, 2005, 2022) and the defect's safety risk (ECF No. 48, PageID.2753; *e.g.*, ECF No. 42, PageID.1948, 2022) gave rise to a duty to disclose. For its part, Ford cites six cases to show that because of its relationship with consumers, it did not have a duty to disclose the water-pump defect. (ECF No. 45, PageID.2515.)

Because different states impose a duty to disclose a defect under different circumstances, the parties leave the Court with no choice but to analyze the parties' competing case law on a state-by-state basis. (The Court does this for only eight of Plaintiffs' 11 states because, as noted, three of the plaintiffs—Roe (Arkansas), Lowery (North Carolina), and Eidson (Texas)—have not filed tort claims.)

*California.* Plaintiffs rely on *In re Volkswagen Timing Chain* to argue that, under California law, Ford has a duty to disclose a defect if its knowledge of the defect is superior to the consumer's. *Volkswagen* does indicate that superior knowledge of a defect gives rise to a duty to disclose the defect under California law. No. 16-2765, 2017 WL 1902160, at *19 (D.N.J. May 8, 2017). Although Ford cites several cases for the proposition that a duty to disclose exists only when there is a special relationship between the parties, none of Ford's cases apply California law. (ECF No. 45, PageID.2515.) (Ford does cite two cases discussing the duty to disclose under California's consumer protection acts (ECF No. 45, PageID.2490); the Court will address these two cases when it addresses Plaintiffs' consumer-protection-act claims.) Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under California law.

*Illinois.* Ford cites *Weidner v. Karlin* for the proposition that it did not have a duty to disclose the water-pump defect under Illinois law. That case does state, "in order to prove fraud by the omission of a material fact, it is necessary to show the existence of a special or fiduciary relationship." 932 N.E.2d 602, 605 (Ill. Ct. App. 2010) (internal quotation marks omitted). In response, Plaintiffs again cite *In re*

*Volkswagen Timing Chain*, which found that under Illinois law, a manufacturer has a duty to disclose a defect that presents a safety issue. For that rule, *Volkswagen* relied on *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 11, 15, 21–22 & 31 (S.D. Fla. Oct. 14, 2016). But the Court has reviewed *Takata*, and the court there did not hold that Illinois law imposes a duty on manufacturers to disclose defects that present safety issues. As for the other Illinois case cited by Plaintiffs, it involved a duty to disclose arising from a half-truth or partial disclosure. *See Newman v. Metropolitan Life Insurance*, 885 F.3d 992, 1004 (7th Cir. 2018). And the Court has already found that Ford did not tell half-truths about the water pump. Because Plaintiffs' cases do not establish that Ford had a duty to disclose the water-pump defect under Illinois law, and because Ford has cited authority indicating that a duty arises under Illinois law only if "a special or fiduciary relationship" exists, the Court finds that Ford did not have a duty to disclose the water-pump defect. Accordingly, the Court will dismiss Todd LaCognata's fraudulent-omission and fraudulent-concealment claims under Illinois law.

*Maryland*. Citing *In re Volkswagen Timing Chain*, Plaintiffs argue that under Maryland law, a manufacturer has a duty to disclose a defect when its knowledge about the defect is superior to the consumer's. *Volkswagen* does say that. *See* 2017 WL 1902160, at *19. And Ford cites no decision applying Maryland law that is contrary to *Volkswagen*. Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Maryland law.

*New Jersey*. Citing two cases, Ford argues that under New Jersey law, it has a duty to disclose a defect only if it has a special or fiduciary relationship with its consumers. Ford's cases do indicate as much. *See Coba v. Ford Motor Co.*, No. 12-1622, 2013 WL 244687, at \*12 (D.N.J. Jan. 22, 2013); *Argabright v. Rheem Mfg.*, 201 F. Supp. 3d 578, 604 (D.N.J. 2016). In response, Plaintiffs cite *In re MyFord Touch Consumer Litigation*, 46 F. Supp. 3d 936 (N.D. Cal. 2014). That case did find that Ford had a duty to disclose a defect because the defect presented a safety risk and because Ford had superior knowledge of the defect. *Id.* at 960. But in making that finding, the court in *MyFord Touch* did not cite any decision applying New Jersey law. *See id.* at 958–60. In fact, the court did not conduct any state-specific analysis of the duty to disclose. *See id.* Further, in addition to Ford's two cases limiting the duty to special relationships, there are other like cases. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (applying New Jersey law); *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 12-07849, 2015 WL 1270958, at \*8 (D.N.J. Mar. 18, 2015) ("[A] duty to disclose arises from a seller's superior knowledge in New York, but not in New Jersey."). Because Plaintiffs' cases do not establish that Ford had a duty to disclose the water-pump defect, and because Ford has cited authority indicating that it did not have a duty to do so, the Court will dismiss Krow's fraudulent-omission and fraudulent-concealment claims under New Jersey law.

*Ohio*. Plaintiffs rely on *In re Volkswagen Timing Chain* for the proposition that under Ohio law, a manufacturer has a duty to disclose a defect if it presents a safety issue. (ECF No. 48, PageID.2753) Plaintiffs have alleged that the water-pump defect

presents "significant safety risks when the Class Vehicles suddenly become inoperable." (ECF No. 42, PageID.1818; *see also id.* at PageID.1869–1875 (reciting incidents of sudden engine failure while driving).) And Ford has not cited any authority applying Ohio law that is contrary to *Volkswagen*'s finding of a duty to disclose. (ECF No. 45, PageID.2515.) Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Ohio law.

*Pennsylvania.* To establish that Ford had a duty to disclose the defect under Pennsylvania law, Plaintiffs again turn to *In re Volkswagen Timing Chain* and its determination that there was a duty to disclose the defect. (ECF No. 48, PageID.2753.) Ford has not cited any contrary decision that applies Pennsylvania law. (ECF No. 45, PageID.2515.) Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Pennsylvania law.

*Tennessee.* Plaintiffs cite *Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 940 (M.D. Tenn. 2010), for the proposition that Tennessee law requires disclosure of a defect when it presents a safety issue for the consumer. Ford cites no case applying Tennessee law that is to the contrary. Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Tennessee law.

*Washington.* Here, Plaintiffs again rely on *In re Volkswagen Timing Chain* to establish Ford's duty to disclose. Ford cites no case applying Washington law that is to the contrary. Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Washington law.

In sum, under the authority provided to the Court by the parties, Ford did not have a duty to disclose the water-pump defect to consumers in Illinois and New Jersey; so LaCognata's and Krow's fraudulent-omission and fraudulent-concealment claims will be dismissed.

### 3.

Ford also argues that the economic-loss doctrine requires the Court to dismiss some of Plaintiffs' tort claims. (ECF No. 45, PageID.2516.)

Generally speaking, "[t]he term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property," and the economic-loss doctrine ensures that certain economic losses are remediable in contract and not tort. *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).

But like the duty to disclose, the economic-loss doctrine is not the same across states. So the Court must address Ford's assertion of the economic-loss doctrine on a state-by-state basis. But because Ford expends only a sentence on the economic-loss doctrine (ECF No. 45, PageID.2516), the Court will be brief.

*California.* Ford cites *Trgo v. Chrysler Corps.*, 34 F. Supp. 2d 581, 595 (N.D. Ohio 1998), for the proposition that under California law, the economic-loss doctrine precludes claims of negligent misrepresentation. *Trgo* cited *AB Avnet EMG v. Sierra Semiconductor Corp.*, for its rule; but *AB Avnet* stated, "where the transaction was a sale of goods *between merchants* and the claim is one for purely economic loss, the remedies are limited to those provided by contract and the UCC." 81 F.3d 167 (9th

Cir. 1996) (unpublished table decision) (emphasis added). This case does not involve a transaction between merchants. So as far as California law goes, Ford's reliance on *Trgo* is misplaced.

*New Jersey*. Ford also cites *Trgo* for the proposition that under New Jersey law, the economic-loss doctrine bars negligent-misrepresentation claims. *Trgo* relied on *Alloway v. General Marine Indus., L.P.*, 695 A.2d 264 (N.J. 1997), and other courts have provided that under *Alloway*, the economic-loss doctrine bars negligent-misrepresentation claims. *See In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. CIV03-4558, 2008 WL 4126264, at *29 (D.N.J. Sept. 2, 2008); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 565 (D.N.J. 2002). Plaintiffs have offered no contrary authority. (*See* ECF No. 48, PageID.2754.) Accordingly, Krow's negligent-misrepresentation claim under New Jersey law will be dismissed.

*Ohio*. Further relying on *Trgo*, Ford asserts that the economic-loss doctrine bars Plaintiffs' negligent-misrepresentation claim under Ohio law. *Trgo* relied on *Picker Int'l, Inc. v. Mayo Foundation*, a case where the parties were in privity of contract. 6 F.Supp.2d 685, 688–89 (N.D. Ohio 1998). But Schuette, the sole plaintiff from Ohio, bought his Ford used, and elsewhere in its brief, Ford says that it is not in privity of contract with Schuette. (ECF No. 45, PageID.2507.) So the Ohio law relied on by *Trgo* does not fit the facts of this case. Moreover, Plaintiffs cite a case indicating that under Ohio law, the economic-loss doctrine does not bar a negligence claim where the consumer and manufacturer are not in contractual privity. *In re*

*Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942, 949–50 (N.D. Ohio 2009). So Ford has not shown that Schuette's negligent-misrepresentation claim under Ohio law is barred by the economic-loss doctrine.

*Illinois.* Ford cites *Gandhi v. Sitara Cap. Management, LLC*, in support of its assertion that under Illinois law, Plaintiffs' negligent-misrepresentation claim is barred by the economic-loss doctrine. (ECF No. 45, PageID.2516.) Gandhi does state, "Generally, claims for economic damages styled as negligent misrepresentation claims are barred by the economic loss doctrine." 689 F. Supp. 2d 1004, 1017 (N.D. Ill. 2010). In response, Plaintiffs cite *In re Chicago Flood Litigation*; but that case merely held that intentional—not negligent—misrepresentations are not barred by the economic-loss doctrine. See 680 N.E.2d 265, 275 (Ill. 1997). Accordingly, LaCognata's negligent-misrepresentation claim under Illinois law will be dismissed.

*Pennsylvania.* For its assertion that the economic-loss doctrine bars fraud (and consumer-protection-act) claims under Pennsylvania law, Ford cites *Simchon v. Highgate Hotels, LP*, No. 3:15-CV-01434, 2016 WL 6595918, at *1 (M.D. Pa. Nov. 7, 2016). *Simchon* got its rule from *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir. 2002). But *Werwinski* is not good law. *See Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021) ("[I]t is now appropriate to set aside our holding in *Werwinski* with respect to the economic loss doctrine's application to [Pennsylvania Unfair Trade Practices and Consumer Protection Law] claims."); *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015) ("*Werwinski* no longer has any vitality."). So Ford has not

shown that Stack's fraud (or consumer-protection-act) claims under Pennsylvania law are barred by the economic-loss doctrine.

\* \* \*

As that completes the analysis of whether Plaintiffs' tort claims are plausible, a summary is in order. The Court will dismiss all the tort claims insofar as they are based on affirmative representations. The Court will also dismiss all of Plaintiffs' negligent-misrepresentation claims; Mori's, Schuette's, and Christenson's negligent-misrepresentation claims will be dismissed because they have not adequately pled affirmative misrepresentations and a negligent-representation claim under California, Ohio, and Washington law cannot be based on omission; as for LaCognata's and Krow's negligent-misrepresentation claims, they are barred by Illinois' and New Jersey's version of the economic-loss doctrine. LaCognata's and Krow's fraudulent-omission and fraudulent-concealment claims will also be dismissed; based on the cases presented to the Court, Ford did not have a duty to disclose the water-pump defect to consumers in Illinois and New Jersey. As for the remainder of Plaintiffs' tort claims, Ford has not persuaded the Court that those should be dismissed at the pleading stage. A table at the conclusion of this opinion summarizes the tort claims that are dismissed and the tort claims that survive Ford's motion.

## V.

With the tort claims out of the way, the Court turns to Ford's efforts to dismiss Plaintiffs' consumer-protection-act (CPA) claims. Generalizing, state consumer-

protection acts seek to protect consumers from deceptive trade practices. Here, Plaintiffs allege that Ford "knowingly concealed, suppressed, and/or omitted material facts regarding the" water-pump defect and "misrepresented the . . . quality" of vehicles with Cyclone engines. (ECF No. 42, PageID.1923, 1954, 2044, 2113; *see also* ECF No. 42, PageID.1980, 2002, 2026, 2087, 2091, 2138.) Except Schuette from Ohio, all 11 plaintiffs allege a violation of their states' consumer-protection act.

Not much need be said about the CPA claims brought by four of the plaintiffs. As explained above, the Court was not persuaded by Ford's arguments to dismiss the fraud-by-omission or fraudulent-concealment claims brought by Joseph Albanesi (Maryland), Christopher Stack (Pennsylvania), Ferris Mogy (Tennessee), and Donald Christenson (Washington). And except as discussed below, Ford does not address the CPA claims separately from the tort claims. It follows that the Court is not persuaded by Ford's arguments to dismiss these four plaintiffs' CPA claims.

Three of the plaintiffs—Bobby Roe (Arkansas), Franklin Lowery (North Carolina), and Jeffery Eidson (Texas)—did not bring tort claims. Even so, by analyzing the tort claims of other plaintiffs, the Court has already addressed some of Ford's grounds for dismissing Roe's, Lowery's, and Eidson's CPA claims. In particular, the Court agreed with Ford that Plaintiffs have not adequately pled affirmative misrepresentations. It follows that to the extent that Roe's, Lowery's, and Eidson's CPA claims (or any of the plaintiffs' CPA claims) are based on affirmative misrepresentations, they fail. And, as explained, the Court was not persuaded by Ford's argument that Plaintiffs' factual allegations failed to meet Rule 9(b)'s demand

for specificity. So the Court will not dismiss Roe's, Lowery's, or Eidson's CPA claims (or any of the plaintiffs' CPA claims) on that basis. Further, as explained, Plaintiffs have adequately alleged a defect and that Ford knew of the defect. So no CPA claims will be dismissed for inadequately pleading a defect or Ford's knowledge of it.

Ford also makes state-specific arguments in an effort to dismiss some of the CPA claims.

*Roe (Arkansas).* Ford cites *Perez v. Volkswagen Group of America*, No. 2:12-02289, 2013 WL 1661434 (W.D. Ark. Apr. 17, 2013), a case addressing an omission under the Arkansas Deceptive Trade Practices Act. (ECF No. 45, PageID.2515.) *Perez* says, "One owes the duty to disclose information only when there is an established relationship between the parties, such as a contractual relationship or a fiduciary relationship." *Id.* at *10 (citing *Badger Cap., LLC v. Chambers Bank of N. Arkansas*, 650 F.3d 1125, 1130 (8th Cir. 2011)). But the case *Perez* cites, *Badger*, does not say that there is a duty of disclosure "only" when there is an established relationship between the parties; *Badger* instead states, "a duty of disclosure arises only where *special circumstances exist*. Such 'special circumstances' *may* exist between parties that have a 'confidential relationship' when 'one party knows another is relying on misinformation to his detriment.'" 650 F.3d at 1130 (emphasis added). And other Arkansas precedent is contrary to *Perez*: "[S]ilence can amount to actionable fraud in some circumstances where the parties have a relation of trust or confidence, where there is inequality of condition and knowledge, or where there are other attendant circumstances. The duty to disclose is not limited to confidential or fiduciary

relationships." *Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 382 S.W.3d 6, 14 (Ark. App. Ct. 2011). Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under Arkansas law.

*Lowery (North Carolina).* Lowery bought his car used and has not alleged that an authorized Ford dealer sold him his car. (ECF No. 42, PageID.1826.) And Ford cites *Ratcliff v. American Honda Motor Co.* for this proposition: "North Carolina requires a relationship of trust or confidence to support finding a duty to disclose, based on a fiduciary relationship, a contractual relationship, or other similar relationship." No. 17CV174, 2018 WL 3542865, at *3 (M.D.N.C. July 23, 2018), *report and recommendation adopted*, 2018 WL 3849911 (M.D.N.C. Aug. 13, 2018). Given Lowery's used-car purchase, Ford implies that it did not have a fiduciary or contractual relationship with Lowery and that his CPA claim should be dismissed under *Ratcliff.*

The Court is not persuaded. To start, it appears that *Ratcliff* did involve a claim under North Carolina's Unfair and Deceptive Trade Practices Act. *See* 2018 WL 3542865, at *1. (And to the extent that Ford cites *Ratcliff* to address Plaintiffs' fraud-by-omission claims, Lowery has brought no such claim.) Second, the relationship in *Ratcliff* was more distant than the one between Ford and Lowery. The plaintiff in *Ratcliff* sued Ford and another company for selling car parts with asbestos; but Ratcliff did not buy the car or even the car parts; instead, her father repaired cars and she had gone to her father's workplace as a child. *Id.* at *3 & n.3. Third, in limiting the duty to fiduciary and contractual relationships, the court in *Ratcliff* cited

31

*Breeden v. Richmond Community College*. Yet *Breeden* expressly says, "a duty to disclose may also arise in situations where parties are dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, or where one party has knowledge of a latent defect in the subject matter of the dealings about which the other party is both ignorant and unable to discover through reasonable diligence." 171 F.R.D. 189, 196 (M.D.N.C. 1997). Accordingly, Ford has not shown that it did not have a duty to disclose the water-pump defect under North Carolina law.

*Eidson (Texas)*. Ford argues that because Eidson bought his vehicle used (and has not alleged it was bought from an authorized Ford dealer), his CPA claim under Texas law must be dismissed. (*See* ECF No. 45, PageID.2515.) In support of this argument, Ford cites *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004). (*Id.*) There, Marian Armstrong's parents bought a Nissan, and after using it for six years and 90,000 miles, they either sold or gave it to Armstrong. 145 S.W.3d at 134 & n.2. Armstrong then allegedly experienced unintended acceleration leading to an accident. *Id.* The trial court directed a verdict in favor of Nissan on Armstrong's claim under Texas' Deceptive Trade Practices Act (the same act Eidson invokes in this case). The Texas Supreme Court affirmed; it reasoned, "Armstrong obtained her car from her parents six years after they bought it from Nissan; Nissan had no involvement or pecuniary interest in the transaction." *Id.* at 149. Ford thus cites *Nissan* to argue that because Eidson bought his car used, his CPA claim fails for the same reason that Armstrong's CPA claim failed.

Without looking beyond the parties' briefing, the Court agrees with Ford. Eidson's situation is similar to Armstrong's: he bought his Ford vehicle used and, as far as this Court can tell from the complaint, Ford had "no involvement or pecuniary interest in the transaction." *Nissan*, 145 S.W.3d at 149. And while there may be reasons why the *Nissan* court's analysis of Armstrong's Deceptive Trade Practices Act claim is not persuasive, Plaintiffs' response to Ford's motion provides none. In fact, their brief does not address *Nissan* at all. So the Court will dismiss Eidson's CPA claim.

*LaCognata (Illinois)*. Ford cites *Spector v. Mondelez International, Inc.*, 178 F. Supp. 3d 657, 672 (N.D. Ill. 2016), for the proposition that an omission that merely gives rise to an "incomplete"—as opposed to an "affirmatively false"—impression is not cognizable under the Illinois Consumer Fraud and Deceptive Business Practices Act. (ECF No. 45, PageID.2513–2514.) LaCognata has not explained how Ford's failure to disclose that the water pump might fail and damage the engine before 150,000 miles is not simply an "incomplete" impression about his vehicle's durability as opposed to an "affirmatively false" representation about his vehicle's durability. And while Plaintiffs' response brief does cite a case finding that the failure to disclose a defect that poses a safety risk can violate the Illinois Consumer Fraud and Deceptive Business Practices Act (ECF No. 48, PageID.2755), that case did not discuss the distinction between an incomplete and affirmatively false impression. *See Miles v. Am. Honda Motor Co.*, No. 17 C 4423, 2017 WL 4742193, at *4 (N.D. Ill. Oct. 19, 2017). Plaintiffs also cite *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No.

CV 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017), for the proposition that the failure to disclose a defect that presents a safety concern plausibly violates various states' consumer protection acts, including Illinois' CPA. But, as discussed, *Volkswagen* relied on *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 11, 15, 21–22 & 31 (S.D. Fla. Oct. 14, 2016), and *Takata* did not hold that Illinois law imposes a duty on manufacturers to disclose defects that present safety issues. Accordingly, LaCognata's claims under the Illinois Consumer Fraud and Deceptive Business Practices Act will be dismissed.

*Mori (California).* Ford argues that it did not have a duty to disclose the water-pump defect under California's Consumer Legal Remedies Act and Unfair Competition Law. In support, Ford cites *Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006), and *Smith v. Ford Motor Co.*, 462 F. App'x 660, 664 (9th Cir. 2011). (ECF No. 45, PageID.2490.) But *Smith* "center[ed] on the question of whether California law creates a duty to disclose *non-safety related* defects." 462 F. App'x at 662 (emphasis added). And in *Daugherty*, "[t]he complaint [wa]s devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." 144 Cal. App. 4th at 836. In contrast to the allegations in *Smith* and *Daugherty*, Plaintiffs have alleged that the water-pump defect presents "significant safety risks when the Class Vehicles suddenly become inoperable." (ECF No. 42, PageID.1818; *see also id.* at PageID.1869–1875 (reciting incidents of sudden engine failure while driving).) Accordingly, Ford has not shown that Mori's CPA claims should be dismissed at the pleading stage.

*Krow (New Jersey)*. As explained above, Krow's fraud-by-omission or fraudulent-concealment claim will be dismissed because Ford did not have a duty under New Jersey common law to disclose the defect. And the economic-loss doctrine bars Krow's negligent-misrepresentation claim. But Ford makes no separate argument as to Krow's CPA claim, and it is not clear that the grounds for dismissing his common-law tort claims also justify dismissing his statutory CPA claim. The plain language of the statute does not refer to a duty to disclose; it instead prohibits "the knowing . . . omission of any material fact with intent that others rely upon such . . . omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2. Indeed, a case Ford cites states, "concealment or omission of material facts . . . constitute[s] deceptive practices" under New Jersey's CPA. *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 609 (D.N.J. 2016). Accordingly, Ford has not shown that Krow's CPA claim is subject to dismissal.

As a final argument, Ford points out that this Court previously dismissed Plaintiffs' CPA claims and then set out a specific procedure by which the Plaintiffs could reinstate those claims. (ECF No. 49, PageID.2778.) Ford notes that Plaintiffs never followed the procedure, and so they should not be allowed to pursue their CPA claims. (*Id.*)

Plaintiffs' failure to follow the Court's procedure does not warrant dismissal of their CPA claims. This Court previously dismissed Plaintiffs' CPA claims on the grounds that Plaintiffs had not adequately pled that Ford knew or should have known of the water-pump defect. In doing so, the Court set out a procedure by which

Plaintiffs could reinstate a CPA claim if they could show that knowledge was not an element of the claim. Via this opinion, the Court has found that it is plausible that Ford knew of the water-pump defect. As such, the basis for this Court's procedure for reinstating the CPA claims is no longer applicable.

\* \* \*

In sum, Ford has not shown that any of Plaintiffs' CPA claims are subject to dismissal at the pleading stage.

**VI.**

Having addressed Plaintiffs' tort and consumer-protection-act claims, all that remains are Plaintiffs' warranty claims. These, of course, come in multiple varieties. Plaintiffs say that Ford breached the express warranty that came with their vehicles, that Ford breached the implied-warranty of merchantability, and that Ford breach the federal Magnuson-Moss Warranty Act. The Court addresses Ford's efforts to dismiss these claims in that order.

**A.**

Plaintiffs' vehicles came with an express warranty. (Ford argues that its written warranty was not an express warranty but merely a promise to repair or replace parts (ECF No. 45, PageID.2506); the distinction is largely semantic and the Court declines to dismiss all of Plaintiffs' express-warranty claims on this basis, *see Gregorio v. Ford Motor Co.*, — F. Supp. 3d —, No. 20-11310, 2021 WL 778913, at \*14 (E.D. Mich. Mar. 1, 2021).) Under the express warranty, if Plaintiffs properly operated and maintained their vehicle, and if Plaintiffs took their vehicle "to a Ford

dealership for a warranted repair during the warranty period," "then authorized Ford Motor Company dealers [would], without charge, repair, replace, or adjust all parts" on Plaintiffs' vehicles that failed during "normal use." (*See e.g.*, ECF No. 42, PageID.2202–2203.) The "warranty period" for powertrain parts—which includes the water pump—is the lesser of 5 years or 60,000 miles of use. (*See e.g.*, ECF No. 42, PageID.2204.)

In *Roe I*, the Court found that none of the plaintiffs' water pumps broke within the lesser of five years or 60,000 miles. The Court thus reasoned, "[a]s it is not plausible that any plaintiff brought his or her vehicle to a Ford dealer for a water-pump repair within the lesser of five years and 60,000 miles, Ford's express-warranty obligation to repair or replace the water pump was never triggered." *Roe I*, 2019 WL 3564589, at *9. It followed that *if the warranty limits were enforceable*, it was not plausible that Ford breached the express warranty.

Plaintiffs attack the "if" clause; they argue that the five-year, 60,000-mile limitations are unconscionable and thus should not be enforced. Or to be more precise about it, Plaintiffs say the factual allegations of their third complaint give rise to a reasonable inference that the time and mileage limitations are unconscionable such that their express-warranty claims should not be dismissed at the pleading stage.

In support of their unconscionability argument, Plaintiffs cite a number of cases. (ECF No. 48, PageID.2745–2746.) The Court has examined every one of them, and except for maybe *Szymczak*, they all have roots in *Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989). *See Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d

614, 621–22 (M.D.N.C. 2006) (following *Carlson*); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 823 (S.D. Ohio 2012) (following *Carlson*); *Lohr v. Nissan N. Am., Inc.*, No. C16-1023RSM, 2017 WL 1037555, at *6 (W.D. Wash. Mar. 17, 2017) (following *Bussain*, which, in turn, followed *Carlson*); *Duncan v. Nissan N. Am., Inc.*, 305 F. Supp. 3d 311, 319 (D. Mass. 2018) (following *Carlson*); *cf. Szymczak v. Nissan N. Am.*, Inc., No. 10 CV 7493 VB, 2011 WL 7095432, at *10 (S.D.N.Y. Dec. 16, 2011) (discussing *Carlson* and arguably relying in part on *Carlson*).

So the Court starts at the root—which could and perhaps should have been the beginning and end of Plaintiffs continuing to maintain this argument. In *Carlson*, General Motors placed time and mileage limits on its express warranty and extended those limits to any implied warranties as well. Some of the plaintiffs experienced trouble with their engine after their vehicles exceeded the time or mileage limits but argued that those limits were unconscionable under the Magnuson–Moss Warranty Act. The Fourth Circuit agreed. It explained, "proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged durational limitations on implied warranties constituted overreaching, and that the disclaimers themselves were therefore unconscionable." *Id.* at 296 (internal quotation marks omitted). The court continued, "When a manufacturer is aware that its product is inherently defective, but the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power." *Id.* (alterations omitted). In that scenario, said the Fourth Circuit, the buyer's acceptance of any warranty disclaimers is

presumptively not knowing and voluntary, "thereby rendering such limitations unconscionable and ineffective." *Id.* (internal quotation marks omitted).

On the surface, the allegations made by the plaintiffs in *Carlson* are similar to the allegations made by Plaintiffs here. But the Court concludes that it is not reasonable to infer that Ford's time and mileage limitations are unconscionable. At least three reasons support this conclusion.

First, *Carlson* was a pre-*Iqbal* decision and the *Carlson* court made much of the fact that unconscionability was a fact-intensive inquiry not suitable for Rule 12(b)(6) analysis. For instance, the court stated, "unconscionability claims should but rarely be determined on the bare-bones pleadings—that is, with no opportunity for the parties to present relevant evidence of the circumstances surrounding the original consummation of their contractual relationship." *Carlson*, 883 F.2d at 292. It also stated, "if no affidavits, interrogatories, depositions, or evidence of any sort have been submitted regarding the circumstances surrounding the transaction, a court can only speculate as to whether or not a contractual term was unconscionable." *Id.* at 293 (alterations and internal quotation marks omitted). In contrast to *Carlson*'s "discovery first" approach, *Iqbal* teaches that before allowing a plaintiff to "present relevant evidence" or submit "affidavits, interrogatories, depositions," *Carlson*, 883 F.2d at 292–93, he must first allege enough factual matter showing that his claim is plausible, *Iqbal*, 556 U.S. at 686 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."). Indeed, several courts have declined to follow *Carlson* because it seemed to apply a pleading standard less

than what *Iqbal* now demands. *See Alban v. BMW of N. Am.*, No. 09-5398, 2011 WL 900114, at *9 n.8 (D.N.J. Mar. 15, 2011) ("[I]n light of *Bell Atlantic* and *Iqbal*, the Fourth Circuit's logic [in *Carlson*] is no longer persuasive, as conclusory allegations are insufficient to survive a motion to dismiss."); *Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *7 n.5 (E.D.N.Y. Sept. 25, 2015) (following *Alban* and noting "*Carlson* . . . has been criticized by several district courts in light of the Supreme Court's subsequent decisions in *Iqbal* and *Twombly*.").

Second, while *Carlson* rightly found that information asymmetry affects bargaining power, bargaining power is dictated by more than just knowledge. *See Hart v. Louisiana-Pac. Corp.*, 641 F. App'x 222, 228 (4th Cir. 2016) ("[W]e . . . do not read *Carlson* for the broad proposition that the terms of a warranty are necessarily substantively unconscionable solely because one party conceals certain information during the bargaining process."); *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 630 (E.D. Mich. 2019) ("[A] seller's presale knowledge of an alleged defect, standing alone, is insufficient to establish procedural unconscionability." (internal quotation marks omitted)). Aside from knowledge, bargaining power depends on options. And as this Court said in *Roe I*, "Plaintiffs . . . had meaningful choices: General Motors, Toyota, and Kia to name a few. Indeed, around the time when Plaintiffs bought their Ford vehicles, they could have opted for Kia's 10-year, 100,000-mile powertrain warranty." 2019 WL 3564589, at *10. And while this Court surmised that Plaintiffs lacked the ability to haggle with their Ford dealer for warranty terms that were tailored to their particular needs, Ford has since

informed the Court that Plaintiffs had the option to buy an extended warranty for the powertrain on their vehicles (which includes the water pump). So even if Plaintiffs did not know of the water-pump defect but Ford did, they still had quite a bit of bargaining power. *See Smith v. Ford Motor Co.*, 462 F. App'x 660, 663–64 (9th Cir. 2011) (finding warranty limits not unconscionable and explaining "Smith was presented with a meaningful choice, not just the option of purchasing a different vehicle from a different manufacturer, but also the option of purchasing a different warranty with an extended durational limit from Ford.").

Third, while there are courts that have followed *Carlson*, there are also courts that have declined to follow *Carlson* and instead adopted the Second Circuit's reasoning in *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238 (2d Cir. 1986). *See Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015) (following *Abraham*); *Taylor, v. BMW of North America, LLC*, No. CV 20-1994, 2021 WL 1186777, at *9 & n.32 (D.N.J. Mar. 29, 2021) (explaining that "[t]wo lines of cases have emerged" and noting reasoning of *Abraham*).

In *Abraham*, the Second Circuit explained that there is nothing unscrupulous about a manufacturer knowing that a part will usually fail at a certain age or mileage and then setting the warranty period accordingly. The court explained, "Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to 'know'

that many parts will fail after the warranty period has expired." 795 F.2d at 250. Thus, the Second Circuit concluded, "[a] rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage." *Id.*

On the facts of this case, the Court prefers *Abraham*'s reasoning over *Carlson*'s. Ford did not set time and warranty limits on a part-by-part basis or for the water pump specifically. Instead, it promised that it would repair or replace any part in the entire powertrain during the vehicle's first five years or 60,000 miles. This suggests that Ford engaged in the type of business judgment described in *Abraham*—it likely factored in the anticipated costs of repairs during the warranty period in pricing its vehicles. Ford also likely accounted for its competitors' warranties in selecting five years and 60,000 miles. In other words, it is not plausible that the warranty limits were solely based on Ford's knowledge of when the water pump typically failed; indeed, Plaintiffs' complaint suggests that the pump usually lasts 100,000 miles. Thus, as the Second Circuit reasoned in *Abraham*, it appears that Ford "predict[ed] rates of failure of particular parts in order to price warranties." 795 F.2d at 250.

To sum up, the allegations of the third complaint do not permit the Court to reasonably infer that Ford's five-year, 60,000-mile limits on its express warranty are unconscionable. And, as explained, none of the plaintiffs sought repair or replacement of their water pump within the earlier of five years or 60,000 miles. It follows that Plaintiffs' express-warranty claims will be dismissed.

**B.**

Next up are Plaintiffs' claims that Ford breached the implied warranty of merchantability.

As with Plaintiffs' express-warranty claims, in addressing Plaintiffs' implied-warranty claims, the Court does not write on a clean slate. In *Roe I*, the Court found that except for one plaintiff (who has since been dismissed from this case), all of the plaintiffs' implied-warranty claims were barred by the applicable statutes of limitations. The Court explained that Plaintiffs had four years from the tender of delivery to sue for a breach of implied warranty and that "each plaintiff . . . has sued more than four years after their vehicle was first purchased." *Roe I*, 2019 WL 3564589, at *13. Plaintiffs, well aware that Ford would assert the statute of limitations, argued that the four-year clock was tolled due to Ford's fraudulent concealment. *Id.* "But for Ford to have fraudulently concealed the water-pump defect," this Court explained, "it would have to at least have known that the water pumps in Cyclone engines were defective." *Id.* at *14. Because Plaintiffs second complaint had not adequately pled that Ford knew of the water-pump defect, it followed that Plaintiffs "ha[d] not adequately pled equitable tolling." *Id.*

But now, as explained above, Plaintiffs' third complaint does adequately allege that Ford knew of the water-pump defect. So the Court must revisit Plaintiffs' fraudulent-concealment argument.

Identifying the factual allegations relating to Ford's attempts to conceal the water-pump defect is a good place to start. Plaintiffs allege that by design, the defect

is concealed: the water pump is located inside the engine block and cannot be inspected without six hours of skilled labor. (ECF No. 42, PageID.1817–1818.) Plaintiffs' third complaint also highlights Ford's advertising campaign, including the "Build Ford Tough" slogan and Ford's assurance that "safety" is a "top priorit[y]." These statements, say Plaintiffs, "help [Ford] conceal the Defect's existence." (*Id.* at PageID.1850–1853; *see also id.* at PageID.1908.) Plaintiffs further claim that Ford amended its visual-inspection charts in 2009 to remove the water pump; this, say Plaintiffs, was "an attempt to conceal the cost prohibitive—but needed—coolant pump specific inspection tasks." (*Id.* at PageID.1898.) Plaintiffs also allege that "by omitting the water pump from the maintenance schedules," Ford "fraudulently concealed the need for repair or replacement of the water pump before 150,000 miles." (*E.g.*, *id.* at PageID.1916.)

In this Court's opinion, none of these allegations make it reasonable to infer that Ford took *affirmative* actions to prevent Plaintiffs from discovering the water-pump defect.

Consider first the allegations about the pump's design. True, the design of the Cyclone engine probably made it impracticable for Ford owners to discover when their water pumps were nearing failure. But that type of concealment is inherent in the defect, at least as Plaintiffs have defined the defect. In particular, Plaintiffs say that one of the problems with their water pumps is that they are located inside the engine block. If Plaintiffs had external water pumps that failed before the engine's useful life, presumably they would not be claiming a defect. (*See* ECF No. 42, PageID.1830,

1837 (contrasting internal and external water pumps).) So while concealment is inherent in Plaintiffs' definition of the water-pump defect, that does not mean that once Ford was aware of the defect, it took steps to prevent Plaintiffs from discovering it.

Next consider Plaintiffs' allegations based on Ford's advertising and maintenance schedules. The Court has already made clear that Ford's advertisements are both general and classic puffery. *Roe I*, 2019 WL 3564589, at *4. So by saying that its vehicles are "Built Ford Tough," Ford did not, in any meaningful way, dissuade consumers from discovering that their water pumps would not last over 150,000 miles. As for the maintenance schedules, the Court has already explained, "Plaintiffs' theory that Ford, via the maintenance schedule, represented that the water pump would last the useful life of the engine is not plausible." *Roe I*, 2019 WL 3564589, at *3. So the maintenance schedules also did not dissuade Plaintiffs from discovering the water-pump defect.

As for the visual-inspection charts, those too do not show that Ford took affirmative actions to hide the water-pump defect from Plaintiffs. Apparently, Plaintiffs believe that had Ford included the water pump on the visual-inspection charts, a mechanic could have discovered the water-pump defect. But it is a stretch to infer that Ford did not include the water pump on the charts because it was attempting to prevent mechanics (and thus consumers) from discovering the defect. Plaintiffs themselves say that visual inspection of an internal water pump is "cost[] prohibitive." (ECF No. 42, PageID.1893.) So Ford could have eliminated visual

inspection of the pump to save customers money rather than to hide a problem with the water pump. Further, although Ford did not include the pump itself on its visual-inspection charts, it did advise mechanics to check if coolant was in the engine oil. (ECF No. 42, PageID.1899.) That is one of the primary symptoms of the alleged defect. So if Ford wanted to hide the defect, why tell mechanics to look for one of the primary symptoms of the defect? In the same vein, Plaintiffs allege that Ford recently added the water pump back to the visual-inspection chart—again, if Ford did not want mechanics (and thus consumers) to discover the defect, why would Ford now require its inspection?

Thus, the Court finds that Plaintiffs have not adequately alleged that Ford took *affirmative* steps to prevent them from discovering the water-pump defect. At most, Plaintiffs have alleged that Ford knew about the water-pump defect and stayed silent about it.

That determination about the facts leads to this question about the law: Does a defendant fraudulently conceal facts underlying a legal claim by simply staying silent about those facts? Or to toll the statute-of-limitations, does the defendant have to take affirmative steps to prevent the plaintiff from discovering the facts underlying the claim?

The problem for Plaintiffs is that they have not adequately informed the Court how the law answers these questions—let alone how the law of 10 different states answers these questions. *See Reid v. Baker*, 499 F. App'x 520, 526 (6th Cir. 2012) ("[W]hen the court can ascertain from the complaint that the period for bringing the

claim has expired, a plaintiff must affirmatively plead an exception to the limitations statute."). The Court has reviewed the authorities cited by Plaintiffs. (ECF No. 48, PageID.2748–2749.) Among them, only *Abecassis v. Wyatt*, 902 F. Supp. 2d 881 (S.D. Tex. 2012), suggests that silence amounts to fraudulent concealment for tolling purposes. But that case was applying federal common law, not the law of Plaintiffs' home states. *See id.* at 884 (noting that plaintiffs brought claims under the federal Antiterrorism Act). Moreover, in *Abecassis*, defendants "stipulated that they fraudulently concealed from the plaintiffs the facts essential to their claims." *Id.* at 904. So it appears that the dispute was over whether the defendants needed to *continue* to take "affirmative actions throughout the concealment period." *Id.* Only in that context did the court indicate that silence was sufficient for tolling: "A plaintiff claiming fraudulent concealment need not prove that a defendant *continuously* took affirmative actions throughout the concealment period. Fraudulent concealment tolls limitations from *the initial act of fraudulent concealment* until a plaintiff exercising reasonable diligence would become aware of her claim, whether the defendants affirmatively take steps to deny their actions or simply maintain silence." *Id.* (emphasis added). So Plaintiffs' authorities do not show that mere silence amounts to concealment for tolling purposes.

What is the upshot of all this? Fact-wise, Plaintiffs have not adequately pled that Ford took affirmative actions to conceal the water-pump defect; at most, Plaintiffs have alleged that Ford knew of the defect and stayed quiet about it. Law-wise, Plaintiffs have not cited cases indicating that in each of the 10 states for which

they seek to toll the statute of limitations, Ford's silence amounts to fraudulent concealment. It follows that even accepting Plaintiffs' factual allegations as true, Plaintiffs have not shown that the statute of limitations on their implied-warranty claims was tolled due to Ford's fraudulent concealment. Thus—based on the briefing before the Court—Plaintiffs' implied-warranty claims are untimely.

And the Court will not, at this point in the case, permit Plaintiffs to further brief the issue. Plaintiffs have already twice amended their complaint and have twice responded to two motions to dismiss that asserted their implied-warranty claims were untimely, with page limits that far exceed the Court's local rule requirements. In other words, Plaintiffs have had plenty of opportunity to provide the relevant authority.

Moreover, Plaintiffs implied-warranty claims face two other hurdles. For one, Ford points out that it limited any implied warranties to the duration of the express warranty (the lesser of five years, 60,000 miles). (*See* ECF No. 45, PageID.2507; *see also* ECF No. 42, PageID.2159, 2200, 2240; ECF No. 45, PageID.2538, 2578, 2622.) While the case law is mixed, some courts have dismissed implied-warranty claims where the defect manifested outside the express-warranty limits and the implied warranty was subject to those same limits. *Compare Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612, at *9 (E.D. Mich. Mar. 31, 2021) ("Plaintiffs allege that their trucks were 'never fit for their ordinary purpose,' so the question of whether a defect manifested within the warranty period does not arise."), *with Hall v. Gen. Motors, LLC*, No. 19-10186, 2020 WL 1285636, at *11 (E.D. Mich. Mar. 18, 2020)

(finding, where duration of implied warranty was limited to the duration of express warranty, "Plaintiffs . . . sought repairs of their vehicles long after their implied warranties expired"). Other than arguing that the durational limits are unconscionable, Plaintiffs have not engaged with the possibility that their implied warranties had expired by the time their water pumps broke. And at this stage of the case, they should have addressed that issue. As noted, the Court has already addressed a motion to dismiss, and Plaintiffs have already twice amended their complaint and twice responded to a motion to dismiss.

And assuming that Plaintiffs could show that their implied-warranty claims are timely, they would face a third hurdle: merchantability. This Court previously stated that it was plausible that a vehicle that experienced catastrophic engine failure before 75,000 miles was not merchantable. *Roe I*, 2019 WL 3564589, at *12. But there is case law to the contrary. *Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *8 (E.D.N.Y. Sept. 25, 2015) (citing cases and reasoning, "as alleged by Plaintiffs, the Class Vehicles were each operated for over five years (or more) and for tens of thousands of miles before any issues with the Timing Chain Tensioning System arose. . . . As alleged, there simply is no question that the vehicles were fit for their intended purpose for a substantial period of time and use"). And while the Court would not alter its prior *plausibility* finding in light of this case law, there is a fair chance that *discovery* will show that most class members' vehicles were merchantable. Indeed, based on the NHTSA complaints relied on in the most recent

complaint, half the water pumps in Cyclone engines lasted 100,000 miles or more. (ECF No. 42, PageID.1859.)

In short, even if Plaintiffs could establish fraudulent concealment for tolling purposes, their implied-warranty claims might not be viable for other reasons.

That almost wraps the analysis of Plaintiffs' implied-warranty claims. But there is one final issue relating to Mori, the plaintiff from California. In a footnote, Mori argues that California's discovery rule renders his warranty claims under California's Song-Beverly Act timely. (ECF No. 48, PageID.2749.) (Oversimplifying, the Song-Beverly Act enhances express and implied warranties. *See Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 213 (Cal. Ct. App. 1991).) In support of his assertion that under the discovery rule, the statute of limitations did not start until he could have reasonably discovered the breach, Mori cites *Rodarte v. Ford Motor Company*, No. 1810499, 2019 WL 1100150, at *6 (C.D. Cal. Mar. 7, 2019). That case does say that the "delayed discovery rule applies to Song-Beverly Act claims where a warranty explicitly extends to future performance of the goods." *Id.* at *5. But in *Rodarte*, the court also stated that "the delayed discovery rule applies to the warranties on Plaintiff's vehicle because the *express* warranty guaranteed the vehicle for five years or 100,000 miles." *Id.* (emphasis added). The issue here is the timeliness of Mori's *implied*-warranty claim. And the case law is mixed as to whether the discovery rule applies to implied-warranty claims under the Song-Beverly Act. *Compare Tanner v. Ford Motor Co.*, 424 F. Supp. 3d 666, 672 (N.D. Cal. 2019) (applying discovery rule), *with Mandani v. Volkswagen Grp. of Am., Inc.*, No. 17-CV-

07287-HSG, 2020 WL 3961975, at *3 (N.D. Cal. July 13, 2020) (refusing to apply discovery rule). Accordingly, the Court does not find persuasive Mori's cursory invocation of the discovery rule.

The Court concludes that, after three opportunities, the Plaintiffs have failed to show their implied-warranty claims are not barred by the statute of limitations. The implied-warranty claims will thus be dismissed.

### C.

Plaintiffs also bring claims under the Magnuson–Moss Warranty Act. But both sides agree that those claims rise and fall with Plaintiffs' express- and implied-warranty claims. (ECF No. 45, PageID.2511; ECF No. 48, PageID.2751.) Accordingly, the Court will dismiss the Magnuson–Moss Warranty Act claims.

\* \* \*

To summarize the analysis of Plaintiffs' warranty claims, Plaintiffs' express-warranty claims will be dismissed because (1) Ford only promised to repair or replace Plaintiffs' water pumps when Plaintiffs' vehicles were less than five years old and had been driven less than 60,000 miles and (2) each plaintiff sought repair or replacement beyond those limits. Plaintiffs' implied-warranty claims will be dismissed because (1) Plaintiffs did not sue within the four-year statute-of-limitations period and (2) Plaintiffs have not shown that Ford's silence about the water-pump defect amounted to fraudulent concealment that tolled the statute of limitations. And

the parties agree that so go the express- and implied-warranty claims, so go the Magnuson–Moss Warranty Act claims.

<h2 style="text-align:center">VII.</h2>

For the reasons given, Ford's motion to dismiss Plaintiffs' third complaint (ECF No. 45) is GRANTED IN PART and DENIED IN PART. The table below summarizes the claims that remain in this case.

No party is to file any motion until having a video conference with the Court on July 9, 2021 at 2:00 p.m. At the conference, the Court intends to discuss how this case can be managed efficiently, conserving not only counsel's time, but the Court's. The parties are encouraged to come to the conference with creative solutions for making this case manageable for all involved.

SO ORDERED.

Dated: June 21, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

| | Express Warranty | Implied Warranty | Magnuson-Moss | Negligent Misrep. | Fraud by Omission or Fraudulent Concealment | Consumer Protection Act |
|---|---|---|---|---|---|---|
| **Roe (AR)** | Dismissed | Dismissed | Dismissed | No Claim | No Claim | Survives |
| **Mori (CA)** | Dismissed | Dismissed | Dismissed | Dismissed | Survives | Survives |
| **LaCognata (IL)** | Dismissed | Dismissed | Dismissed | Dismissed | Dismissed | Dismissed |
| **Albanesi (MD)** | Dismissed | Dismissed | Dismissed | No Claim | Survives | Survives |
| **Krow (NJ)** | Dismissed | Dismissed | Dismissed | Dismissed | Dismissed | Survives |
| **Lowery (NC)** | Dismissed | Dismissed | Dismissed | No Claim | No Claim | Survives |
| **Schuette (OH)** | Dismissed | Dismissed | Dismissed | Dismissed | Survives | No Claim |
| **Stack (PA)** | Dismissed | Dismissed | Dismissed | No Claim | Survives | Survives |
| **Mogy (TN)** | No Claim | No Claim | No Claim | No Claim | Survives | Survives |
| **Eidson (TX)** | Dismissed | Dismissed | Dismissed | No Claim | No Claim | Dismissed |
| **Christenson (WA)** | Dismissed | Dismissed | Dismissed | Dismissed | Survives | Survives |